AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| MEI XING, | |
| Defendant | |

FILED
CLERK, U.S. DISTRICT COURT

04/17/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DM/BM___ DEPUTY

Case No.    2:20-mj-01724

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of January 2017 to October 2018 in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1591(a) | Sex Trafficking by Force, Fraud, or Coercion |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Alton Richards
*Complainant's signature*

ALTON RICHARDS, Special Agent Federal Bureau of Investigations
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    April 17, 2020

*Judge's signature*

City and state:   Los Angeles, California

HON. JEAN ROSENBLUTH, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Alton L. Richards, being duly sworn, declare and as follows:

## I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant against MEI XING ("XING") for a violation of Title 18, United States Code, Section 1591(a) (Sex Trafficking by Force, Fraud, or Coercion).

2.   The facts set forth in this affidavit are based upon my personal observations, the evidence in this case, law enforcement reports, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant, and does not purport to set forth all of my knowledge of or investigation into this matter, nor set forth all of our knowledge or investigation into all of the targets of this investigation.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND FOR FBI SPECIAL AGENT ALTON L. RICHARDS

3.   I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since July 2014.  I am currently assigned to the Los Angeles Field Office where I have been working on the Violent Crimes Against Children Squad since January 2019.  I am assigned to the multi-agency child exploitation task force known as the Southern California

Regional Sexual Assault Felony Enforcement Team, as well as the Los Angeles Regional Human Trafficking Task Force.  I currently investigate criminal violations relating to child exploitation and sex trafficking involving minors and adults.

4.    During my career as an FBI Special Agent, I have participated in numerous child exploitation and human trafficking investigations.  In addition, I have received both formal and informal training from the FBI and other institutions regarding human trafficking and other sex related crimes, and the methods in which human traffickers coerce, fraudulently induce, and force their victims to engage in commercial sex on behalf of the human trafficker.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.    From July 2016 to October 23, 2018, XING engaged in sex trafficking by force, fraud, and coercion involving at least six victims, including victim Q.D.  In many respects, XING's pattern method of trafficking is similar for each of her victims.

6.    On or about January 2017, XING recruited Q.D. to be a massage therapist at XING's massage parlor located at 9622 Garvey Avenue, South El Monte ("Sunshine Massage").  Shortly after Q.D. was hired, XING fraudulently induced and coerced Q.D. to engage in commercial sex against her will.  On or about May 30, 2017, Sunshine Massage closed.  From on or about June 1, 2017 to October 2018, pursuant to a written partnership agreement, XING co-owned and managed two different massage parlor locations: 2821 Peck Road, Unit E, El Monte ("the Peck

Road Massage Parlor"), and 9611 Garvey Avenue Unit 201A, South El Monte (the "Garvey Avenue Massage Parlor," and together with the Peck Road Massage Parlor, "the Co-Owned Massage Parlors"). XING brought some of her prior victims, including Q.D., to the Co-Owned Massage Parlors to continue providing massages and commercial sex.

7.   When Q.D. told XING that she wanted to stop engaging in commercial sex, XING responded by telling Q.D. (and other sex trafficking victims who wanted to leave XING's employment) that XING would turn them into the police.

8.   XING coerced other victims into performing commercial sex by all manner of threats, including threats to report their prostitution to police, expose their immigration status, and implicitly threats to have them murdered.

9.   XING's threats to Q.D. and other victims induced them to continue engaging in commercial sex acts for the benefit of XING against their will.

10.   XING benefited financially from the victims, including Q.D., when they engaged in coerced commercial sex at the Co-Owned Massage Parlors.

11.   XING's sex trafficking conduct affected interstate and foreign commerce because commercial sex inherently affects interstate commerce, the commercial sex was offered in part at businesses open to interstate commerce, items that moved in interstate commerce were used to facilitate the commercial sex, and instrumentalities of interstate commerce were used to

recruit, maintain, and obtain the victims, including Q.D., for commercial sex with patrons.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

12.  Based on my own investigation in this case, my review of law enforcement reports, my review of the evidence, conversations with other law enforcement officers, interviews with witnesses, interviews with XING,[1] and based on my training and experience, I am aware of the following:

13.  From July 2016 to October 23, 2018, XING engaged in sex trafficking by force, fraud, and coercion involving at least six victims, including victim Q.D.  The below statements do not include statements from all of XING's known victims, nor does it include all of the information in the government's possession.

14.  XING engaged in sex trafficking victim Q.D. by force, fraud and coercion from January 2017 to October 2018.

**A.  Xing Trafficked Q.D.**

1.  <u>XING Hired Q.D. to be a Massage Therapist</u>

15.  On or about January 2017, XING recruited Q.D. to be a massage therapist at Sunshine Massage.  A friend introduced Q.D. to XING via WeChat.[2]

---

[1] Many of the witnesses and XING speak predominately Chinese.  As a result, law enforcement interviews with the victims were translated into English by a Chinese speaking law enforcement officer.  Quotations and statements by the victims and witnesses are predominately, if not entirely, quotations and statements that were translated from Chinese to English.

[2] I know from further investigation using public online resources that WeChat is a Chinese mobile communications application which can be accessed on a digital device.  This application can be used to message other users of WeChat, similar to WhatsApp, Facebook Messenger, and other online

16.  Q.D. believed she was applying for a position as a massage therapist with XING, and was told to go to Sunshine Massage.  A short while later, Q.D. arrived at Sunshine Massage and met XING.[3]

17.  XING did not ask Q.D. whether she was licensed to perform massages, and did not ask Q.D. to fill out any employment forms.  XING told Q.D. that she would be paid $10 per hour-long massage performed, and nothing for half-hour long massages.  XING told Q.D. that she would get to keep her tips, but had to pay XING $15 per week.  Q.D. did not receive an hourly wage.

18.  Q.D. knew she was working illegally because she did not have a massage license, but accepted the position anyway.

19.  For the first day or two, Q.D. performed massages as expected, similar to the majority of XING's victims.

      2.   XING Fraudulently Induces Q.D. to Engage in Unwanted Commercial Sex Acts

20.  After hiring Q.D. to perform massages, XING fraudulently induced and coerced Q.D. into engaging in commercial sex acts against her will.  Before this, Q.D. still believed that her job was to perform non-sexual massages.

21.  On the second or third day after hiring Q.D., XING told Q.D. that her next customer would be a "cop" and "whatever

_____

applications.  WeChat requires internet service to message others, and was developed by a Chinese company, Tencent.  WeChat is a popular application in China.

[3] Q.D. and all of the victims referenced in this complaint positively identified XING by her photo.

the customer tells you to do, do it."  After Q.D. entered the
massage room, the "cop"[4] directed Q.D. to give him manual and
oral stimulation to his genitals.  Q.D. felt as though she had
no choice but to comply because she was illegally working at the
massage parlor without a license and did not want to get
arrested.  Q.D. said the "cop" did not physically harm her, but
he did forcibly hold her down, and she felt like she could not
refuse or leave.

22.  Q.D. later discovered that the sex acts were
commercial sex acts pre-arranged by XING and the "cop" without
Q.D.'s knowledge or consent.

23.  Q.D. also heard from other victims that nobody was
allowed to take money or tips from the "cop" and that the "cop"
tells XING about upcoming law enforcement raids of her massage
parlor.

24.  Q.D.'s experience was similar to multiple other
victims, who stated that their first commercial sex acts were
sexual assaults by customers expecting commercial sex acts that
XING had pre-arranged without the victims' knowledge or consent.

       3.    <u>XING Coerced Q.D. into Remaining a Commercial Sex
Worker</u>

25.  After Q.D.'s first commercial sex act, XING arranged
for Q.D. to perform commercial sex acts with two to three
customers per day.  Q.D. also engaged in commercial sex at
XING's Townhouse located at 305 West Newby Avenue, Apartment J,

---

[4] I refer to this person as a "cop," because that is how the
victim and XING referred to this person.  Thus far this
investigation has not verified that this person is a member of
any law enforcement agency.

San Gabriel, California 91776 ("XING's Townhouse").  XING would
typically arrange the commercial sex acts at XING's Townhouse
directly with the customers via telephone and coordinate with
Q.D. via telephone or in person.

26.  Q.D. felt pressured into performing these commercial
sex acts because XING told her XING had relationships with the
government, the police, and the criminal underworld.  Q.D. was
afraid to leave, and felt safer working for XING than elsewhere
because of XING's aforementioned "relationships."

27.  Q.D. had heard stories from other victims that gangs
may rob or hurt other massage workers, or the police may arrest
people who illegally worked without massage licenses.  However,
because XING did not seem to have gang issues, and appeared to
elude police inspections, Q.D. believed XING had the
"relationships" she claimed.

28.  Furthermore, Q.D. felt she could not make a living if
she did not perform commercial sex acts because XING did not pay
Q.D. a wage for non-sex work.

29.  At one point, XING threatened Q.D. and other women
working at the massage parlor and told them that if they left,
XING would call the police because they do not have massage
licenses.  As a result of this threat, Q.D. was scared to leave.
Q.D. believed that she would be deported if XING called the
police and was discovered working without a massage license.

30.  Q.D.'s experience with XING was not unique.  At least
six other witnesses have come forward and have reported that
XING engaged in similar conduct to coerce victims into

commercial sex.  Some victims reported that XING threatened to turn them into the police or immigration authorities if they stopped performing commercial sex act.  One victim even stated that XING kept pictures of her changing clothes and handling condoms as "proof of prostitution."

4.   XING Threatened to Kill Q.D.

31.  In October 2018, during an argument, Q.D. told XING that she was going to call the police and report XING.  Q.D. subsequently learned that XING said she would spend $2,000 to "buy" Q.D.'s life or "have her head."

32.  Q.D. believed XING was stating her intention to have Q.D. killed.  Q.D. believed XING could carry this threat out because of XING's stated connections to the police and criminal underworld.  As a result, Q.D. fled the state.

33.  Another victim reported that XING explicitly threatened to pay $2,000 to have that victim killed.  XING's threat came after the victim had been sexually assaulted by customers on several occasions and told XING she no longer wanted to engage in commercial sex.

34.  A third victim reported that XING told the victim that XING could have her killed for a couple thousand dollars.

35.  At least five of the seven women to have come forward reported that XING told victims something akin to: you can "buy a life" or "kill someone" for $2,000 dollars.

B.   XING's State Arrest

36.  On October 23, 2018, law enforcement executed a search warrant for XING's Townhouse, the Co-Owned Massage Parlors, and

XING's Mercedes Sedan.  Law enforcement also executed a state arrest warrant for XING.

### 1.   Xing's Townhouse

37.   A witness who lived at XING's Townhouse told law enforcement that XING's employees would come to XING's Townhouse to conduct what the witness believed to be massage business in the third story bedroom.  This witness suspected that the employees were also engaging in commercial sex acts, but that was just the witness's speculation.  The witness described the women as dressed "scantily."

38.   In XING's Townhouse, in the third floor bedroom, law enforcement saw two night stands next to a bed.  In one night stand, law enforcement found SICO condoms[5] and a bottle of lotion.  In the other night stand, law enforcement found a pair of high heeled shoes.  In the bathroom connected to this bedroom, law enforcement found Trojan condoms and condoms wrapped in cellophane, cleaning supplies, oils, and toilet paper.  The bedroom and adjoining bathroom were generally devoid of personal items.

39.   Law enforcement also found over $5,000 dollars cash in what appeared to be XING's bedroom, along with what appeared to be expensive watches, designer bags, and other items.

40.   In her post-arrest interview, XING stated that she only made approximately $3,000 to $4,000 per year, and received $800 per month in child support.  When confronted with the large

---

[5] Based on a search of public online resources, I discovered that SICO condoms are sold by a German company.

amount of cash found in her home compared to her income, XING stated that she did odd jobs, like driving or babysitting. She also stated that people rent a room in her house, but did not provide the name of any tenants and admitted that she did not currently have a tenant.

41.   XING did not explain how she paid for her Mercedes.

42.   XING claimed that the expensive purses, watches, and other items in her house came from her uncle and brother when they came to America. She claims she paid off her townhouse with the sale of her house in China.

### 2.   The Co-Owned Massage Parlors

43.   In both of the Co-Owned Massage Parlors, law enforcement found lotion and condoms.

44.   At the Peck Road Massage Parlor, law enforcement entered and saw a woman open a door and throw a purple lotion bottle which contained several unused and unwrapped condoms inside. Law enforcement also discovered another lotion bottle with a false bottom.

45.   At the Garvey Avenue Massage Parlor, law enforcement found several unopened packages of condoms hidden on top of a piece of wall art. In the main part of the business, law enforcement found several small bottles of toiletries with removable bottoms and unpackaged condoms concealed inside.

### 3.   XING's Mercedes

46.   In XING's Mercedes, law enforcement found four cellphones. Three of these phones were iPhones, and one phone was a T-Mobile Alcatel 786T. According to public online

10

resources, it appears that both Alcatel 786T and the iPhones are all manufactured internationally.

47.   In her interview, XING admitted that she had three phones.   XING stated that the reason she has so many phones is related to the massage business.

### C.   XING's Post-Arrest Attempts to Tamper with Witness Testimony

48.   After XING was arrested by local law enforcement on October 23, 2018, she contacted many of her former victims either directly or through a third party and asked them to provide false testimony to law enforcement.   Thus far, at least four of the seven women to have come forward have reported XING's attempts to tamper with their testimony.

49.   A victim ("Victim 2")[6] told law enforcement that XING contacted her twice to try to figure out who told law enforcement about XING's illegal activity.

50.   Multiple victims reported that XING also asked the victims to pass along XING's threats to another victim ("Victim 1") to dissuade Victim 1 from testifying against XING.

### 1.   XING's Attempt to Discover and Intimidate a Potential Law Enforcement Witness

51.   On November 28, 2018, Victim 2 told law enforcement that XING had contacted her twice trying to discover who had informed law enforcement about XING's criminal conduct.

---

[6] The Victims are numbered based on the how they are identified in law enforcement reports, not in the order in which they appear in this complaint.

52.   Victim 2 received the first call shortly after XING was bailed out of jail.   In the first call, XING questioned Victim 2 to see if Victim 2 knew who the "snitch" was.[7]   XING also discussed the possible people who could have "snitched." Victim 2 estimates the conversation lasted approximately five or six minutes.

53.   In November 2018, Victim 2 received a second phone call from XING in which XING questioned Victim 2 to see if Victim 2 was the "snitch."   Victim 2 reported that she was panicked and felt threatened.

2.   <u>XING Coerced Victim 7 into Providing False Information for XING's Attorney to Record</u>

54.   Another witness ("Victim 7")[8] told law enforcement that defendant coerced her into making a false statements on a recording with XING's defense attorney, and tried to get Victim 7 to have other victims make false statements on XING's behalf.

55.   Victim 7 said that around December 26 or 27 in 2018, XING called Victim 7 and wanted her to tell XING's lawyer that XING did "did not force [Victim 7] to prostitute" and "did not traffic [Victim 7] as a human being" and that Victim 7 had her freedom.

---

[7] Based on my training and experience, the word "snitch" is a derisive term for somebody who provides information to law enforcement.

[8] Victim 7 also told law enforcement that XING got her to smoke methamphetamine at a party in 2017, and Victim 7 has been addicted ever since.   Nonetheless, I believe Victim 7 is a reliable witness.   Victim 7 has provided numerous pieces of information that law enforcement was able to corroborate through other sources or by the physical evidence discovered as part of this investigation.

56.   Victim 7 said she felt uncomfortable making those statements because XING was threatening Victim 1 and was going to hurt Victim 1 for speaking to the police about XING.  Victim 7 was also afraid XING would harm Victim 1's family in China. Victim 7 also said she felt obligated to accede to XING's request because XING is her "godmother,"[9] because XING would threaten her, and Victim 7 was concerned for XING's son, who Victim 7 cared about.

57.   Out of fear and obligation, Victim 7 agreed to XING's request and made the requested recording containing her false testimony with XING's attorney.

58.   For the same reasons, Victim 7 also agreed to solicit recordings of false testimony from other victims on XING's behalf.

59.   Victim 7 later added that she was "very afraid" when XING asked her to provide false testimony because she has known XING for two and a half years and is aware of what XING "is capable of."  At another point in the interview Victim 7 stated that XING had told her in the past, "in America you can buy a life for $2,000 dollars, you can kill someone for $2,000."

60.   According to the Deputy District Attorney L. Christmas Brookens ("DDA Brookens"), XING's defense attorney for her state case told DDA Brookens that he had a video he wished to play at XING's preliminary hearing.  I believe the video XING's attorney referenced is the video of Victim 7's false statements described

---

[9] I do not know if this was intended as a literal statement or a Chinese euphemism.

above.  As of today, law enforcement does not have a copy of this video.

61.  Victim 7 also told law enforcement that XING's friend asked Victim 7 to provide false testimony.  Victim 7 refused to identify the person who made this request.

62.  Victim 7 said that XING's friend contacted Victim 7 shortly after XING was arrested.  The friend asked Victim 7 if she had any data on her phone from the suspect, and directed her to erase it.

3.  <u>XING Attempts to Tamper with Q.D.'s Testimony</u>

63.  Q.D. told law enforcement that, after XING was arrested, XING contacted Q.D. and asked Q.D. to provide false testimony on XING's behalf.  XING wanted Q.D. to say that XING never forced Q.D. to have sex or be a commercial sex worker. XING also wanted Q.D. to convince another victim known as "Niko" to make the same false statement.  Q.D. told law enforcement that XING spoke to Q.D. shortly after XING was arrested, either in November 2018, December 2018, or January 2019.

64.  Q.D. did not provide false testimony nor did she try to convince "Niko" to provide false testimony.

4.  <u>XING's Attempts to Tamper with Other Victims'
Testimony and Threaten Victim 1</u>

65.  Another victim ("Victim 3") told law enforcement that, after XING was arrested, XING told Victim 3 that if she did not provide false testimony to law enforcement, XING would tell the authorities about Victim 3's immigration status.

14

66.  XING also instructed Victim 3 to find Victim 1 and persuade Victim 1 "not to step forward for the good of everyone," and if Victim 1 did step forward, to tell her to "remember her family members in China."

67.  Another victim ("Victim 5") told law enforcement that a third party relayed a message that was purportedly from XING. According to the third party, XING did not want Victim 5 to testify, and asked her to go to court and provide false testimony that Victim 5 was not trafficked.  Victim 5 refused. The third party then asked Victim 5 to tell Victim 1 not to testify, saying "think about the safety of your family in in China."

### D.   XING's Stated Plan to Flee

68.  XING told Victim 7 that if XING cannot win her court trial, she would escape and go back to China.  Victim 7 then expressed concern about Victim 7's own eight-year-old son in China if XING was able to flee back to China.

69.  In her post-arrest interview in October 2018, XING told law enforcement that she intends to go back to China once her son graduates from his current school.

70.  On or about March 27, 2020, defendant sold her townhouse, which she owned in her name.  As of today, I am unaware if XING has purchased a corresponding residence.

### E.   XING's Plan to Take Revenge

71.  XING also told Victim 7 that she had 10 million yuan, (approximately $1.4 million USD) in China, and if she goes to

jail she will use that money to seek revenge against anybody who wronged her.

72.  Victim 1 independently told law enforcement that XING bragged to victims that she has 10 million yuan in two properties in China.

73.  XING told another victim, if XING is convicted to a sixty-year term, she would not forget those that did not help her.

## V.  CONCLUSION

74.  For all the reasons described above, there is probable cause to believe that XING has committed a violation of Title 18, United States Code, Section 1591(a) (Sex Trafficking by Force, Fraud or Coercion).

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  17th day of
April, 2020

_____
UNITED STATES MAGISTRATE JUDGE
HON. JEAN ROSENBLUTH