**1**

1          UNITED STATES DISTRICT COURT
       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
2        HONORABLE OTIS D. WRIGHT, U.S. DISTRICT JUDGE

3
UNITED STATES OF AMERICA,
4
                    Plaintiff,
5
    v.                              Case No.
6                                   2:20-cr-00228-ODW
MEI XING,
7
                    Defendant.
8  _____

9

10            REPORTER'S TRANSCRIPT OF PROCEEDINGS
                  JURY TRIAL - DAY 1
11                  MAY 17, 2022
                     8:00 A.M.
12              LOS ANGELES, CALIFORNIA

13

14  APPEARANCES:

15  FOR THE PLAINTIFF:      MS. DAMARIS M. DIAZ
                            MR. SCOTT M. LARA
16                          Assistant United States Attorneys
                            312 North Spring Street, 13th Floor
17                          Los Angeles, California 90012

18  FOR THE DEFENDANT:      MS. NEHA A. CHRISTERNA
                            MS. CALLIE G. STEELE
19                          Deputy Federal Public Defenders
                            321 East 2nd Street
20                          Los Angeles, California 90012

21

22  _____

23            JUDY K. MOORE, CRR, RMR
           FEDERAL OFFICIAL COURT REPORTER
24           350 WEST 1ST STREET, #4455
           LOS ANGELES, CALIFORNIA 90012
25                213.894.3539

1          (Proceedings commenced at 9:30 a.m.)

2          THE COURT:  Calling Case Number 1, United States

3  versus -- how do you pronounce your client's last name?

4          MS. CHRISTERNA:  Xing.

5          THE COURT:  -- versus Mei Xing, Case Number

6  CR20-00228.  We certainly have not picked a jury yet, but

7  appearances of the record, beginning with the Government,

8  please.

9          MS. DIAZ:  Good morning, your Honor.  AUSA Damaris

10  Diaz and Scott Lara on behalf of the United States.  Also at

11  counsel table is FBI Special Agent Corrie Lyle.

12          THE COURT:  Thank you.

13          MS. CHRISTERNA:  Good morning, your Honor.  Neha

14  Christerna and Callie Glanton Steele on behalf of Mei Xing, who

15  is present and being assisted by the Mandarin interpreter.

16          THE COURT:  All right.  Good morning.  I understand

17  the defense would like to make a motion.

18          MS. STEELE:  Yes, your Honor.  I would like to note

19  for the record that Ms. Xing is shackled at counsel table.  We

20  are making a motion to have the shackles taken off during the

21  jury trial.  The jury may hear the shackles and know that she's

22  shackled.  It restricts her movement.  It also affects her

23  ability to assist counsel, in violation of the 6th Amendment.

24  So, your Honor, we would ask that the shackles be removed.

25          Not only that, the 9th Circuit case *Howard*

1  specifically states that the Court must make an independent

2  determination as to whether or not any restraints are

3  necessary.  This is especially -- oh, I'm not sure she can

4  hear.

5          THE DEFENDANT:  I cannot hear.

6          MS. STEELE:  Your Honor, you know, I'm going to

7  repeat because Ms. Xing was unable to hear.

8          We are going to make a motion to have the shackles

9  removed.  Ms. Xing is shackled at her ankles.  During a jury

10  trial, this is extremely important that she not be shackled.

11  The jury might hear the shackles and know that she's in

12  custody.  It also restricts her movement and it restricts her

13  ability to assist counsel, in violation of the 6th Amendment.

14          In addition, the *Howard* case, the 9th Circuit case,

15  specifically states that an accused -- the accused should not

16  be restrained without an independent determination that it's

17  necessary.  Ms. Xing has no history of violence or escape or

18  anything of that sort.  It is not necessary for her to have

19  shackles on, especially during her jury trial, and we would

20  move that they be removed.

21          THE COURT:  All right.  That isn't going to happen,

22  and I'd be curious to hear how her being shackled at the ankles

23  will interfere with her ability to assist in her defense.

24          MS. STEELE:  Your Honor, if someone is restricted in

25  their movement, just for the record, Ms. Xing is very involved

1  in her case.  She's very --

2          THE COURT:  Just answer my question.  How is being

3  shackled at the ankles hindering her ability to assist you in

4  her defense?

5          MS. STEELE:  Your Honor, when you're restrained, it

6  has -- it can affect you psychologically.  You are sitting in a

7  courtroom facing a life sentence and your ankles are

8  restrained.  It's not necessary, and I believe that it would

9  affect her in her ability to assist us.

10          THE COURT:  In what way?  Because you believe.  I

11  mean, you don't know this for a fact.  You just -- well, you're

12  just making an argument.

13          I want to tell you something else that I'm worried

14  about.  And I've been worried about it since we moved into this

15  building.  I'm worried about the layout of this building, that

16  a few feet outside that door is an abyss, and I am scared to

17  death that some defendant facing a long sentence is going to

18  make a break for it and throw themselves over that very low

19  railing to their death.  And for what?  Because you're worried

20  about noise?  I'm going to tell you something.  This place was

21  designed as a courtroom, and this is why the fronts of counsel

22  table are blocked off.  The jury can't see a thing.  In fact, I

23  doubt that the jury can hear anything.  You've made your

24  record.  The answer is no, it will not happen.

25          MS. STEELE:  Your Honor, if I may just state --

1          THE COURT:  Pardon me?

2          MS. STEELE:  I just wanted to state that there are

3    marshals stationed --

4          THE COURT:  I know what's in the court.  Okay?  Let

5    me explain something else, too.  Going forward, here's the way

6    this is going to operate:  There will be argument.  Sometimes

7    I'll hear from both sides.  And then the second stage starts.

8    That's where I make a ruling.  After that, we move on to

9    something else.  Don't make me have to repeat this in front of

10   the jury.  Okay?

11         MS. STEELE:  Your Honor, if I may just be heard.

12   The Court stated that there is an abyss outside in the hallway,

13   and I just wanted to state for the record, for the appellate

14   court, that there are marshals stationed in this courtroom.

15   Ms. Xing, if the Court is afraid that she's going to run and

16   jump into the abyss, there are capable marshals stationed

17   between her and the door.  Thank you.

18         (Off the record.)

19         THE COURT:  Go right ahead.

20         MS. DIAZ:  Your Honor, we wanted to confirm that

21   witnesses would be excluded and we would ask that the case

22   agent be permitted -- the case agent, FBI Special Agent Lyle,

23   be permitted to sit at counsel table.

24         THE COURT:  If that's your request, that's

25   permissible.

1          MS. DIAZ:  And then we also want to note that there

2     are Crime Victims Rights Act, and so we ask that the Court

3     exclude witnesses except those that cannot be excluded under

4     the Crime Victims Rights Act.  I don't know that any victims

5     are in the courtroom.  Victims' counsel is here, but no victims

6     are in the courtroom.

7          MS. CHRISTERNA:  We have no witness --

8          THE COURT:  So it's a non-issue.

9          MS. CHRISTERNA:  We have no witnesses here in the

10    courtroom, your Honor.

11         THE COURT:  Okay.  Good.

12         MS. DIAZ:  The Government has produced a 902(11)

13    certificate, business records, produced in discovery over the

14    course of the past several years.  Last week we gave notice of

15    our intent to introduce documents pursuant to those

16    certifications, and we have received no objection, so we wanted

17    to let the Court know that there are certain documents that

18    would be admitted pursuant to those certificates.

19         THE COURT:  Okay.

20         MS. STEELE:  Your Honor, we just need to confer with

21    counsel.  We have not indicated there's no objection.

22         THE COURT:  I'm sorry.  You did what?  You were

23    given notice, you filed no objection, and what is it now?

24         MS. STEELE:  Your Honor, they gave us also a -- I

25    can't remember how many pages of a translation that we had to

1   have translated in Mandarin, which we had to have reviewed,

2   which we just got reviewed.  So we're trying to address those

3   things with the Government because we just got word back from

4   our interpreter as to what the discrepancies are.

5           MS. DIAZ:  This is separate from the 902(11).

6           MS. STEELE:  Would you please indicate which exhibit

7   it is?

8           MS. DIAZ:  So the business records admitted pursuant

9   to 902(11) will be...  And these are not translated.  Some of

10  them are in English.

11          MS. STEELE:  Your Honor, I believe that this can be

12  addressed after we pick the jury.

13          THE COURT:  I would think so.  If these are

14  certified records, I don't understand what the deal is.

15          MS. DIAZ:  We just wanted to note that we have given

16  defense notice, they have not raised an objection to the

17  certified records.

18          THE COURT:  All right.  So when you have time to go

19  over this with your client, if there's an issue, then let us

20  know, and we'll deal with it after we get a jury selected.

21          MS. DIAZ:  One thing is that we are confident that

22  the defense will not raise matters excluded related to Rule

23  412, but in the event that it is raised, we will object and ask

24  the Court for the limiting instruction that we provided to the

25  Court and to the defense.

1          THE COURT:  Thank you.  I saw the limiting

2   instruction, and I'm going I know I'm losing it, but didn't we

3   talk about 412?

4          MS. DIAZ:  We have.

5          THE COURT:  Okay.  All right.  Good.

6          MS. STEELE:  Your Honor, we did -- we do -- with

7   respect to witnesses being excluded, we'd ask that our

8   investigators be allowed to be in the courtroom.  They would

9   only testify if there is some sort of discrepancy in one of the

10  witness' testimony and they have to testify as to what the

11  witness said at a different time.  But just as they have their

12  case agent, we would like to have our investigators.

13         THE COURT:  Have you ever used a court reporter

14  before?

15         MS. STEELE:  I talk too fast.  Yes, I have.  For 30

16  years I have, yes, your Honor.

17         THE COURT:  I don't know.  What's the Government's

18  view?  It's different from a party or a party representative,

19  and I don't like the -- I don't like this caveat that it may be

20  necessary for the investigator to testify.  Now, if you want

21  the investigator here because there may be some need to press

22  the investigator into service as an investigator during the

23  course of the trial, that's one thing, but to anticipate

24  already in advance of anyone testifying that your investigator

25  may be called upon to testify and you would like the

1    investigator to stay in the courtroom throughout the trial --

2           MS. STEELE:  No, your Honor, that wasn't the

3    purpose.  It was the first, what the Court stated to begin

4    with, that the investigator might have to perform their

5    investigative services.  I'm not asking that they be here so

6    that they can testify.  I'm saying that we would like them to

7    be able to be present in the courtroom just like the case

8    agent.  Sometimes the Government calls the case agent even

9    though the case agent has been sitting through all the

10   testimony.  We would like to have the same for our

11   investigators, that they be allowed to be in the courtroom but,

12   if necessary, they have the same exception as the Government --

13          THE COURT:  Don't try to compare the two.  They're

14   not the same.  Now, you're anticipating using -- having your

15   investigator testify?

16          MS. STEELE:  No, not at this time.

17          THE COURT:  Not at this time?  Okay.  Government

18   have a feeling about this one way or the other?

19          MS. DIAZ:  We would not object to an investigator --

20          THE COURT:  Okay.  Fine.

21          MS. DIAZ:  But we do take issue with the idea that

22   the investigator is here to watch the witnesses and then later

23   testify about in-court testimony.

24          MS. STEELE:  That's not the -- that's not the

25   purpose, your Honor.

1        THE COURT:  You are intentionally leaving the door

2  open for this investigator to testify, and it does give me

3  pause.

4        MS. STEELE:  Your Honor, the investigator has taken

5  pictures, spoken to witnesses, done their -- you know, worked

6  as an investigator --

7        THE COURT:  And turned over that work product to

8  you.

9        MS. STEELE:  That's correct.

10        THE COURT:  That should be it, right?

11        MS. STEELE:  No.  Sometimes we have to present

12  something to the jury, sometimes we have to lay the foundation,

13  so we might have to call the investigator to say, "Did you go

14  to this location?"

15        THE COURT:  Okay.  All right.  I'll tell you what.

16  There is the possibility that I'm not going to permit it, so --

17  but if that's what you want to do, go ahead.

18        MS. STEELE:  I don't understand that ruling, your

19  Honor.

20        THE COURT:  All right.  You want the investigator to

21  remain in the courtroom.  I will go ahead and permit it, with

22  the understanding that you're basically telling me that there's

23  a likelihood that you're going to use your investigator to

24  testify as a witness of some sort.  I am telling you that there

25  is also a likelihood, or at least a possibility, that I'm not

1   going to permit your investigator to testify.

2          MS. STEELE:  Your Honor, we would object to that

3   ruling, respectfully.

4          THE COURT:  Whatever.

5          MS. STEELE:  Your Honor, also, we have an expert

6   that the Court has precluded.  We have filed -- and we don't

7   have to address it now, but we're filing a motion for

8   reconsideration and we would --

9          THE COURT:  On what grounds?

10          MS. STEELE:  Your Honor, at the time that the --

11   sorry.  At the time that the expert provided her opinion, she

12   had not looked at the --

13          THE COURT:  No.  No.  What grounds are you seeking

14   reconsideration?

15          MS. STEELE:  There's additional information.

16          THE COURT:  That did not exist when we talked about

17   this a couple of days ago?

18          MS. STEELE:  Yes, your Honor.  Yes.  The Government

19   did not -- on May 6th when we appeared last, the Government --

20   I don't believe that the Government had the -- and I can't even

21   remember the timing of it, but I don't think that they even had

22   our expert's report yet.  I believe that the report was

23   received probably after that because the -- on the 9th, the

24   expert was able to review the T visa applications, and

25   following -- I think that we had given them a summary of the

1    expert's testimony, which was just a summary, but then the

2    expert had a chance to review the T visa applications.  I

3    believe -- and I don't remember the exact timing -- that the

4    Government then filed a motion to preclude the use of the

5    expert and the Court granted it.

6         Since that time, we filed a motion to compel the

7    Government to provide Brady information, which was the asylum

8    applications.  The Court granted that motion yesterday.

9    Yesterday, the expert was able to go and look at the asylum

10   applications, so now the expert has had an opportunity to look

11   at, not just the T visa applications, but also the asylum

12   applications, compare them, and has rendered an opinion, which

13   is in the document that we filed this morning.  I apologize for

14   filing it this morning, but the expert just looked at it last

15   night and then worked on the report all night so that we could

16   file it this morning.

17        THE COURT:  Okay.  I don't understand why the expert

18   is -- okay.  My understanding is that throughout this case you

19   have had the opportunity to review all of this immigration --

20   all these immigration documents, right?

21        MS. STEELE:  No, your Honor.  There was a time on

22   the 6th when the Government refused to let us look at the --

23        THE COURT:  All right.  Let me be clear.  You've

24   never had the documents in your possession, but you've had the

25   ability to review them on occasion; is that right?

1    MS. STEELE:  Correct, your Honor.  Sometimes they're

2    redacted.  We've had to ask for some things to be unredacted.

3    THE COURT:  When you conducted your review, did you

4    have your investigator with you?

5    MS. STEELE:  Are you talking about the investigator

6    or the expert?

7    THE COURT:  I'm sorry.  Your expert.

8    MS. STEELE:  The last few times, I did have the

9    expert.

10   THE COURT:  So my question again is, what has

11   changed which would give rise to a motion for reconsideration?

12   MS. STEELE:  There are new facts, your Honor.

13   THE COURT:  But the facts apparently were in

14   existence.

15   MS. STEELE:  The Government didn't allow the expert

16   to look at the asylum applications.  When I asked for the

17   Government --

18   THE COURT:  Did you see the asylum applications?

19   MS. STEELE:  I did, your Honor, but --

20   THE COURT:  And the expert was with you when you saw

21   the --

22   MS. STEELE:  No, your Honor.  When the expert was

23   with me, they only showed us the T visa applications.  The A

24   file consists -- these A files consist of two segments.

25   THE COURT:  Okay.

1          MS. STEELE:  The asylum application that happened in

2     2015 where they said "I can't go back to China for these

3     reasons," and in 2019, the T visa -- T visa applications where

4     they said "We can't go back to China because of trafficking."

5          THE COURT:  All right.  Here's the deal:  One of the

6     things that hasn't changed is this is a -- I'm not going to

7     call this a tangential issue because you indicated it goes to

8     credibility because these people have used a number of aliases

9     and they have given a number of different justifications for

10    leaving China and you think this goes to their credibility, and

11    you're absolutely entitled to bring that up.  But what I'm

12    hearing now is something that's going to take a day.

13         MS. STEELE:  No.

14         THE COURT:  You don't need an expert to say that on

15    such-and-such an occasion, with respect to such-and-such an

16    application or government document, you listed your name as

17    whatever and how that wasn't true and that you're giving

18    conflicting reasons for why you left China.  Both of them can't

19    be true.  Now, tell me why I need an expert.  Why do I need to

20    hear an expert offer an opinion with respect to conflicting

21    factual information?

22         MS. STEELE:  Well, your Honor, one of the --

23    according to the discovery that's been provided, the witnesses

24    are going to testify that they applied -- or there's going to

25    be evidence that they applied for T visas.  They worked for Ms.

1  Xing and then they claimed that she forced them and then filed

2  T visas saying "I was forced, coerced into providing sex work,"

3  essentially.  So the Court at our last hearing said, what's a T

4  visa?  Most people don't know what a T visa is.  Until you have

5  a case like this, you don't know what a T visa is.  A T visa is

6  a visa for people who have been trafficked or had some kind of

7  labor violation.  So these witnesses, when they -- many of them

8  need to adjust their status, they want to become legal

9  permanent residents.  They claim that they were trafficked by

10  Ms. Xing and then they applied for T visas.  And one of them

11  specifically says, "I was trafficked to get here."

12          THE COURT:  Are you saying -- oh, I think I'm

13  understanding now.  It's not just merely the assertion that

14  they've been giving conflicting information; it's -- you're

15  saying that the motivation for accusing your client, the

16  defendant here, is to upgrade their legal status in this

17  country?

18          MS. STEELE:  Yes, your Honor.  So under --

19          THE COURT:  Okay.  All right.

20          MS. DIAZ:  Your Honor, may I be heard?

21          MS. STEELE:  I haven't finished.

22          THE COURT:  Yes.

23          MS. STEELE:  Under Rule 702, your Honor, it

24  specifically states that "A witness who's qualified by

25  knowledge, skill, training, or education" --

1          THE COURT:  I understand about experts.  Thank you.
2  I'm looking for the justification.  You provided that.  Thank
3  you.
4          MS. STEELE:  Thank you, your Honor.
5          THE COURT:  Yes?
6          MR. LARA:  Your Honor, to be clear, in the middle of
7  2021, the Government provided access to the immigration
8  records, the complete files, and defense -- prior defense
9  counsel came to the U.S. Attorney's Office and reviewed those
10 files.  Earlier this year the Government produced to the
11 defense redacted copies of the T visa applications, which may
12 be relevant because they discuss the trafficking by the
13 defendant.  There are four victims who applied for T visas, one
14 who was already a lawful permanent resident at the time of this
15 conduct, three --
16         THE COURT:  Wait, wait, wait.  So with respect to
17 that one, there was no incentive?
18         MS. DIAZ:  Correct.
19         THE COURT:  Okay.
20         MS. DIAZ:  Three of the four victims who did apply
21 for T visas also had previously applied for asylum.  So one of
22 the victims has a T visa application, no prior asylum
23 application.  The asylum applications talk about their travel
24 from -- why they left China.  The T visa applications discuss
25 what happened to them in the United States.  They are not

1  contradictory.

2           THE COURT:  Okay.  All right.  Fine.

3           MS. DIAZ:  So with regard to access, just so it's

4  clear on the record, multiple times in the past several weeks

5  defense has come to the U.S. Attorney's Office to inspect the

6  entire A file.  The night before the hearing on May 5th, they

7  disclosed for the first time an expert witness.  At the Court's

8  hearing, the Court ruled that those historical immigration

9  files, the ones that pre-date the T visas, were excluded in

10  response to the Government's motion in limine.  The Court also

11  orally excluded the defense's expert.

12           Over the weekend, we had a disagreement over what

13  the Court's rulings were, so on Monday morning the Government

14  filed a motion to preclude the expert for the reasons stated on

15  the record in court on Friday and also citing legal support

16  which shows that these historical immigration documents are

17  irrelevant and should not be admissible in this trial.  The

18  Court granted that motion excluding the expert.  So it's the

19  Government's position that the historical immigration records

20  have been excluded, the --

21           THE COURT:  All right.  Anything --

22           MS. DIAZ:  -- the expert has been precluded because

23  it's been determined to be not helpful to the jury and not on a

24  matter that's relevant.

25           THE COURT:  I want to get to that part right now,

1  but you're right, everything that pre-dated the T visa

2  applications, it's out.

3         MS. DIAZ:  And then -- I'm sorry.  Since that time,

4  we have given the defense counsel -- because of that order and

5  those rulings, we did give the defense counsel and their

6  experts access to the unredacted T visas because we felt those

7  were probably going to be discussed in trial, and even if their

8  expert couldn't testify, we wanted to give the expert access so

9  they could consult and advise the defense counsel for their

10 arguments and for their questioning.  So defense counsel came

11 and reviewed the T visas.

12         Once the Court ordered us to provide the defense

13 expert access to the entire file yesterday, we gave them

14 access, and they came and reviewed.  And then this morning we

15 got a report.  So for all the reasons previously stated, also,

16 the late notice, we would again ask that the Court preclude the

17 expert from testifying and especially preclude the historical

18 immigration records from even being referenced in court.

19         THE COURT:  Those are out.  All right?  But I am

20 interested in the T visas because an argument could be made

21 that there is a motive to blame someone.

22         MS. DIAZ:  Correct.  And that can be made.

23         THE COURT:  Well, yeah, I don't know that -- well,

24 the only reason I can see you need an expert for that is

25 someone's got to explain this concept to the jury.  Now, I

1   don't know anything about T visas, all right?  So someone needs

2   to do that, but not much more than that, because the documents

3   are the documents.  All right?  And counsel can make their

4   argument with respect to it is the -- to bolster the T visa

5   application that these assertions are being made against the

6   defendant.  Fine.  Do that.  How long do you think it will take

7   to do that?

8            MS. STEELE:  Not long, your Honor.

9            MS. CHRISTERNA:  Not long.

10           THE COURT:  I know.  Okay.  Okay.  All right.  I've

11  got an amount of time in my head, and 15 minutes is it.  And,

12  seriously, you can bring the expert in here because I think it

13  would be helpful to the jury to at least somewhat explain what

14  a T visa is and what kind of information is on it.  And then,

15  of course, you can make your argument with respect to, in order

16  to help fill out these blanks, they had to point the finger at

17  someone and allege that they were trafficked.  Okay?  And

18  that's why we're here.  That is not going to take a long time,

19  and I will not give you a long time to make that point.  I hope

20  I'm being clear.

21           MS. STEELE:  Yes, your Honor.  And I just wanted to

22  clarify the Court's ruling.  The Court at the -- my

23  understanding, at our May 6th hearing, the Court indicated that

24  we could bring up information that's in asylum applications,

25  such as aliases, inconsistent statements.  Even though we could

1    not bring in the asylum applications, we could still refer to

2    information and statements that were made in the asylum

3    applications.

4           THE COURT:  Here's the way I want you to do this:

5    Because you can just simply ask.  And if you're specific, then

6    you have a much better chance of getting the answer you want to

7    know.  But if different names have been used on applications,

8    government applications, that's -- certainly that's fair game.

9    If different rationale has been given for someone leaving

10   China, you say it's one thing on one application and you give a

11   different excuse for the same exit on a different application,

12   yes, you can ask those questions.  How long is that going to

13   take?

14          MS. STEELE:  Not long.

15          THE COURT:  Okay.  But, see, the thing is, we're

16   here for a trial for the violation of one statute -- well, and

17   2(A).  All right?  And I want to keep our focus there.  Now, if

18   you want to attack the credibility of the complaining

19   witnesses, fine, but I don't want to spend all day because if

20   you spend too much time on it, then we start losing focus of

21   what this trial is about.  Because, by the way -- and there's

22   something else I was going to talk to you folks about -- we

23   bring these people in, they don't know much about this case

24   other than that joint statement that you all have prepared and

25   did a good job, thank you, and then they start hearing stuff,

information, and they don't know what to do with this

information.  And then at the very end of this thing, we give

them a quiz.  We never told them what they were supposed to be

listening for, what's important.  And then we start -- we're

going to fill their heads with all of this stuff, and they're

going to wonder "is this an immigration case" after a while.

No, you're not going to do that.  You're going to

get to the point.  And if you want to preface it with "the only

reason I'm going into this inquiry is there seems to be some

inconsistency in some of the reports that you filled out and

these are government -- official government forms.  There seems

to be some inconsistency here, and the only reason I'm asking

you is we want to know just how believable you are.  How much

stock can we place in your testimony here today when on

such-and-such a date you said this on this official government

form?  And then on such-and-such a date later you said

something else."

I don't need an expert for that, you don't need an

expert for that.  The only thing we need an expert for is to

explain to us what a T visa is.  All right?  And move it along.

I have some concern over these people's time.  I also have some

concern over not muddying the waters to the point where nobody

understands what it is that we're trying to -- the point that

we're trying to make.  Anyway, what?

MS. STEELE:  I just wanted to clarify for the

1  record, your Honor, because the Government indicated that they

2  had made the T visas available for quite sometime.  I just

3  want, just for the record, the Government made redacted T visas

4  available and they gave us redacted T visas.  When the Court

5  ruled that we could see the asylum applications, they gave us

6  the whole A file with no redactions.  In the past, we had been

7  tagging things with Post-Its, saying, can you unredact this,

8  can you unredact that -- oh, sorry.

9            THE COURT:  It doesn't matter, dear.

10           MS. STEELE:  I just want the record to be clear.

11           THE COURT:  These things don't matter.  This is all

12  ancillary stuff.

13           MS. STEELE:  It is, your Honor, but it makes it

14  sound like we've had these documents and we just haven't been

15  looking at them.  We've been saying, can you unredact this, can

16  you unredact this, and yesterday they finally did.

17           THE COURT:  Okay.

18           MS. STEELE:  So that's all I wanted to make -- the

19  point I wanted to make for the record.

20           THE COURT:  Okay.  Nah, nah-nah, nah-nah, nah.

21  Okay.  Fine.

22           Yes, please?

23           MS. DIAZ:  Just for the record, impeachment by

24  extrinsic evidence is not allowed.  We will raise the objection

25  if and when the defense counsel tries to impeach with

1  statements from the prior asylum applications.

2        THE COURT:  I think what they're seeking, which is

3  the best thing, they're going to get an admission that they

4  used such-and-such a name on such-and-such a date or time

5  period and then on a different time period they used a

6  different name.  And they used one explanation for why they

7  left China on -- in connection with this application and then

8  used a different rationale later on.  We don't really need any

9  documents.  Okay.

10        MS. STEELE:  Your Honor, just one other thing.

11        THE COURT:  What is this?  This is like a thing to

12  see who's going to go last.

13        MS. STEELE:  No, it isn't, your Honor.  The reason I

14  stood up originally is because the Court indicated that

15  witnesses would be excluded.  We are asking --

16        THE COURT:  You asked for that.

17        MS. STEELE:  There's another issue.  Our expert, we

18  would ask that the expert be allowed to be present during the

19  testimony of the witnesses.

20        THE COURT:  Yes.

21        MS. DIAZ:  If the expert is only here to talk about

22  what a T visa is.

23        THE COURT:  Yes.

24        MS. DIAZ:  There's no need for her to watch the

25  victims testify.

1          THE COURT:  It doesn't matter.  The expert's
2    testimony really is going to be limited to explaining to the
3    jury about T visas, and then I'm going to excuse them.  Okay?
4    They don't believe it, but they will.
5          MS. DIAZ:  The expert will not be allowed to opine
6    on the credibility of the victims?
7          THE COURT:  No.  That's their job.
8          MS. DIAZ:  Right.
9          MS. STEELE:  Your Honor, my question is, may the
10   expert be present during the testimony because the expert is
11   advising us --
12         THE COURT:  I don't care, because the expert is only
13   going to testify about the T visa.
14         MS. STEELE:  Very well, your Honor.
15         THE COURT:  And then they can leave if they want,
16   because I'm sure you're paying them by the hour.
17         MS. STEELE:  That's correct.
18         (Jury pool in.)
19         (Jury pool sworn.)
20         COURTROOM DEPUTY:  Thank you.  Please be seated.
21         THE COURT:  We have not had this many people in here
22   in over two years.  First thing that occurs to me is this:  I
23   want you to do, all of you, individually, I want you to do
24   whatever you feel you need to do in order to make yourself
25   comfortable.  We have face shields, we've got Hazmat suits,

1  we've got whatever it is that will make you comfortable.  Okay?

2  Please.

3       All right.  I'm going to start with this, which is,

4  when I get called for jury duty -- yes, I get called for jury

5  duty -- this does not indicate that I threw it in the trash.  I

6  fill it out, I show up.  I never get called, but I show up, and

7  that's what you all have done, and we appreciate that.  Thank

8  you.  It's a pain in the butt, but it is our civic obligation.

9  So when I do get called, the first thing I do is go down to the

10  courtroom and look at the calendar to find out what kind of a

11  case it is because I'm nosey that way.  The lawyers here have

12  jointly prepared a statement of what this case is about so that

13  you'll know, you know, is this a patent case?  We don't do

14  anything that boring here.

15       All right.  In summary, the Government alleges in

16  the first superseding indictment that at various time periods

17  from July 2016 through October of 2018 in Los Angeles,

18  California, defendant Mei Xing engaged in sex trafficking

19  whereby Ms. Xing knowingly recruited, enticed, harbored,

20  transported, provided, obtained, and maintained Victims 2, 3,

21  4, 5, and 6 to engage in prostitution activities, resulting in

22  a financial benefit to Ms. Xing.  The Government alleges that

23  Ms. Xing used a means of force, fraud, and/or coercion, or any

24  combination of those means, to cause Victims 2, 3, 4, 5, and 6

25  to work for her as a prostitute.

1          It is, of course, Ms. Xing's position that she never

2     forced Victims 2, 3, 4, 5, and 6 to work as prostitutes.  She

3     maintains that she is not guilty of these charges.

4          Okay.  I apologize for the legalese.  That could

5     have been said so much more simply, but that mirrors the

6     statute.  That's what this is about.

7          All right.  So here's the deal:  What we're here to

8     find out as best we're able is whether or not we can seat 12

9     individuals who can be fair and impartial and give this lady a

10    fair trial.  And I always think that, you know, this could be

11    any one of us on trial, and dear God, we hope that those jurors

12    can be fair and impartial and don't come -- well, we all come

13    with biases.  We all come with that baggage.  We all come with

14    preconceived notions.  You know, we have to go to these

15    schools, okay?  And I remember three days were devoted to

16    coming to grips with the fact that we have biases.  And we

17    spent some time acknowledging that and identifying that.  We

18    didn't have to identify them outloud, but to ourselves,

19    identify the fact that we have biases.

20         And then we learned to put those aside and never,

21    ever, ever let those biases influence your decisions.  That's

22    all we expect of you.  I'm not asking that you don't have any

23    biases or preconceived ideas about anything.  That's fine.  But

24    this is not a situation where we're down at Starbucks having a

25    cup of coffee and just kind of talking, shooting the breeze.

1    That isn't what this is.  This involves somebody's life, not

2    literally, but this is important.  It's certainly important to

3    her.  She deserves, as we all would deserve, someone to give us

4    a fair shake.  That's all we're asking.

5            I'm not saying, are any of you completely free of

6    biases?  I'm not even going to ask you what your attitudes are

7    about prostitution.  Okay?  Because it kind of doesn't matter.

8    It's almost like asking, what are your attitudes about sex?

9    Kind of doesn't matter.  Because that isn't what this case is

10   about.  This case is about being forced.  Okay?  That's it,

11   about being forced.  If the Government can prove that beyond a

12   reasonable doubt, sobeit.  But as things stand right now,

13   that's just a nice lady sitting over there who is guilty of

14   nothing.

15           Okay.  Here's a trick question that sometimes I ask:

16   If you have to vote right now to convict or to acquit right

17   now, what's your vote?  Believe it or not, that is not a hard

18   question.  Okay.  I'm going to go back to the 7th grade.  In

19   all cases, the Government bears the burden of proof.  We've all

20   heard that.  We're all innocent until proven guilty.  We all

21   know that.  We know that.  We're as familiar with that as we

22   are about the damn Miranda warning.  It's on every TV show.

23   That lady right this minute is innocent.  If you had to vote

24   right now, she is innocent.  You have heard absolutely no

25   information, no evidence of her guilt.  She comes into this

1  thing innocent.  The Government has to establish her guilt.

2  And until you are convinced beyond a reasonable doubt of her

3  innocence -- I'm sorry -- convinced beyond a reasonable doubt

4  of her guilt, she remains innocent.

5          Anyone have a problem with that concept?  Hands,

6  please.  Now, this is important.  It's almost where the rubber

7  meets the road.  No hands.  I never know whether or not there's

8  no hands because you're all strangers to each other and, you

9  know, you're not feeling comfortable with, you know, singling

10  yourself out.  Get over that.  Get over that because 12 or 14

11  of you are going to be friends.

12          All right.  Just based upon what you've heard, does

13  this arouse any feelings in anyone where you're thinking, oh, I

14  can't do this; or, oh, I don't want to do this; or, oh, this is

15  the way I worked my way through junior high school?  Whatever,

16  okay?  Anything at all that makes anyone feel uncomfortable?

17  Hands?

18          Yes, ma'am?  Your name -- hang on a second because

19  she's going to find your number because you don't know what

20  your number is, do you?

21          COURTROOM DEPUTY:  Those of you that raised your

22  hands, line up, please.

23          THE COURT:  Oh, my goodness gracious.  I thought

24  maybe one of you would come up.

25          PROSPECTIVE JUROR:  Jessica Von Medicus.

1          COURTROOM DEPUTY:  24.

2          THE COURT:  Thank you, dear.

3          COURTROOM DEPUTY:  No.  No.  No.  Wait.

4          PROSPECTIVE JUROR:  Sorry.  You said thank you.

5          THE COURT:  That's a first.  All right.  You heard

6   something or something clicked somewhere.  What is it?

7          PROSPECTIVE JUROR:  I'm not sure I'd be able to be

8   impartial.

9          THE COURT:  Okay.

10         MS. STEELE:  Your Honor, may we have a sidebar?

11   Perhaps the juror can meet us at a sidebar.

12         PROSPECTIVE JUROR:  Yeah.  Too personal.  Sorry.

13         THE COURT:  Oh, sure.  Absolutely.  Come up here.

14         (The following proceedings were held at the bench,

15   outside the hearing of the jury.)

16         THE COURT:  Just here with me, some of my closest

17   friends.

18         PROSPECTIVE JUROR:  I've been...  I don't know how

19   to --

20         THE COURT:  Hang on.  Hang on.  Hang on.  Are you

21   trying to tell us you've been victimized?

22         PROSPECTIVE JUROR:  No.  No, no, no.  Just I've had

23   friends and acquaintances that have been in this situation and

24   I have strong opinions.

25         THE COURT:  Too close to home?

1        PROSPECTIVE JUROR:  Yeah.

2        THE COURT:  I don't know.  I leave it up to you all.

3        MS. DIAZ:  This is Government counsel Damaris Diaz.

4   Would you be able to listen to the evidence in order to

5   determine whether the Government has proven that the victims in

6   this case were actually forced, coerced, or defrauded into sex

7   work?

8        PROSPECTIVE JUROR:  Yeah.  Yeah.  Yes.

9        MS. DIAZ:  And even though you have strong personal

10  feelings about your own friends, could you sit and listen to

11  the evidence and not prejudge the defendant merely because

12  she's accused of something?  And would you wait to determine

13  whether the Government has met their burden of proof?

14       PROSPECTIVE JUROR:  I think so, yes.  Yeah.

15       MS. STEELE:  What are your -- this is Callie Steele

16  for the defense.  What are your strong opinions that you

17  mentioned?

18       PROSPECTIVE JUROR:  That -- sorry, I'm trying to

19  choose my words carefully -- or well.  That it's not okay.  My

20  friend's lives were ruined and -- yeah.

21       MS. STEELE:  And is that something that happened,

22  like, relatively recently?

23       PROSPECTIVE JUROR:  No.  It was when we were in high

24  school.  It was -- wasn't the same situation but similar.

25       MS. STEELE:  And the fact that you were close to

1  people who had their lives ruined from something similar to

2  this, is that something that would affect you in making your

3  decision in this case?

4          PROSPECTIVE JUROR:  I would hope not, but I wanted

5  to be truthful, that I am close to this.

6          MS. STEELE:  So it could possibly affect your

7  opinion?

8          PROSPECTIVE JUROR:  Potentially, yeah.

9          MS. STEELE:  Thank you.

10         MS. DIAZ:  Thank you for your honesty.

11         PROSPECTIVE JUROR:  Of course.  Thank you.

12         COURTROOM DEPUTY:  Okay.  So you can go back to your

13  seat.

14         PROSPECTIVE JUROR:  I'm sorry.

15         THE COURT:  Given her emotional state, do you find

16  it necessary to prolong -- never mind.  It's not important.

17  What's your vote?  What are we doing?

18         MS. STEELE:  Your Honor, we would ask that she be

19  excused for cause.

20         THE COURT:  Any objection to that?

21         MS. DIAZ:  Yeah.  She said she would listen to the

22  evidence and not pre-judge the defendant and make her analysis.

23         THE COURT:  Over your objection, I'm letting her go.

24  This woman was really quite emotionally choked up.  It's like,

25  are we going to further traumatize her?  No.  She's gone.

1          MS. STEELE:  Thank you, your Honor.

2          THE COURT:  Over the Government's objection.

3          (The following proceedings were held in open court.)

4          THE COURT:  Sheila, did you talk to the rest of the

5    people in line?

6          COURTROOM DEPUTY:  Not yet.

7          THE COURT:  As a matter of fact, this is for

8    everybody:  Everybody, everybody, everybody, if you wish to

9    communicate some information to us but you don't want to do it

10   publicly, you don't want to see it on the 11:00 news, have a

11   sidebar.  We'll -- you know, just me and six of my friends,

12   we'll talk about it with the least -- well, we'll try to make

13   you as comfortable as possible under the circumstances.  All

14   right?

15         This process is not about embarrassing anyone or

16   making anyone feel uncomfortable.  That is not the goal here.

17   The goal here is to try to find 12 or 14 fair-minded people who

18   can give this lady a fair trial.  That's the goal.  So if

19   there's something going on with you that's going to interfere

20   with you being dispassionate and objective, we need to know

21   about it.  Lord have mercy, she'd like to know about it.  Okay.

22   But if you want to talk to us privately -- okay,

23   semi-privately, just let me know.

24         PROSPECTIVE JUROR:  My name is Alice Bell Gaines.

25         THE COURT:  What's your number?

1          COURTROOM DEPUTY:  9.

2          THE COURT:  I can ask, right?

3          PROSPECTIVE JUROR:  Yeah, you can.

4          THE COURT:  Okay.  Ms. Bell Gaines, you came a long

5    way.

6          PROSPECTIVE JUROR:  Okay.  So I do have a

7    two-year-old grandson.  I am also a children's pastor

8    overseeing zero through 5th grade.  I'm also a member of a

9    human trafficking prevention organization, and I don't think

10   that I can give her my fair assessment of the situation.

11         THE COURT:  Tell me about your organization.  What

12   does your organization do?

13         PROSPECTIVE JUROR:  It's called A21, an organization

14   against human trafficking.  And I have participated for, gosh,

15   I would say over ten years.  I've gone to Greece to participate

16   in that as well.

17         THE COURT:  I'm going to go way out on a limb and

18   say that I bet lots and lots and lots of people, the vast

19   majority of people, are probably against human trafficking.

20   Now, are you saying that -- well, no.  Thank you for the

21   information, but notwithstanding your involvement in being

22   involved in an organization that's anti-human trafficking,

23   which I wish the whole world were against, but do you think

24   that that would somehow inhibit your ability to give this lady

25   a fair trial?

1    PROSPECTIVE JUROR:  Yes.

2    THE COURT:  She's innocent.  She's just been

3 accused.

4    PROSPECTIVE JUROR:  The fact that she's here tells

5 me that --

6    THE COURT:  Oh, my goodness.  We've got a -- okay.

7 This brings up another question, a horrible question.  This

8 lady's been drug off the streets by law enforcement and forced

9 to defend herself.  Does that mean that she is guilty?  Because

10 if so, I can turn this in, there's no need for this, there's no

11 need for this.  So we go from arrest to prison?  Is that our

12 system?  Arrest to prison.  Forget proving people's guilt,

13 forget due process, forget all of that stuff.  Is that what

14 we're saying?  Give me some hands.  Is that what it is?  She is

15 here, so she must be guilty.  Who believes that?  You've gotta

16 put your hand up.

17    PROSPECTIVE JUROR:  I don't think she -- I don't

18 know if she's guilty or not, but just the fact that she's here,

19 I said I cannot give her a fair assessment of that because I

20 already have a bias because of my association with children.

21    THE COURT:  You're hurting my Constitution.

22    PROSPECTIVE JUROR:  You asked.

23    THE COURT:  I did.  And thank you.  Thank you for

24 your honesty.  I appreciate that.  Go sit down.  Come here.

25 Come here.  Come here.  Come here.  Oh, I thought you had your

**35**

1    face painted on your mask.  Okay.

2              PROSPECTIVE JUROR:  No, sorry.

3              THE COURT:  All right.  You're saying you can't give

4    her a fair trial.  She's guilty?

5              PROSPECTIVE JUROR:  I'm not saying she's guilty.  I

6    just --

7              THE COURT:  Yeah, you are.

8              PROSPECTIVE JUROR:  -- cannot be a part of --

9              THE COURT:  She would have to take the stand and

10   prove her innocence to you, right?

11             PROSPECTIVE JUROR:  Well, to everybody else, not

12   necessarily just to me.  I'm not the -- I mean, if I was in the

13   jury, I'm not the sole decision maker.

14             THE COURT:  No.  We operate by unanimous verdicts

15   here, okay, unanimous.

16             PROSPECTIVE JUROR:  Exactly.

17             THE COURT:  Okay.  But you don't feel you could do

18   it?

19             PROSPECTIVE JUROR:  I don't.

20             THE COURT:  Okay.  Write down next to Ms. Bell's

21   name "This lady is unfair."

22             PROSPECTIVE JUROR:  Put X, X, and X.

23             THE COURT:  I'm messing with you.  Go ahead and sit

24   down.  Thank you.

25             COURTROOM DEPUTY:  We have another sidebar.

```
 1              THE COURT:  You want to have a semi-private
 2  conversation?
 3              PROSPECTIVE JUROR:  (Nods.)
 4              THE COURT:  Okay.  What is your name, ma'am?
 5              COURTROOM DEPUTY:  16.
 6              PROSPECTIVE JUROR:  Nohemy Estrada.
 7              (The following proceedings were held at the bench,
 8  outside the hearing of the jury.)
 9              THE COURT:  Thank you.  Okay.  Ms. Estrada, what
10  would you like to share with us?
11              PROSPECTIVE JUROR:  I'd like to share that I don't
12  think I'll be, you know, fair with the lady.  I have been
13  working with children for 26 years, and in my work, I mean, if
14  we, I mean, suspect that there's child abuse, we do a report.
15  In my eyes, she's already guilty.
16              THE COURT:  Okay.  Excuse me.  I must have made a
17  mistake.  I messed up here.  Somewhere along the line, I
18  probably communicated to everyone that this involves children.
19  It does not.
20              PROSPECTIVE JUROR:  Oh, that's -- okay.
21              THE COURT:  I'm sorry, I did not -- I remember a
22  judge here that confused pornography with pedophilia.  Okay.
23  These are not the same things.
24              PROSPECTIVE JUROR:  Okay.  Then, you know, my
25  English is not good to be --
```

1          THE COURT:  No.  My English is not good.  It's my

2    English.  I did not communicate this effectively.  So, no, this

3    is about adults.

4          PROSPECTIVE JUROR:  Adults?

5          THE COURT:  Yes.  That's all, no children involved.

6          PROSPECTIVE JUROR:  Well, same thing for me, I

7    mean...

8          THE COURT:  It's not the same thing.

9          PROSPECTIVE JUROR:  Well, I mean, human traffic, I

10   mean, I know it's not the same, but I mean, for me, just to see

11   them -- in the county where I am, Santa Barbara County, I mean,

12   you know, Oriental people, they get arrest --

13         THE COURT:  Did you say "Oriental people"?

14         PROSPECTIVE JUROR:  Oriental people.

15         THE COURT:  This is not 1950.

16         PROSPECTIVE JUROR:  I know, but, I mean, that's

17   what's happening in our county in Santa Barbara, I mean, they

18   get arrest --

19         THE COURT:  What is your ethnicity, if you don't

20   mind me asking?

21         PROSPECTIVE JUROR:  Mexican.

22         THE COURT:  Oh, all right.  I thought you were

23   Asian.

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  That's with the mask.  The mask only

1  shows...  Okay, now let's start all over again.  Clean slate.

2  No children involved.

3          PROSPECTIVE JUROR:  No children.

4          THE COURT:  Are you okay?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Thank you, dear.  You can deal with this

7  now, right?  These are adults.

8          PROSPECTIVE JUROR:  Adults --

9          THE COURT:  I'm not saying that adults can't be

10  hurt.  I'm simply saying there are no children involved here.

11  It's not hypersensitive.  It's adults.  You okay now in terms

12  of what you wanted to share with us?

13          PROSPECTIVE JUROR:  Well, okay.  Going against Santa

14  Barbara County have the highest human trafficking.

15          THE COURT:  Okay.

16          PROSPECTIVE JUROR:  So I'm not comfortable.  And, I

17  mean, today I came, I mean, and my daughter drove me over here,

18  I mean, because I don't drive L.A.  That's another thing, you

19  know, it's like --

20          THE COURT:  Okay.  Listen.  Okay -- and I want to

21  get into talking about driving in L.A. traffic but not right

22  now.  All right?  I just simply want to know whether or not

23  whatever concerns you are feeling that caused you to stand in

24  that line and then come up here and share with us, you know,

25  your views about things, has that issue been resolved?  I'm not

1     talking about, you know, is there peace on earth?  I'm just

2     saying, that issue.

3               PROSPECTIVE JUROR:  No.  I'm not --

4               THE COURT:  There's no children.

5               PROSPECTIVE JUROR:  Yeah, but I still do not feel

6     comfortable to be doing this.

7               THE COURT:  Doing what?

8               PROSPECTIVE JUROR:  I mean, sitting in a -- you

9     know, judging --

10             THE COURT:  You're not judging.  I judge.

11             PROSPECTIVE JUROR:  Yeah, but I mean, you know.

12             THE COURT:  They're going to ask you facts, right?

13             PROSPECTIVE JUROR:  Yeah, facts.

14             THE COURT:  They're going to present you with a

15     scenario.  All right?  And they need to establish these facts

16     to your satisfaction, just the facts.  That's all.

17             PROSPECTIVE JUROR:  Look it, I'm so nervous, I

18     already got confused.  You know?  Like, I'm, like -- I mean,

19     I'm shaking inside.

20             THE COURT:  It's okay because you're going to have a

21     lot of company, you're going to have a lot of friends with you,

22     right?  This is not like standing up on a stage and, you know,

23     performing.  It's not like that.  You're going to be sitting in

24     a room with your closest friends, and you're all going to talk

25     about it and exchange views and make a determination whether or

1   not the Government has proven to your satisfaction the

2   existence of these facts.  That's all.  You're just going to

3   look at -- make a determination on facts.

4           PROSPECTIVE JUROR:  And they're not going to

5   understand some of my English.  You know?

6           THE COURT:  Okay.  Listen.  That is one of the

7   things that I have been listening -- I've been listening to the

8   words, but I've also been paying attention to the way you're

9   able to communicate, because that is a concern.  You need to be

10  able to communicate.

11          PROSPECTIVE JUROR:  And not get confused one thing

12  for another thing.

13          THE COURT:  You are doing great.  You only made one

14  tiny little error.  You confused adults with little children.

15  But that's --

16          PROSPECTIVE JUROR:  But that's a big thing, I

17  mean --

18          MS. CHRISTERNA:  I think she said she indicated she

19  feels --

20          COURTROOM DEPUTY:  I'm sorry.  You've got to speak

21  into the microphone.

22          MS. CHRISTERNA:  Oh.  I think she said she indicated

23  she feels the same about the case whether it's adults or

24  children.  It doesn't change whether she thinks she can be

25  fair.

1          MR. LARA:  Your Honor has correctly questioned her,

2    and she said that she can give her a fair shake, given that

3    it's not children.

4          MS. CHRISTERNA:  I'm sorry.  That's not what I

5    heard.

6          THE COURT:  Well, and I did not hear what you heard.

7    Okay?

8          MS. CHRISTERNA:  Well, we can ask her.

9          THE COURT:  Yes.  Go ahead.

10          MS. CHRISTERNA:  I just need to ask you, did you say

11    it wouldn't make a difference to you if it was kids or adults

12    in terms of whether you feel like you can be fair?

13          PROSPECTIVE JUROR:  Yes, I don't think I could be

14    fair.

15          MS. CHRISTERNA:  Thank you.

16          THE COURT:  That didn't answer the question.  That

17    doesn't answer the question.  Does it matter to you in terms of

18    your being able to be a fair and impartial juror, does it

19    matter to you whether or not we're talking about children

20    victims or adult victims?  Does it matter?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Okay.  Do you view it as being not

23    nearly as serious that we're dealing with adults as opposed to

24    children?

25          PROSPECTIVE JUROR:  Yeah.  I mean, I care more for

 1  the children, I mean --

 2          THE COURT:  That's a natural inclination.  All

 3  right.  My question -- the bottom line, the question is this:

 4  Can you sit and listen to the Government's presentation of

 5  evidence, the facts that they're going to lay out, and simply

 6  decide based upon hearing the evidence and looking at the

 7  evidence and hearing the people testify who's telling the

 8  truth?  Can you do that, just simply make a decision with

 9  respect to, what are the facts?  Because that's all we're

10  asking you to do.  Can you do that?

11          MS. CHRISTERNA:  Fairly.

12          PROSPECTIVE JUROR:  I guess.

13          THE COURT:  Yeah, fairly.  Fairly and impartially,

14  putting -- well, I don't want to say "put yourself in this

15  lady's shoes," but any of us could be a defendant in a case,

16  could stand accused, and we simply want our jurors to be fair.

17  That's what we want.  Can you be that person?

18          PROSPECTIVE JUROR:  I guess, yes.

19          THE COURT:  Okay.  That's all we want to know.

20          PROSPECTIVE JUROR:  So, but the other thing, you

21  know, that they talk at trial, that's in July, right?

22          THE COURT:  I have no idea.  What trial?

23          PROSPECTIVE JUROR:  When is going to be --

24          THE COURT:  Now.

25          PROSPECTIVE JUROR:  Now?

1        THE COURT:  Now.

2        MR. LARA:  I think the judge will address all of the

3   other potential issues that might come up, but I think we're

4   only -- we're talking about the first question, right, your

5   Honor?

6        THE COURT:  Yes.

7        MR. LARA:  So we'll address all the other issues as

8   this process goes on.

9        PROSPECTIVE JUROR:  Okay.

10       MS. DIAZ:  We're just here to address the sensitive

11  issue.

12       MR. LARA:  Right, which has been resolved.

13       THE COURT:  Okay.

14       MS. CHRISTERNA:  In our view, the issue has not been

15  resolved.

16       THE COURT:  What is it?  So she's here.  Resolve it.

17       MS. CHRISTERNA:  So I still think that --

18       THE COURT:  You talk to me.  Resolve it with me.

19       MS. CHRISTERNA:  I think what I was hearing, and

20  correct me if I'm wrong, is that you still have a problem being

21  fair and balanced?

22       PROSPECTIVE JUROR:  Well, now that he explained to

23  me that it's children and adults, you know, it changed.

24       MR. LARA:  I think at this point, your Honor, we

25  don't need to question her any more about this and we can all

1  discuss.  We've got lots of people here.

2            THE COURT:  Yes, we have lots of people.  Thank you.

3  Thank you, very much, Ms. Estrada.

4            MS. DIAZ:  Should we clarify the adult versus

5  children?

6            THE COURT:  I guess we can.

7            COURTROOM DEPUTY:  What is it?

8            MS. STEELE:  Do we want to talk about this juror

9  right here, because we're moving to excuse her for cause?

10           MR. LARA:  The Government opposes.

11           THE COURT:  Not for cause.  You can expend one of

12  your peremptories, but I don't see for cause.  She indicated

13  that she's much more able to sit as a juror knowing that this

14  is adults and not children.

15           MS. STEELE:  But when the Court clarified and you

16  said, oh, it's not children, it's adults, she said, "same

17  thing."  She said she had a problem with human trafficking.

18           THE COURT:  Yes, she does.

19           MS. STEELE:  And she was talking about the fact that

20  she lives in Santa Barbara, and in Santa Barbara, I guess she

21  was saying Asian people get arrested in San Bernardino County.

22           THE COURT:  I don't know that that's right.

23           MS. STEELE:  I'm just saying she seems to have some

24  sort of opinion about human trafficking even when it comes to

25  adults when it comes to Asian people.

1          THE COURT:  Do you want to put that question to the

2   entire room, does anybody have an opinion about human

3   trafficking?

4          MS. STEELE:  Your Honor, I don't think this is about

5   human trafficking.  I think it's about sex work.

6          THE COURT:  It is.  It is.  So that's got nothing

7   anything to do with anything, does it?

8          MS. STEELE:  But that's what the charges are.  The

9   charges are human trafficking.  And she said even --

10          MR. LARA:  Your Honor, this --

11          MS. STEELE:  I'm not finished.  Even when it comes

12   to adults, she said "same thing," so...

13          THE COURT:  That's a little ambiguous.  That's why

14   we had to ask her pointed questions.  You're pulling things

15   out, you know, and -- it's kind of misleading, but I'm used to

16   it.

17          MS. STEELE:  It's not misleading, your Honor.  I

18   think when you keep questioning her and saying couldn't you,

19   couldn't you, couldn't you, she's kind of like "I guess," but

20   she was tentative.  So we --

21          THE COURT:  You've got this entire line, and you

22   made a motion to excuse her for cause and it's been denied.

23          (The following proceedings were held in open court.)

24          THE COURT:  By the way, have I left any one of you

25   under the impression that this case involves children, the

1  exploitation of children?  It does not.  Okay.  Good.  Thank

2  you.

3          (The following proceedings were held at the bench,

4  outside the hearing of the jury.)

5          COURTROOM DEPUTY:  Say your name.

6          PROSPECTIVE JUROR:  Elizabeth Dawson.

7          COURTROOM DEPUTY:  31.

8          THE COURT:  All right.  Ms. Dawson, what is your

9  concern?

10          PROSPECTIVE JUROR:  That I would be able to be

11  impartial.

12          THE COURT:  Okay.

13          PROSPECTIVE JUROR:  I'm still going through PTSD

14  therapy for sexual abuse and domestic abuse.

15          THE COURT:  Counsel may inquire.

16          MS. DIAZ:  Do you think that hearing testimony about

17  other people's sexual assault would trigger your own PTSD?

18          PROSPECTIVE JUROR:  Yes.

19          MS. STEELE:  We have no questions.  Thank you so

20  much for your honesty.

21          PROSPECTIVE JUROR:  Thank you very much.

22          THE COURT:  Thank you.

23          MS. STEELE:  We move for her to be excused for

24  cause.

25          THE COURT:  Now.  Now.  Yes.

1    PROSPECTIVE JUROR:  Brody Richards.

2    COURTROOM DEPUTY:  42.

3    THE COURT:  Do you memorize these things in advance?

4    COURTROOM DEPUTY:  When I call the names, I just try

5    to connect a name with a face.

6    THE COURT:  I need you to speak into the mic.  What

7    are your concerns?

8    PROSPECTIVE JUROR:  I'm concerned just because I --

9    in my life, I have a lot of people that are victims of sexual

10   assault, rape, things adjacent to --

11   THE COURT:  You're saying in your life you have a

12   lot of people who are victims of sexual assault?

13   PROSPECTIVE JUROR:  Yes.  Off the top of my head,

14   yes.  Yes, I could name three off the top of my head, yes.  And

15   it -- it's kind of hard to talk about, but I -- I'm concerned

16   that -- obviously, I don't know the proceedings of the case,

17   but as we get into this, if I hear testify of people talking

18   about their experience of what happened to them, I'm concerned

19   about my own biases and just because of the people I've known

20   in my life.  I don't -- I just don't want that to ruin

21   something that's going on here.  If it was a traffic ticket,

22   that would be a very different world, but this is something

23   that hits a little closer to home than I like.

24   MR. LARA:  Right.  So is it fair to say that you

25   don't like sexual assaults and that you know people who have

1  experienced it?

2          PROSPECTIVE JUROR:  Yes, sir.

3          MR. LARA:  But does that affect whether or not you

4  can judge whether the Government has met its burden and proven

5  that this particular person has done what the Government is

6  accusing her of doing?

7          PROSPECTIVE JUROR:  I think so because I have so

8  much time with the victims and hearing people out and believing

9  that they've done things, doing what I can for them, that I

10  think as soon as you throw somebody up on a witness stand in

11  front of me that talks about what they had to live through, I

12  think I would just --

13          MR. LARA:  Could you also be fair and impartial when

14  it comes to all of the witnesses, not just victims?  So if, for

15  example -- if, for example, anyone else testifies, can you have

16  all of their testimony be equally considered in your mind?

17          PROSPECTIVE JUROR:  It fully depends on what the

18  involvement is.  Like, if they're one of the factors that is

19  pushing this forward, I'm -- just to be honest, I'm going to

20  have a bias against them.

21          MR. LARA:  If at the end of this case you felt that

22  the Government has not met its burden of proof, has not proven

23  beyond a reasonable doubt that the defendant has done what the

24  Government has said she has done, what would your vote be?

25          MS. STEELE:  Objection.  I don't think you can ask

that question.  That's not appropriate.  We would object to

that question.  This is Callie Steele from the defense.

MR. LARA:  If the Government is not able to meet its

burden of proof, would you be able to acquit the defendant, is

my question.

PROSPECTIVE JUROR:  Am I okay to answer this?

THE COURT:  Oh, please do answer that one.  That's

important.

PROSPECTIVE JUROR:  I can't say for sure.

THE COURT:  Okay.  Wait, wait, wait, wait, wait.  Do

it again.  Talk slowly.  Listen carefully.

MR. LARA:  If the Government has not met its burden

of proof, the Government has not proved to you beyond a

reasonable doubt the defendant has done what we have accused

her of, then would you be able to vote to acquit?

PROSPECTIVE JUROR:  I don't know.  I'd have to

listen to these people because they clearly haven't been

listened to in the past to get here.

MR. LARA:  So what you're saying is you would need

to hear the evidence before you could decide whether or not you

could acquit?

PROSPECTIVE JUROR:  Yes, but it -- it would take so

much, I --

MR. LARA:  I know.  This is very challenging and

it's a very challenging case for everyone to sit through.  I

1  mean, every single person in this room, this is not what they

2  want to do, so we're just trying to find out, if you've

3  determined, after listening to all of the evidence and all the

4  witness testimony, that the Government has not met its burden

5  of proof, can you vote to acquit the defendant?

6         PROSPECTIVE JUROR:  If they somehow had the

7  evidence, then yes.  I just don't know what that evidence would

8  even be.

9         MS. CHRISTERNA:  And so can I ask a question?  I

10  know this is emotional, so I appreciate --

11         PROSPECTIVE JUROR:  I'm past the --

12         MS. CHRISTERNA:  No, I appreciate your talking to

13  us.  So if you hear from witnesses who claim that they were

14  victims, would you give them more importance in weight than

15  other witnesses?

16         PROSPECTIVE JUROR:  Absolutely.  Because

17  historically speaking, that's the voice that gets acquitted.

18  I'm so sorry.

19         MS. CHRISTERNA:  No.  Thank you.  Thank you so much.

20         THE COURT:  There's discussion on this.

21         MS. CHRISTERNA:  We move for cause.

22         THE COURT:  Absolutely.

23         COURTROOM DEPUTY:  State your name.

24         PROSPECTIVE JUROR:  Amy Law.

25         MS. DIAZ:  This is AUSA Damaris Diaz.  I was asking

1    the juror if she could tell us why she has come to the sidebar.

2           PROSPECTIVE JUROR:  I didn't ask to come to the

3    sidebar, but that's fine.  That's okay.  I'm fine with it.  I

4    just don't -- after just hearing the brief introduction of the

5    case, I just don't feel -- I really kind of feel like she's

6    guilty of committing what she's committed because there is --

7    I'm sure there's a fair reason she's here to begin with, and

8    I've -- and I've heard so many stories about this kind of

9    thing.  And I am assuming she's from the Asian countries, but

10   there -- just -- I just feel --

11          THE COURT:  What's the relevance of that part?

12          PROSPECTIVE JUROR:  I've heard many stories about

13   these kind of cases, and a lot of times it's true that I just

14   don't feel -- I don't agree with prostitution.  It makes

15   me sick.

16          THE COURT:  Voluntarily or involuntary?

17          PROSPECTIVE JUROR:  Both.

18          THE COURT:  Okay.  That's a problem.

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Okay.  People gotta make a living.

21          PROSPECTIVE JUROR:  It doesn't need to be that way,

22   to me.

23          THE COURT:  Anyway, so you've got a negative

24   attitude about this lady -- wait a minute.  You know what?

25          PROSPECTIVE JUROR:  Unfortunately.

1          THE COURT:  Wait, wait, wait.  She is not accused of

2  being a prostitute.  No one is saying that she's been involved

3  in any prostitution activity herself.

4          PROSPECTIVE JUROR:  But she was involved with the

5  business that --

6          THE COURT:  Well, we'll have to see.

7          PROSPECTIVE JUROR:  From the -- like I said, from

8  the brief introduction that I've heard, she's involved with it.

9  And then being kind of --

10          THE COURT:  Accused.

11          PROSPECTIVE JUROR:  -- the leader of encouraging

12  this kind of activity, which I strongly disagree with, whether

13  voluntarily or forced.

14          THE COURT:  But only if the Government proves it,

15  right?

16          PROSPECTIVE JUROR:  And, once again, there's a good

17  reason she's caught here.

18          THE COURT:  You cannot put that aside, can you, the

19  fact that she's here?

20          PROSPECTIVE JUROR:  Right.  That's -- I believe the

21  system, that, you know, there's a reason she's caught.

22          MS. DIAZ:  This is part of the system.

23          PROSPECTIVE JUROR:  I know.  I apologize.  I don't

24  mean to be disrespectful.

25          MS. DIAZ:  No, no problem.

1    THE COURT:  So what I said about innocent until

2  proven beyond a reasonable doubt to be guilty.

3    PROSPECTIVE JUROR:  I know.  I don't know if I can

4  exercise that.

5    THE COURT:  You don't think you can do that?

6    PROSPECTIVE JUROR:  I understand that should be the

7  way, but I don't know.

8    THE COURT:  Sweetness, that is the way.  Remember

9  when I also said we're not down at Starbucks just having a cup

10  of coffee and just shooting the breeze?  You remember that

11  part?

12    PROSPECTIVE JUROR:  I understand.

13    THE COURT:  Look around.  You see where we are?

14  This is the real deal.  This is serious business.  Facts,

15  proof, people's lives are at stake.

16    PROSPECTIVE JUROR:  Right.

17    THE COURT:  Okay.

18    PROSPECTIVE JUROR:  Right.

19    THE COURT:  And you're telling me that you cannot do

20  that, sit there and dispassionately listen to the evidence, put

21  the Government to the test of introducing to you evidence that

22  establishes beyond a reasonable doubt that that lady who has

23  been drug in here is actually guilty?

24    PROSPECTIVE JUROR:  I highly doubt that.  I highly

25  doubt it.  Oh, I'm sorry.  That she's guilty?  Yes, I have --

1          THE COURT:  You don't think --

2          PROSPECTIVE JUROR:  I highly doubt that she's

3  completely innocent.

4          THE COURT:  You do realize that people are acquitted

5  every day, acquitted of crimes that they have been charged with

6  having committed?  You understand that, right?

7          PROSPECTIVE JUROR:  Yes, sir.

8          THE COURT:  All the time.  It happens.  Because the

9  Government is just not up to the test, the evidence isn't

10  there, maybe it's the wrong person, maybe there's strong

11  circumstantial evidence.  Or it could happen in a southern

12  state.  You know, any number of things, right?  Because people

13  take their jobs as jurors seriously.  They put the Government

14  to the test.  All right?  Prove it to me.  It's one thing to

15  accuse someone of something.  Prove it to me.  Sometimes the

16  Government can, sometimes they can't, and when they can't,

17  strong, fair-minded citizens stand up and go, "No.  Let them

18  go."  I'm only asking whether or not you can do that.  We're

19  not at Starbucks.

20          PROSPECTIVE JUROR:  I wish I was.

21          THE COURT:  I'll bring donuts.

22          PROSPECTIVE JUROR:  And the fact that I -- I don't

23  know if it's related, I work with children and I work with

24  teens, and just the thought of -- it's just disgusting to me.

25          MS. DIAZ:  There are no children or teens involved

1  in this case.  This is Damaris Diaz.

2         MS. CHRISTERNA:  And this is Neha.  I think what I'm

3  hearing you say is you're uncomfortable with just prostitution,

4  even putting aside the trafficking, and that makes you feel

5  like you can't be a fair juror?

6         PROSPECTIVE JUROR:  I'm afraid I don't -- I'm afraid

7  I won't be and won't make a fair judgment because I'm kind of

8  already jumping to conclusions that she's guilty.

9         THE COURT:  And that, you can't put aside, huh?  You

10  just cannot put that aside?  I hope you never get arrested,

11  dear.  No.  Seriously, you cannot set that aside, this

12  preconceived idea that she's gotta be guilty?  You cannot do

13  that?

14         PROSPECTIVE JUROR:  If I really, really, really must

15  do it, but...

16         THE COURT:  To be a juror, yeah, you really must do

17  it.

18         PROSPECTIVE JUROR:  I'm not sure I could 100 percent

19  do that.

20         THE COURT:  What if your human citizenship rests on

21  that?

22         MS. DIAZ:  Can you do that in any case?  Is it just

23  this case?  Have you ever served as a juror before?

24         PROSPECTIVE JUROR:  No.

25         MS. CHRISTERNA:  This is Neha.  The subject matter

1  makes you uncomfortable where you can't be fair?

2            PROSPECTIVE JUROR:  This particular one, yes.

3            MS. DIAZ:  Thank you for your honesty.

4            THE COURT:  Fair enough.  Fair enough.  Okay.  That

5  made that easy.

6            COURTROOM DEPUTY:  Is she gone?

7            THE COURT:  What's her number?

8            COURTROOM DEPUTY:  54.  Is she gone?

9            THE COURT:  Yes, she's gotta be gone.

10           MR. LARA:  Your Honor, this is Scott Lara.  Are we

11 asking everyone to come up to the sidebar at this point, or are

12 we asking them --

13           THE COURT:  It was just convenient.

14           MS. STEELE:  Your Honor, I think it's probably

15 better so they don't taint the rest of the jury.

16           THE COURT:  I agree with that.  And if it's not

17 necessary, so what?  No harm.

18           MR. LARA:  I'm just wondering what the process is,

19 your Honor.  This is Scott Lara.

20           COURTROOM DEPUTY:  Are you guys ready for the next

21 one?

22           THE COURT:  Yes.

23           PROSPECTIVE JUROR:  My name?  Justina Lang.

24           COURTROOM DEPUTY:  60.

25           THE COURT:  All right.  Ms. Lang?  You're a

translator.  What language?

PROSPECTIVE JUROR:  Japanese.

THE COURT:  Japanese?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  Something about this case has piqued your interest or concern?

PROSPECTIVE JUROR:  I'm sorry, this is trivial compared to everyone else, but I'm just concerned about if there might be anything graphic that might come up with evidence during the court.

THE COURT:  Hang on a sec, because I don't know.

MS. DIAZ:  Graphic?  There may be testimony discussing sexual assault.

THE COURT:  Okay.

MS. STEELE:  And rape.

MS. DIAZ:  And rape.  But in terms of visually graphic, condoms.  Nothing other than that.

THE COURT:  Uh-oh, not a condom.

MS. CHRISTERNA:  And lubricant.

THE COURT:  Oh, yeah, this -- lubricant.  I'm sorry.  Go ahead.

PROSPECTIVE JUROR:  It's mostly just out of -- it's a bit of a sensitive subject for me, so I'm not sure how composed I could stay, I suppose.

MS. CHRISTERNA:  So if you hear something that makes

1  you uncomfortable, do you feel like that would affect whether

2  or not you see the defendant as guilty or not guilty?

3         PROSPECTIVE JUROR:  I mean, to be honest, I'm not

4  sure.

5         MS. CHRISTERNA:  Okay.  Would you be able to give

6  her a fair trial if you hear something that might make you

7  upset or emotional?  This is Neha talking, by the way.  If you

8  hear about, like, rape, for example, would that -- and if it

9  made you emotional, would that interfere with you being able to

10 be fair to the defendant?

11        PROSPECTIVE JUROR:  I would want to try, but I don't

12 know if I trust myself.

13        MS. CHRISTERNA:  So my question to you was, if you

14 hear about a rape and if it made you emotional, would that

15 interfere with you being able to be fair in this case?

16        PROSPECTIVE JUROR:  Like I said, you know, I would

17 want to try, but I'm not sure if I could trust myself.

18        THE COURT:  Trust yourself to do what?

19        PROSPECTIVE JUROR:  To be fair, I suppose.

20        THE COURT:  Okay.  What would you consider unfair

21 from your standpoint?  What do you think you would do?

22        PROSPECTIVE JUROR:  I guess letting my emotions get

23 the better of me or being unable to think kind of clearly, I

24 suppose.

25        THE COURT:  And what do you think you would tend to

1 do under those circumstances?

2 PROSPECTIVE JUROR: I suppose I feel strongly about

3 rape and such, so I would want to make sure that, you know, she

4 gets her due diligence, but I guess I'm -- I suppose I'm a

5 little concerned if I might lean more towards the supposed

6 victims.

7 THE COURT: Okay. Nothing unusual about that. I

8 think everyone has the same feeling, so --

9 PROSPECTIVE JUROR: No. And I know in terms of jury

10 duty, you know, we're supposed to stay impartial.

11 THE COURT: Yes.

12 PROSPECTIVE JUROR: And that's why I want to just

13 disclose that, just in case.

14 THE COURT: Yeah. Thank you. And, like I said, we

15 all come into -- we come into everything and we have biases.

16 We have likes and dislikes. We have things we absolutely

17 detest. Okay? And that's why we're kind of talking about it

18 now. We want to know whether or not any of those things are

19 present in this particular case, as far as you're concerned.

20 And, again, in many, many, many cases, we're able to put those

21 things aside, say, okay, you know what? I have these feelings

22 about this. But that is not this case. There is none of that

23 in this case. I am not here to determine whether or not that

24 lady committed or facilitated rape. Okay? So I appreciate

25 what you're saying, we do, and it's better for us to have more

1  information than less, but if you don't think you can put these

2  feelings aside and just concentrate on what elements and facts

3  the Government has to establish, listen to all the evidence

4  come in and make a decision as to whether or not you think that

5  looking at this evidence, whether or not they have met their

6  burden with respect to the facts that they have to establish,

7  yes or no, it's up or down, either they succeeded or they

8  didn't -- and that's all you have to do is vote up or down, yes

9  or no.  Okay?  All you have to do.  If you don't think you can

10  do that, let us know.

11          PROSPECTIVE JUROR:  I'm sorry.  I guess I do want to

12  believe that I'd be able to be impartial as best as I can.

13          THE COURT:  Bottom line is...

14          PROSPECTIVE JUROR:  That she's innocent until proven

15  guilty.

16          THE COURT:  Can you do it?  Can you do it or not?

17  You want to believe you can, but that's not good enough.

18  That's not good enough.  We want you to assure us as best you

19  are able going into this thing that, yeah, I believe I can and

20  I'm going to make a concerted effort to treat this lady fairly.

21          PROSPECTIVE JUROR:  Yes.  I just -- I guess I'm also

22  just concerned about how composed I can stay as well.  I don't

23  know how many jurors you have who cry.

24          THE COURT:  How many judges do you think you've

25  seen, male judges, cry in a trial?  Okay.  I don't have a

1  problem with it.  I have no problem with being human, nor

2  should you.

3          PROSPECTIVE JUROR:  Uh-huh.

4          THE COURT:  Okay?

5          PROSPECTIVE JUROR:  Okay.

6          THE COURT:  All right.  Are you in or out?  Do you

7  stand with us and enjoy donuts in the morning or --

8          PROSPECTIVE JUROR:  I believe I should be able to --

9          THE COURT:  You going to give it a shot?

10         PROSPECTIVE JUROR:  Yeah, I think.  Yeah.

11         THE COURT:  Thank you.

12         MS. CHRISTERNA:  This is Neha, and I apologize

13  again.  I would move for cause because she couldn't give a

14  complete answer.  She just kept saying, "I think I can be

15  fair," and I don't think that's sufficient for her to be an

16  impartial juror.

17         THE COURT:  That's not the last thing she said.  The

18  last thing she said pretty much negates the ability to

19  challenge her for cause.  You may not like her because she

20  appears to be kind of weak, but for cause, no.  But you still

21  have a chance to get rid of her.

22         MS. DIAZ:  No objection -- I mean, I'm sorry, no

23  moving for cause by the Government.

24         COURTROOM DEPUTY:  Ready for the next one?

25         THE COURT:  Yeah.  I can't believe this is taking so

1  long.  Damn.  Yes?

2              PROSPECTIVE JUROR:  Erica Berger.

3              COURTROOM DEPUTY:  47.

4              THE COURT:  Okay, Ms. Berger.  What do we got?

5              PROSPECTIVE JUROR:  So as much as I'd like to

6  believe I'd be impartial, I saw the defendant, and in the last

7  11 months, my father passed away and his partner for thirteen

8  years was Chinese American, and in the last two months of his

9  life -- he had terminal cancer.  In the last two months of his

10 life, she manipulated him heavily to the point of him almost

11 not speaking to me before he died and tried to steal a bunch of

12 our assets.  And as much as I'd like to think that I'm a

13 progressive, woke human that can push away this recent

14 experience, unfortunately, I don't believe that I can.  They're

15 about the same age, they look alike, and she's not spoken to me

16 since his death, so...

17             THE COURT:  All right.  And because it's connected

18 with the death of your father, that is indelibly imprinted in

19 your psyche.  There's no walking away from that; there's no

20 putting it behind you and moving on?

21             PROSPECTIVE JUROR:  I had to take over his entire

22 business and 50 employees, including his assistant who caught

23 her trying to steal our assets, so...

24             THE COURT:  Counsel?

25             MS. DIAZ:  There are Government witnesses who are

1   also of Chinese descent.  Does the fact that there are people

2   on both sides -- associated with both the Government and the

3   defense that are of Chinese descent, does that affect -- do you

4   think that would affect your ability to be fair to both sides,

5   given that you have a bias that applies to both sides?

6           PROSPECTIVE JUROR:  I think the issue is more around

7   her specific age and how similar she looks to my father's

8   girlfriend.

9           MS. CHRISTERNA:  You said age.  So she is older than

10  the other witnesses, and that would affect your ability to be

11  fair to her?

12          PROSPECTIVE JUROR:  Yes.

13          MS. CHRISTERNA:  Thank you.

14          THE COURT:  I have nothing.  Thank you.

15          MS. CHRISTERNA:  We would move for cause, your

16  Honor.

17          THE COURT:  Yep.  Yep.  Yep.

18          COURTROOM DEPUTY:  Say your name in the mic, she

19  slowly.

20          PROSPECTIVE JUROR:  Gabriela Romano Abdala.

21          COURTROOM DEPUTY:  Number 2.

22          THE COURT:  Okay.  What would you like to share?

23          PROSPECTIVE JUROR:  I would just have a concern

24  about, like, my mental health in the trial if as a victim of,

25  like, sexual assault --

1      THE COURT:  You have been victimized yourself?

2      PROSPECTIVE JUROR:  Yeah.  So just if stuff comes

3  up, I'm worried that it will be, like, not healthy for my

4  mental health to be involved if it's a long trial, or I'm not

5  sure what's going to happen.

6      THE COURT:  All right.  The lawyers may inquire.

7      MS. DIAZ:  I just want to confirm, have you

8  experienced the -- this is Damaris Diaz.  Have you experienced

9  trauma before by hearing other people talk about their sexual

10 assault?

11     PROSPECTIVE JUROR:  It's definitely difficult, yeah.

12 I don't know if I would call it, like -- that that is trauma,

13 traumatizing, but it definitely brings up my emotions around

14 what I went through.

15     MS. DIAZ:  Okay.  And do you think that you could

16 listen to the trial and still evaluate whether the Government

17 has met its burden of proving defendant's guilt beyond a

18 reasonable doubt?

19     PROSPECTIVE JUROR:  Yes.

20     MS. CHRISTERNA:  This is Neha talking.  And if you

21 hear testimony that makes you emotional, are you more likely to

22 find the defendant guilty based on that reaction?

23     PROSPECTIVE JUROR:  I would think so, yeah.

24     THE COURT:  I have nothing.  She had me at "victim."

25     MS. DIAZ:  I appreciate you being honest.

1        Your Honor, may I make an argument outside the

2   presence of this juror.

3        THE COURT:  Sure.

4        MS. DIAZ:  Do you mind stepping back for a moment?

5        This is Damaris Diaz for the Government.  Your

6   Honor, one in four women has been sexually assaulted.  We

7   cannot excuse everyone who's been sexually assaulted from this

8   jury.

9        MS. CHRISTERNA:  Your Honor, if I could be heard.

10  Even though one in four women have been assaulted, they're not

11  affected in the same way, and she felt compelled to raise her

12  hand and to tell us at sidebar that she is emotionally affected

13  and cannot give the defendant a fair trial, she's more likely

14  to find them guilty based on her emotion.  That is just what

15  she said.

16       THE COURT:  All right.  Forget the one in four, even

17  though I can't forget that.  The issue is her.  Okay?  The

18  issue is her.  I've gotta let her go.  You know what?  I'd let

19  25 percent of everyone who came up here go.

20       MS. DIAZ:  The Government objects.

21       THE COURT:  Over the Government's objection, because

22  they are unfeeling.

23       MS. DIAZ:  She did say that she would hold the

24  Government to its burden.

25       THE COURT:  Yeah.  You know what -- well, why are we

1  going to re-traumatize this woman?  Rape is so freaking

2  horrible --

3          MS. DIAZ:  One in four, your Honor.

4          THE COURT:  I'm not excusing that.  That's bullshit.

5          MS. DIAZ:  You're not excusing her?

6          THE COURT:  Hell yes, I'm excusing her.

7          MS. DIAZ:  Okay.  I'm sorry.

8          COURTROOM DEPUTY:  Go to that mic there.  Say your

9  name.

10          PROSPECTIVE JUROR:  My name, Stella Lee.

11          COURTROOM DEPUTY:  63.

12          MS. CHRISTERNA:  This is Neha.  Can you tell us why

13  you're here to speak to us?

14          PROSPECTIVE JUROR:  Yes.  I have a very personal

15  reason.  Because I speak very heavily accented English, so I'm

16  not suitable.  And at this moment, speak very frankly, I'm not

17  able to -- you know, to consider other people just like, you

18  know, some lady's life, so I'm sorry.  I'm very uncomfortable.

19          MS. CHRISTERNA:  So the first thing you told us,

20  what is your native language?

21          PROSPECTIVE JUROR:  Korean.

22          MS. CHRISTERNA:  And you feel like because of that

23  language, you wouldn't be able to properly hear all the

24  evidence --

25          PROSPECTIVE JUROR:  Maybe my English just for

everyday, but not situational like this.  Because my co-workers

and there are some friends, they went to the juror, but I don't

think, you know, that they speak better than me, but inside the

courtroom, I would feel very burdened and I'm not comfortable.

MS. CHRISTERNA:  And thank you for being honest.  I

see that you're emotional, too.  Is there something about the

subject matter or --

PROSPECTIVE JUROR:  No, I don't think so.  That's

not the matter, but my only concern is my, you know, not fully

equipped good English.

MS. DIAZ:  This is Damaris.  Have you had a problem

understanding the things that have been said so far today?

PROSPECTIVE JUROR:  Frankly speaking, that problem.

MS. DIAZ:  So you've had no problem understanding

everything today so far?

PROSPECTIVE JUROR:  No.  No.

THE COURT:  What is a patient representative?

PROSPECTIVE JUROR:  It means the kind of the work at

the front office in the dental, dental office, dentistry.

THE COURT:  And in what capacity do you represent

the patients?

PROSPECTIVE JUROR:  You know, how much it costs for

the treatment, you know, what kind of treatment they need,

especially calculate for the insurance co-pay.  My main job is

asking people how much they should pay when they're treated and

1   managing the doctor's time.

2           THE COURT:  All right.  And do you also interface

3   with the insurance companies?

4           PROSPECTIVE JUROR:  Yes.

5           THE COURT:  And are you interfacing with

6   non-English-speaking patients?

7           PROSPECTIVE JUROR:  Yes, absolutely.  That's why,

8   you know, I've been working for many Korean doctors.

9           THE COURT:  Okay.  So the non-English-speaking

10  patients, what language do you have to communicate with them

11  in?

12          PROSPECTIVE JUROR:  Most the time Korean.

13          THE COURT:  Sometimes Korean, Spanish?

14          PROSPECTIVE JUROR:  No Spanish.

15          THE COURT:  French, Russian?

16          PROSPECTIVE JUROR:  Some, yeah, Spanish-speaking

17  patients, if they know Korean.  Very seldom Japanese and

18  Chinese.

19          THE COURT:  All right.  Anybody else have any

20  questions?

21          MS. CHRISTERNA:  Is there anything else about the

22  case that makes you feel like --

23          PROSPECTIVE JUROR:  The current case, I didn't have

24  any speak -- any rejection like that, but my only concern is my

25  not good English might affect the case is the main objection.

1       THE COURT:  All right.  Thank you.  I appreciate

2  that.

3       COURTROOM DEPUTY:  What's going on with her?

4       THE COURT:  Go ahead.

5       MS. CHRISTERNA:  Your Honor, I think she said she

6  doesn't feel comfortable and she doesn't feel like she can

7  understand the evidence, so I think that will weigh on whether

8  or not she can be a fair juror, so I would move for cause.

9       THE COURT:  As she is communicating all of this

10  information to us quite clearly.

11       MS. DIAZ:  The Government would object.  She stated

12  that she can understand everything that was in the proceedings

13  today, she was able to communicate with us, and is clear she

14  would be -- although her English is heavily accented, we are

15  all able to understand her, the words she was saying.

16       THE COURT:  And let's not overlook what she does for

17  a living, so -- anyway, your challenge for cause is noted.

18       MS. CHRISTERNA:  But we're not --

19       THE COURT:  No.

20       MS. CHRISTERNA:  Okay.

21       COURTROOM DEPUTY:  Okay.  Last one?

22       THE COURT:  Gosh.  This is unbelievable.

23       COURTROOM DEPUTY:  I had to tell some of the jurors

24  to go use the restroom.

25       State your name.

1          PROSPECTIVE JUROR:  Brian Luong.

2          COURTROOM DEPUTY:  26.

3          THE COURT:  All right.  Tell us what's on your mind,

4    sir.

5          PROSPECTIVE JUROR:  So I've, like, made a bunch of

6    assumptions about the case already.  I think she's a Chinese

7    national, she owns a massage parlor, and she's probably

8    trafficking a lot of little old ladies.

9          THE COURT:  You think she's trafficking a bunch of

10   little old ladies?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Okay, I like that, little old ladies.

13         PROSPECTIVE JUROR:  Yeah.  And, you know, they're

14   not going to be prostitutes on purpose, right?

15         MS. CHRISTERNA:  And do you have some personal life

16   experience that brings you to make these assumptions?

17         PROSPECTIVE JUROR:  My friends go to massage parlors

18   and stuff like that, so...

19         MS. CHRISTERNA:  To get massages?

20         PROSPECTIVE JUROR:  Yeah.

21         MS. CHRISTERNA:  And do you think that that would

22   affect how you look at this defendant, whether she's guilty?

23         PROSPECTIVE JUROR:  I mean, I just assume, like, you

24   know, it's just a...

25         MS. CHRISTERNA:  You assume she's guilty?

1          PROSPECTIVE JUROR:  Yeah.

2          THE COURT:  You didn't listen to my speech at all,

3   did you?

4          PROSPECTIVE JUROR:  I listened.

5          THE COURT:  I worked on that all night.

6          PROSPECTIVE JUROR:  That was a very good speech.

7          THE COURT:  Didn't convince you one bit.  You still

8   think she's guilty, huh?

9          COURTROOM DEPUTY:  You've gotta say it verbally.

10          PROSPECTIVE JUROR:  Yes.  Yes.

11          MS. DIAZ:  So what you're saying is that you cannot

12   follow the Court's instructions to listen to the evidence and

13   be impartial and not convict unless you are firmly convinced of

14   the guilt as proven by the Government?

15          PROSPECTIVE JUROR:  Yes.  Yeah.

16          MS. DIAZ:  You cannot follow the Court's

17   instructions?

18          PROSPECTIVE JUROR:  Uh-huh.

19          MS. CHRISTERNA:  I have nothing further.  Thank you

20   for your honesty.  I think we need -- he gave enough

21   information.

22          THE COURT:  Thank you, sir.  Little old ladies, huh?

23   You can visit.

24          COURTROOM DEPUTY:  So what do you guys think?

25          THE COURT:  They have finally got one through.

1           MS. CHRISTERNA:  I would move for cause.

2           MS. DIAZ:  No objection from the Government.

3           THE COURT:  We'll excuse for cause, because of that

4   little old lady crap.

5           COURTROOM DEPUTY:  Let me tell you about Number 18.

6           THE COURT:  What was that number?

7           COURTROOM DEPUTY:  He's 26.  Let me tell you about

8   Juror Number 18.  Short story, I guess he was involved in a

9   lawsuit that involved prostitution.  He wasn't sued, but he

10  wants to bring it up.  So you guys want to speak with him?

11          THE COURT:  How can be involved --

12          COURTROOM DEPUTY:  You know what?  He has to explain

13  it because he was going on and on.  I said, wait, wait, just

14  stop.

15          THE COURT:  Mario Peres?

16          PROSPECTIVE JUROR:  I'm Mario Peres.

17          THE COURT:  I think you're going to be the most

18  interesting thing that happens to us today.  Tell me about the

19  lawsuit.

20          PROSPECTIVE JUROR:  Yes, sir.  I have commercial

21  property.  I leased to this couple, and it's a massage place.

22  So, you know, they have other locations.  And it's an Asian

23  woman and a white guy, and they have -- credit was good,

24  everything looked good, so they rent for massage.  And going

25  into about six months, then a cop approaches me, oh, there's

1   prostitution going on there.  I'm like, what?  I'm like, it's a

2   massage place.  They have a license for it.  No, no, no.

3   It's -- so I cooperated with them and -- so they were building

4   the case.  So I cooperated with the police, meaning leaving

5   them there for a little bit longer for them to build a case,

6   and they, you know, shut down the place.  And they busted the

7   heck out of the place, but they got them.  And when they sued

8   them, they included me also in the case, the DA.  I'm like,

9   wait a minute.  That's not what -- I'm no part of this thing.

10  So, anyway, they did release me.  I guess she wanted to -- the

11  DA wanted to include me so there are no loose ends or something

12  with it.  But I didn't get any charges or anything.  I was

13  dismissed.  And I think she put me on probation for two years

14  just to say that they had me on something, but I -- so there's

15  no way I -- you know, people lie, based on my knowledge.  And

16  when there are things like that involved, it's like, hhm, to

17  me, you're in, you know?

18          THE COURT:  Yeah, but you got arrested, right?

19          PROSPECTIVE JUROR:  No, I didn't.

20          THE COURT:  I think you said after a while they

21  released you.

22          PROSPECTIVE JUROR:  Well, the case.  I never got --

23  there's nothing against me.

24          THE COURT:  They didn't arrest you?

25          PROSPECTIVE JUROR:  Nothing.

1        THE COURT:  It's a good thing because we've got

2   people in here that would have sent you to prison just because

3   you got arrested.

4        PROSPECTIVE JUROR:  No.

5        THE COURT:  Okay.  And that's all you wanted to tell

6   us?

7        PROSPECTIVE JUROR:  That is it.  This is sort of

8   pertinent to that sort of thing, so I figured in my gut that it

9   would be pertinent to discuss.

10       THE COURT:  And that has left you feeling something,

11  right, in some way?

12       PROSPECTIVE JUROR:  Oh, yeah.  Uh-huh.

13       THE COURT:  What?  How?  What aspect of that has

14  left a lasting impression?

15       PROSPECTIVE JUROR:  The river rocks and things are

16  like that, you're guilty, man, as far as I'm concerned, in my

17  book.

18       THE COURT:  What about you?  You were connected with

19  that, too.  You owned the establishment.

20       PROSPECTIVE JUROR:  But I have my proof.

21       THE COURT:  You owned the establishment.

22       PROSPECTIVE JUROR:  Yes, the property, not the

23  business.

24       THE COURT:  And you didn't know what was going on?

25       PROSPECTIVE JUROR:  I didn't.  It's down the street.

**75**

1  I don't live there.

2          THE COURT:  Well, I think you know.

3          PROSPECTIVE JUROR:  You can go fishing.  It's -- I

4  love to fish.

5          THE COURT:  I'm the judge hearing this and I'm

6  thinking you owned the establishment, you checked these people

7  out.

8          PROSPECTIVE JUROR:  I checked.

9          THE COURT:  You knew what they were doing.  Surely

10  you knew what was going on in there.  You're guilty.

11          PROSPECTIVE JUROR:  No, I didn't partake or nothing.

12  They came and paid the rent.  That's down the street.

13          THE COURT:  So what do you mean, I've got to now

14  listen to evidence?  You want me to listen to all the facts now

15  before I make up my mind?

16          PROSPECTIVE JUROR:  Well, typically you want the

17  facts, yes.

18          THE COURT:  Is that what you want me to do?

19          PROSPECTIVE JUROR:  Well, I'm just speaking my mind

20  as far as this is pertaining to what I'm concerned about.

21  That's all I wanted to say.

22          THE COURT:  And did you listen to the facts?

23          PROSPECTIVE JUROR:  Do I?

24          THE COURT:  Would you?

25          PROSPECTIVE JUROR:  I listen to facts.  I like to

1  listen to what I think is the facts.

2          THE COURT:  Have you already drawn some conclusions

3  about guilt or innocence in this case?

4          PROSPECTIVE JUROR:  Uh-huh.

5          THE COURT:  And having heard no facts?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  The hypocrisy of it all.  Come on.

8          PROSPECTIVE JUROR:  I know.

9          THE COURT:  I don't know -- I don't know if this

10  is...  Oh, my God in Heaven.  Can you be fair in this case,

11  this case?  Can you be fair to that lady over there?

12          PROSPECTIVE JUROR:  I don't feel in my gut that I

13  could be fair.

14          THE COURT:  You don't?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  But you ran a business of prostitution?

17          PROSPECTIVE JUROR:  Heck, no.

18          THE COURT:  Please, someone, get through to him,

19  please.

20          MS. DIAZ:  May I inquire?

21          THE COURT:  Yes.

22          MS. DIAZ:  Where was this massage parlor?

23          PROSPECTIVE JUROR:  On Avalon in Wilmington.

24          MS. CHRISTERNA:  In Long Beach?

25          PROSPECTIVE JUROR:  City of Wilmington.

1          THE COURT:  PCH.

2          MS. DIAZ:  So putting -- would you be able to listen

3   to the evidence -- and so if this case is about whether the

4   defendant made people be prostitutes by force, fraud, or

5   coercion, not whether or not prostitution happened at all but

6   whether the defendant forced, defrauded, or coerced, could you

7   listen to the evidence and determine whether the Government has

8   met that burden of proving her guilty beyond a reasonable

9   doubt?

10         PROSPECTIVE JUROR:  I have a feeling that I wouldn't

11  be fair and impartial.  I just -- you know, I was born in Cuba

12  and lived through the Communism.  There's a lot of drama in my

13  life that I've lived through.  And when I see things like that,

14  I just shy and usually find more, like -- I don't know, I find

15  more guilt than not.  When things are rolling and you see or

16  hear these things, the facts might be, but sometimes the

17  actions and the whatever, I just -- impartiality is kind of a

18  problem for me.

19         MS. DIAZ:  What if the facts don't prove her guilty?

20  Could you listen to the evidence and vote not guilty?

21         PROSPECTIVE JUROR:  It's going to be hard to

22  convince, in my view.

23         MS. DIAZ:  Impossible to convince?

24         PROSPECTIVE JUROR:  Pretty impossible, yeah.

25         MS. DIAZ:  Okay.

1          MS. STEELE:  Thank you very much for your honesty.

2          PROSPECTIVE JUROR:  You're welcome.

3          MS. CHRISTERNA:  Move for cause, your Honor.  He

4     said it would be impossible for him to --

5          THE COURT:  He's been through this thing.  He said

6     how easy it is to get falsely accused.  Jesus.  This is Mario

7     Peres, right?  Number 18.  For cause.  Yeah, because these

8     people.

9          Okay.  Go ahead and let them go.  We're going to

10    take at least -- you ask her how much she wants.

11         THE REPORTER:  Ten.

12         THE COURT:  Okay.  Ten minutes it is.

13         (Jury pool out.)

14         (Recess from 11:19 a.m. to 11:26 a.m.)

15         THE COURT:  Back on the record outside the presence

16    of the jury, but counsel and the defendant are present.  And

17    the issue has come up with respect to what was the final

18    decision with respect to Juror Number 9, Alice Bell Gaines.

19    And I was only half kidding when I wrote down that she's

20    unfair.  She is too unfair to sit on the jury, so she's been

21    excused for cause.

22         MS. CHRISTERNA:  Thank you, your Honor.

23         MR. LARA:  Thank you, your Honor.

24         MS. STEELE:  Thank you, your Honor.

25         THE COURT:  Hope that clarifies matters.

1          (Recess from 11:27 a.m. to 11:35 a.m.)

2          (Jury pool in.)

3          (The following proceedings were held in open court.)

4          THE COURT:  All right.  Ladies and gentlemen, you've

5     spent some quality time with Ms. English, the courtroom deputy

6     clerk, and you've at least seen the lawyers and other principal

7     players.  Momentarily I'm going to ask the lawyers to not only

8     introduce themselves and those seated at counsel table with

9     them but also read from their witness list to see whether or

10    not any of you are familiar with any of the witnesses.  Now,

11    they're going to read a global witness list.  All these people

12    are not necessarily going to come in and testify, but just in

13    case, we want to make sure that none of you, you know, are

14    familiar with any of the witnesses or anyone in court, for that

15    matter.  So if any of you are familiar with anyone who's seated

16    in the courtroom right now, raise your hand.  Thank God.  Okay.

17         All right.  Let's begin with the Government.  Once

18    again, introduce yourselves and any special agents who may be

19    in the neighborhood and then go down your witness list.  Now,

20    if any of you think that a witness mentioned may be someone

21    you're familiar with, good, let us know, and then we'll provide

22    a bit more identifying information so that we can narrow it

23    down.  All right?  Okay.  Go ahead.

24         MS. DIAZ:  Thank you, your Honor.  May I remove my

25    mask?

1          THE COURT:  You can do whatever you want.

2          MS. DIAZ:  Good morning, everyone.  My name is

3     Assistant United States Attorney, AUSA, Damaris Diaz.

4          MR. LARA:  Good morning, everyone.  My name is

5     Assistant United States Attorney Scott Lara.

6          MS. DIAZ:  With us at counsel table is Special Agent

7     Corrie Lyle with the FBI.  The Government's witness list

8     includes the following names:  Ed Chen, who's a Los Angeles

9     Sheriff's Department Deputy -- Reserve Deputy, sorry -- Los

10    Angeles Sheriff's Department, LASD, Reserve Deputy.  Samuel

11    Chen Chong, who's a Federal registered court interpreter.

12    Michael Duff, an LASD deputy.  Fresno Police Detective David

13    Fries.  FBI linguist Helen Hong.  FBI Special Agent Corrie

14    Lyle.  LASD Detective Roger Harga.  FBI Special Agent Stanley

15    Patrzalek.  LASD Detective Nicholas Stewart.  And then the

16    following individuals:  Hong Yang, Kwan Hai Liu, Yang Tan, Yang

17    Lee Pan and Qinghua Ding.  Thank you.

18         THE COURT:  Thank you.  Any recognition or potential

19    recognition of any of the names called?  No hands.  Good.

20         All right.  Ms. Christerna?

21         MS. CHRISTERNA:  Good morning.  My name is Neha

22    Christerna, and I'm here with Callie Glanton Steele.  We're

23    with the Federal Public Defender's Office, and it's our honor

24    to represent our client Mei Xing.  And I will have Callie read

25    the names.

1          MS. STEELE:  Phan Le Huynh, P-H-A-N, L-E, H-U-Y-N-H.

2     Jiayuan Bates, J-I-A-Y-U-A-N, B-A-T-E-S.

3          THE COURT:  Drop your mask just for a second.

4          MS. STEELE:  Sean Xing Hooley, S-E-A-N, X-I-N-G,

5     H-O-O-L-E-Y.  Mercedes Rodriguez, M-E-R-C-E-D-E-S,

6     R-O-D-R-I-G-U-E-Z.  Xiang Zeng, X-I-A-N-G, Z-E-N-G.  Doug

7     Liu -- Dong Liu, D-O-N-G, L-I-U.  Los Angeles County Sheriff's

8     Department Detective Nick Stewart, S-T-E-W-A-R-T.  Deputy E.

9     Chen, C-H-E-N.  Jin Hongyan, J-I-N, H-O-N-G-Y-A-N.  Dr. Gamal

10     A. Tayab, G-A-M-A-L, A, T-A-Y-A-B.  Sonia Figueroa, S-O-N-I-A,

11     F-I-G-U-E-R-O-A.  Teo Casas, T-E-O, C-A-S-A-S.  Maria Sapene,

12     S-A-P-E-N-E.  Thank you.

13          THE COURT:  Thank you.  Any potential recognition?

14     No?  All right.  Thank you.  Hang on one second.

15          Right before -- we're going to put you in the box,

16     but right before that, I've got some questions, mainly because

17     we had just mentioned that there's going to be a number of

18     police officers from various agencies come in to testify.  All

19     right.  Anybody had any real bad experiences with LASD, the

20     Lincoln County Sheriff's Department, such that you would just

21     blindly disregard anything a member of the Sheriff's Department

22     said even under oath?  Anybody?  What about the FBI?  Fresno

23     Police Department?  Such negative feelings that you don't care

24     what they said, swearing on a Bible, you wouldn't believe

25     anything he had to say?

1          By the way, anyone -- is there anyone who blindly

2    will believe law enforcement over non-law enforcement

3    testifying about the same thing with the same opportunity to

4    observe, the same motivations, whatever they may be, or lack of

5    motivation, but if non-law enforcement says, no, that did not

6    happen but law enforcement says, yes, that happened, how many

7    would just simply, based upon nothing else, would say, yes, I

8    believe law enforcement on this issue just because they're law

9    enforcement?  Thank goodness.

10          THE WITNESS:  Could you explain that?  Federal law

11   enforcement?

12          THE COURT:  Oh, my goodness gracious.  Okay.  How

13   many would believe Federal law enforcement over local?  Two

14   people.  Okay.  Two and a half people.  Let's start with the

15   half.  Why is -- who are you?

16          COURTROOM DEPUTY:  Wait a minute.  I've gotta pass

17   the mic.  She wants a sidebar.

18          THE COURT:  Uh-oh.  Come on.

19          (The following proceedings were held at the bench,

20   outside the hearing of the jury.)

21          THE COURT:  Come on.  You're the star of the show.

22   Come on.

23          COURTROOM DEPUTY:  Say your name at that mic right

24   there.

25          PROSPECTIVE JUROR:  Good morning, sir, and ma'am.

1  Mine is just a simple --

2          COURTROOM DEPUTY:  Say your name.

3          THE COURT:  No, no, no.  We want to know who to

4  blame.

5          PROSPECTIVE JUROR:  Jazmine Bendo is the last name.

6          COURTROOM DEPUTY:  58.

7          THE COURT:  Yes indeed.  Senior analyst.  All right.

8  Talk to us.

9          PROSPECTIVE JUROR:  Yes, sir, your Honor.  Mine is

10  just a simple reason.  My best friend is a police officer.  My

11  best friend is a police officer.

12          THE COURT:  So?

13          PROSPECTIVE JUROR:  So I just believe in what she

14  does, and whatever she, you know, researches, whatever she

15  does, I just believe her.  I just, you know, stand up for what

16  she believes in.  She's been an officer for almost 20-something

17  years.

18          THE COURT:  And what department does your best

19  friend work for?

20          PROSPECTIVE JUROR:  She's a training officer in

21  North Hollywood.  I know she --

22          THE COURT:  You say North Hollywood Sheriff's

23  Department?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Okay.  No other law enforcement agency,

1   just the sheriff's department?  That's the one that you have

2   this --

3           PROSPECTIVE JUROR:  Correct, sir.  Correct, sir.

4   That's right.

5           THE COURT:  This allegiance to?

6           PROSPECTIVE JUROR:  That's correct.  And I have

7   military involved as well.

8           THE COURT:  Okay.  Now, is it just her that you will

9   believe or any of the, I don't know, 10,000 members?

10           PROSPECTIVE JUROR:  My relatives back home are also

11   in the police department, so I have a strong belief in the

12   service.

13           THE COURT:  In what they do, but --

14           PROSPECTIVE JUROR:  They're just police officers in

15   the Philippines, sir.

16           THE COURT:  Okay.  But tell me this --

17           PROSPECTIVE JUROR:  I'm sorry, sir?

18           THE COURT:  Tell me this:  These are people that you

19   know?

20           PROSPECTIVE JUROR:  Yes.  People I love as well.

21           THE COURT:  And love.  Okay.  And you've got some

22   basis to know about their trait for honesty and integrity, et

23   cetera?

24           PROSPECTIVE JUROR:  Yes.

25           THE COURT:  But what about people you don't know?

1  Would you also just blindly accept whatever they tell you?

2           PROSPECTIVE JUROR:  I couldn't really speak for

3  them; however, since I know that these people really work so

4  hard and they do believe in justice, I really -- you know, I

5  really believe in what they do.

6           THE COURT:  And those are character traits that you

7  assign to all of the department, right?

8           PROSPECTIVE JUROR:  Most of them.

9           THE COURT:  Most of them.  Do you know most of them?

10           PROSPECTIVE JUROR:  Most of what they do, you know.

11  But then I can only speak for -- you know, for --

12           THE COURT:  Those people?

13           PROSPECTIVE JUROR:  Yeah.

14           THE COURT:  Okay.  But you will accept whatever law

15  enforcement -- certainly the sheriff's department, whatever

16  they testify to, you will believe that?

17           PROSPECTIVE JUROR:  Sir, I can -- I don't think I'll

18  be -- you know, I'll be fair.  I know I can -- I'm going to be

19  impartial.

20           THE COURT:  Okay.  I think you've asserted that

21  position is starting to come to you now.  You can't vouch for

22  the honesty of people we have never laid eyes on, can we?

23           PROSPECTIVE JUROR:  Yeah, but then I guess it's

24  just -- I guess the first thing is I'm already -- the basis I'm

25  already affected by, you know, because I know they work so hard

1   but then sometimes people don't believe them.

2              THE COURT:  Okay.  I gotcha.  I gotcha.

3              PROSPECTIVE JUROR:  Sorry.  I just had to -- I'm so

4   sorry, sir.  I just had to blurt it out.  I just had to say it.

5              MS. STEELE:  Thank you very much.  This is Callie

6   Steele.  Thank you for your honesty.

7              THE COURT:  I'm still uncomfortable with this.  What

8   about everybody else that testifies?  Are you going to, like,

9   critically listen to what they have to say?

10             PROSPECTIVE JUROR:  I mean, sir, every -- I believe

11  that everybody has their right to defend themselves, but I

12  think first thing is I'm already biased because I know that the

13  police department and the police officers do everything they

14  can, you know, to do what's right.

15             THE COURT:  I'm not going to mention any high

16  profile names right now, but, you know, there are exceptions,

17  aren't there?  The mission, the law enforcement mission, yes,

18  laudable.  Okay?  People are willing to risk their lives for

19  others.  Absolutely.  Okay?  But here, for the purposes of this

20  trial, we're going to put human beings up there on the stand.

21  We're going to give you testimony regarding facts as they see

22  them.  It's going to be necessary, particularly when there's a

23  conflict in the facts, it's going to be necessary for you to

24  determine which one to believe.

25             Now, we would like to know that you are going to

apply some critical analysis to that determination, who you

think is giving you the straight facts, as opposed to simply

saying, nope, we're wearing a badge, gotta be truthful.  We

expect more than that.  And we're going to give you -- we're

going to give you an indicia of things to look for when a

witness is being -- a witness is testifying to help you make a

determination as to whether or not the witness is being

truthful or not, okay, things for you to look for.  And whether

or not you realize it, you do it every day.  You do it every

day.  When that used car salesman tells you, don't worry about

that 500,000 miles on the odometer, there's a brand new engine

in here, oh, and he says, oh, by the way, I used to be a cop, I

mean, you just aren't going to believe everything someone says,

are you?

PROSPECTIVE JUROR:  That's correct, sir; however --

THE COURT:  Oh, don't say "however."

PROSPECTIVE JUROR:  However, just like what I've

told you earlier, first off, I'm already, you know --

THE COURT:  In the law enforcement bag.  Gotcha.

All right.

PROSPECTIVE JUROR:  I'm already doubtful.

THE COURT:  Doubtful.

PROSPECTIVE JUROR:  The doubts are already gonna be

there.

THE COURT:  Wait a minute.  Talk to me.  What are

1   you doubtful about?

2          PROSPECTIVE JUROR:  The reason -- I guess the reason

3   why you're there is because something came up.  You're guilty

4   of something.  Even though I know you said earlier that

5   innocent until proven guilty, right?

6          THE COURT:  Absolutely.  Yeah.

7          PROSPECTIVE JUROR:  But then I'm thinking otherwise.

8          THE COURT:  What are you doubtful about?  I thought

9   you were doubtful of the lady's guilt, but what are you -- when

10  you say you're doubtful, what does that mean?

11         PROSPECTIVE JUROR:  I guess the reason why you've

12  been put in that position is because something is up.

13         THE COURT:  Okay.  Gotcha.

14         Lawyers?

15         MS. CHRISTERNA:  This is Neha.  I have one question.

16  So let me know if I heard you right.  If the L.A. Sheriff's

17  Department officer gets on the stand, are you likely to give

18  his testimony more weight than any other witness, like, give it

19  more importance than any other witness?

20         PROSPECTIVE JUROR:  I would believe so.  I would

21  believe so.

22         MS. CHRISTERNA:  Okay.  Thank you.

23         MS. DIAZ:  This is Damaris.  If the Court instructed

24  you that you must not give any one witness more weight just

25  because of who they're associated with, could you follow that

instruction?

PROSPECTIVE JUROR:  I'm going to try.

MS. DIAZ:  And as the Court said this morning, you know, we all have biases, and you have honestly communicated your bias that you came here with, and we're all grateful that you did so honestly.  Could you follow the Court's instruction to set aside those biases and be fair to the defendant and to listen to all of the evidence that's presented in this case and hold the Government to its burden of proving the defendant's guilt beyond a reasonable doubt?  That means listening to all of the evidence, all of the witnesses, and evaluating their credibility and the facts, following the Court's instructions. Could you do that?

PROSPECTIVE JUROR:  I'm going to try, but then the reason why I'm here is because, firstly, I'm already -- you know, I mentioned that I'm going to be somehow impartial already.

MS. CHRISTERNA:  So if I hear you right -- this is Neha -- you still have doubts on whether you can be fair?

PROSPECTIVE JUROR:  Yes.

MS. CHRISTERNA:  Thank you.

THE COURT:  Go ahead.

MS. STEELE:  For example, if you had an L.A. County Sheriff's Deputy testifying and the defendant were to testify, you would be more likely to believe the deputy?

1          PROSPECTIVE JUROR:  I guess I would closely listen

2     to what he's going to say.  I know it's -- you know, as a part

3     of a jury, you would have to listen to all angles, all the

4     evidence, you know, presented; however, as I've mentioned

5     earlier, I think I'm just going to -- there's just going to be

6     a part of me that's going to -- you know, I am not sure if --

7     it's just going to be my mind completely blocked off or

8     something.

9          MS. STEELE:  But you would give more credibility to

10    the police officer?

11         PROSPECTIVE JUROR:  Given my relationship, given my

12    ties with my friends and my relatives, yes.

13         MS. STEELE:  Okay.  Thank you.

14         MR. LARA:  This is Scott.  If you're presented with

15    evidence that contradicts one of the LASD sheriff's testimonies

16    and you believe the evidence that contradicts their testimony,

17    would you still believe their testimony?

18         PROSPECTIVE JUROR:  Well, it all depends.  It

19    depends on what's going to be presented.

20         MR. LARA:  Right.

21         PROSPECTIVE JUROR:  As I've said earlier.

22         MR. LARA:  What we're trying to get at is, are you

23    going to blindly listen to what they say and just agree with

24    that or are you going to consider all the evidence?

25         PROSPECTIVE JUROR:  There's going to be impartial...

1    MR. LARA:  Will you consider all of the evidence,

2   though, when considering the case as a whole?

3    PROSPECTIVE JUROR:  I would like to promise, but

4   yeah, so...

5    THE COURT:  Thank you very much.

6    MS. DIAZ:  Thank you so much.  Thank you for your

7   honesty.

8    MS. CHRISTERNA:  We move to excuse that juror for

9   cause.

10    THE COURT:  Yes.  Gone.  Gone.

11    COURTROOM DEPUTY:  Number 58?

12    THE COURT:  Yes, Number 57 -- no, 58.  She's gone

13   for cause.  She just would not budge.

14    COURTROOM DEPUTY:  Stand right here and state your

15   name.

16    PROSPECTIVE JUROR:  Narzal Monroy Lopez.

17    COURTROOM DEPUTY:  Number 27.

18    THE COURT:  27.  All right, Mr. Lopez, what is on

19   your mind, sir, that you would like to share with us?

20    PROSPECTIVE JUROR:  Well, you asked the question of

21   who I would believe more, the law enforcement or the lay

22   people, and I would strongly believe, based on my, you know,

23   association with friends and relatives on the forces, that I

24   would believe them first.

25    THE COURT:  First?

1          PROSPECTIVE JUROR:  Yes.  And then, you know, of

2   course, my way of going -- the way of my belief is not just

3   based on, you know, being racist or anything because we talked

4   about this.  In the business, I'm a real estate businessman,

5   and I have clients who are also in the force, and we talk a lot

6   about their incidents, about, you know, them arresting people,

7   such as -- not the crime that this lady was being accused of,

8   but they always tend to believe that they are truthful about,

9   you know -- because they're sworn to protect and serve the

10  people.  That's what I believe.

11          THE COURT:  All right.  So you don't think that they

12  would lie in order to, I don't know, establish the legitimacy

13  of a bad arrest?

14          PROSPECTIVE JUROR:  I don't think so, because I

15  don't think that the other people who are not -- who haven't

16  given their oath would also lie, you know?

17          THE COURT:  You don't think -- to back one of your

18  own, you don't think they would lie?

19          PROSPECTIVE JUROR:  I weigh more on the people who

20  took the oath.  That's what my belief is.

21          THE COURT:  All right.  So you pretty much -- you

22  know, you believe law enforcement?

23          PROSPECTIVE JUROR:  100 percent, yes.

24          THE COURT:  100 percent?

25          PROSPECTIVE JUROR:  Yeah.

1          THE COURT:  And I'm going to give you instructions

2     on how you are to weigh the credibility of witnesses, things

3     you're supposed to look for and listen for, be observant about,

4     but you're not going to need that, right, because if law

5     enforcement says it, you're going to believe it?

6          PROSPECTIVE JUROR:  Well, between the lay people and

7     the people who took the oath, yes, I'll take the law

8     enforcement.

9          THE COURT:  Okay.  All right.  That's good to know.

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  Anybody?

12         MS. DIAZ:  This is Damaris Diaz for the Government.

13    Every witness that will be called in this case will take an

14    oath to tell the truth.

15         PROSPECTIVE JUROR:  Right.

16         MS. DIAZ:  Does that affect your ability to judge

17    them fairly?  You'll have the opportunity to observe them and

18    their testimony, and it will be the job of the jury to

19    determine whether they find the witness credible based on what

20    they did in court.  Would you be able to look at the witnesses

21    and --

22         PROSPECTIVE JUROR:  Well, the people who takes the

23    oath right now, whether they're telling the truth or not, is

24    different from the people who took the oath to, you know,

25    protect and serve the people.  So, I mean, the judgment there

1  is really orange and apple.  So I would say that -- I would

2  give them the benefit of the doubt, but --

3          THE COURT:  Would it change your views at all if I

4  told you factually that police officers do not take an oath to

5  protect and defend the citizens, that they take an oath to

6  protect and defend the Constitution?  Does that make any

7  difference?

8          PROSPECTIVE JUROR:  Well, the Constitution is the

9  overall governing knowledge for all the people, so yeah.  I

10  mean, every city has a Constitution, the national and

11  Federal -- the Constitution is the Federal.

12          THE COURT:  No.  California's got one, too.

13          PROSPECTIVE JUROR:  No, I'm referring to the degree

14  of -- you know, like, the weight of it.  I would say that the

15  Constitution weighs more than, you know, the people.  But,

16  still, whoever preserves and protects the people is for the

17  people, so regardless how you break it down, I would still go

18  for the people who are sworn in.

19          THE COURT:  Okay.  Thank you.  Anybody else?

20          MS. CHRISTERNA:  Just one last question from Neha

21  Christerna.  Just what I'm hearing, and I want to clarify,

22  because of the police officer's oath, you're going to give them

23  more -- you're likely to give them more importance than any

24  other witness?

25          PROSPECTIVE JUROR:  Well, if they don't take the

1  oath, what's the oath for?

2  THE COURT:  Thank you, sir.

3  MS. DIAZ:  Thank you for your honesty.

4  THE COURT:  I'm distracted by the fact that Neha's

5  got bling on her mask.

6  MS. CHRISTERNA:  I know.  That's my kids' glitter.

7  I have it all over the house.

8  THE COURT:  Oh, I'm waiting for you to begin,

9  because you're going to argue about this.

10  MS. DIAZ:  We move to excuse Juror Number 27 for

11  cause.

12  THE COURT:  Thank you.

13  MS. CHRISTERNA:  For the record, we don't object.

14  THE COURT:  Unbelievable.  I've never seen somebody

15  so in the bag.

16  COURTROOM DEPUTY:  Okay.  The last one is going to

17  be Number 3.  Go to the mic and state your name.

18  PROSPECTIVE JUROR:  Pradeep Ramamurthy.

19  COURTROOM DEPUTY:  Number 3.

20  THE COURT:  All right, sir, what would you like to

21  share with us?

22  PROSPECTIVE JUROR:  I think -- based on the

23  question, I think it's worth knowing that I worked at the FBI

24  for seven years.

25  THE COURT:  Yeah, that's worth knowing.  Doing what?

1          PROSPECTIVE JUROR:  Initially, I was a

2    counterterrorism intelligence officer.

3          THE COURT:  Man, dude.

4          PROSPECTIVE JUROR:  I was involved in the

5    reorganization of the FBI.

6          THE COURT:  Wait a minute.  Are you just putting us

7    on or what?

8          PROSPECTIVE JUROR:  No.  And then I worked for Bob

9    Muller for two years directly.

10         THE COURT:  Are you messing with us?

11         PROSPECTIVE JUROR:  No.  That's what I did.

12         MS. DIAZ:  What was the second thing?

13         PROSPECTIVE JUROR:  I worked on the reorganization

14   of the FBI after 911.

15         THE COURT:  Damn.  You should automatically get

16   excused.  You've already done your civic duty.  All right.  So

17   you're in the bag for the FBI?

18         PROSPECTIVE JUROR:  No, but I would trust the FBI's

19   opinion on something over local law enforcement.

20         MS. DIAZ:  If it was at -- I'm sorry.  This is

21   Damaris.  Are you saying you would trust FBI if it was at odds

22   with local law enforcement?

23         PROSPECTIVE JUROR:  Correct.

24         MS. DIAZ:  If you were to hear from both FBI and law

25   enforcement and civilian witnesses in a single case, would you

1  be able to judge the credibility of each witness independently?

2          PROSPECTIVE JUROR:  I would probably be biased

3  towards the FBI.

4          MS. DIAZ:  Meaning that you would believe them no

5  matter how incredible their testimony?

6          PROSPECTIVE JUROR:  If it was -- not how incredible,

7  but it depends on what we mean.  I mean, I have no idea how

8  many witnesses there are on the other side, but if it's going

9  to be one FBI agent or an FBI position versus a local law

10 enforcement position versus a civilian, I'm going to be biased

11 towards the FBI's view on it.

12         MS. DIAZ:  You're not saying FBI witnesses would be

13 infallible; you would still listen to their testimony and

14 evaluate their credibility?

15         PROSPECTIVE JUROR:  Yes.

16         MS. DIAZ:  You just start from a position of bias,

17 but would you be able to follow the Court's instructions and

18 set aside that bias when you're listening to the testimony?

19         PROSPECTIVE JUROR:  I think so.

20         MS. CHRISTERNA:  This is Neha Christerna for the

21 defendant.  So if the FBI is going to testify about an issue

22 and a defense witness testifies about the same issue, are you

23 likely to believe the FBI agent over the defense witness?

24         PROSPECTIVE JUROR:  Probably.

25         MS. CHRISTERNA:  And if the judge tells you you have

1 to treat them fairly, would you still likely give more

2 importance to the FBI agent?

3          PROSPECTIVE JUROR:  I would give more importance.

4 That's probably the right word.

5          THE COURT:  I've got a question.  I'd like to think

6 of it as a common sense question.  Now, would the subject

7 matter of the testimony have any bearing upon who you're going

8 to believe or who you would give greater -- whose testimony you

9 would give greater weight to, the subject matter?

10          PROSPECTIVE JUROR:  I mean, I guess my question

11 would be if it's firsthand knowledge from the FBI or if it's,

12 say, secondhand or thirdhand knowledge from the FBI versus a

13 firsthand account.  I would be biased towards the firsthand

14 account.  But particularly on subject matter, again, I think it

15 depends, I mean, on what the topic was.

16          THE COURT:  Okay.

17          PROSPECTIVE JUROR:  But my tendency is to think that

18 -- just having worked with them, that I just know the caliber

19 of the people that are at the FBI.

20          MR. LARA:  This is Scott.  It sounds like to me what

21 you're saying is you would consider the circumstances of the

22 testimony, the ability of the witnesses to perceive what

23 they're testifying about and all the other evidence when

24 evaluating testimony and it's not just FBI true --

25          PROSPECTIVE JUROR:  Correct.

1          MR. LARA:  -- not FBI not true?

2          PROSPECTIVE JUROR:  Correct.

3          MS. CHRISTERNA:  This is Neha from the Federal

4    Public Defender.  Are you more likely to believe that the

5    defendant is guilty because the FBI is involved in this case

6    and in this investigation?

7          PROSPECTIVE JUROR:  I'm likely to believe that the

8    FBI has good reason for bringing charges.

9          MS. CHRISTERNA:  So you're more likely to believe

10   she's guilty just based on the fact that the FBI's involved?

11         PROSPECTIVE JUROR:  Yeah.  I mean, I think just from

12   a resource/expenditure perspective, I mean, you know, I don't

13   think the FBI wastes its resources, particularly on this topic.

14         MR. LARA:  This is Scott again.  So are you unable

15   to follow the judge's instruction that she's innocent until

16   proven guilty?

17         PROSPECTIVE JUROR:  Oh, I think she's innocent until

18   proven guilty.

19         MR. LARA:  Great.  So do you still believe that,

20   sitting here today, having heard no evidence?

21         PROSPECTIVE JUROR:  Correct.  I would want to hear

22   what the evidence is.

23         MS. CHRISTERNA:  But you wouldn't think that the FBI

24   would be involved if she's not likely good for it?

25         PROSPECTIVE JUROR:  I wouldn't think the FBI would

1  be involved if they didn't think that she was good for it.

2          MS. CHRISTERNA:  If they didn't think, right?

3          PROSPECTIVE JUROR:  Correct.

4          MR. LARA:  This is Scott again.  But that's just as

5  you're sitting here today.  You would consider the evidence

6  once you started hearing it and then make your determination

7  based on the evidence once you start hearing it?

8          PROSPECTIVE JUROR:  Correct.

9          MR. LARA:  Great.  I have no further questions.

10         MS. STEELE:  But you have a bias towards the FBI,

11  right?

12         PROSPECTIVE JUROR:  Organizationally, I think, yeah.

13  I mean, I worked there.  I would be biased to them over local

14  law enforcement for sure, especially if they were on

15  contradictory sides of testimony.  Again, it depends on whether

16  it's firsthand testimony, secondhand testimony, thirdhand

17  testimony.

18         MS. DIAZ:  And this is Damaris again.  You said you

19  would be able to set your bias aside and follow the

20  instructions, right?

21         PROSPECTIVE JUROR:  Correct.

22         MS. STEELE:  If it were between an FBI agent and the

23  defendant, for example, who testified, you'd be more likely to

24  believe the FBI agent, based on your experience?

25         PROSPECTIVE JUROR:  If these are the only two pieces

of evidence?

MS. STEELE:  Yes.

PROSPECTIVE JUROR:  Yeah, I probably would believe the FBI agent in that circumstance.

MS. DIAZ:  This is Damaris.  And if you were watching both testimony and evaluating, would you be able to set aside your bias and evaluate based on what you saw in court so that if you, in court, decide that you believe one person over the FBI, you would act on that belief?

PROSPECTIVE JUROR:  I would, yeah.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Thank you.

MS. DIAZ:  Thank you.

MS. CHRISTERNA:  Thank you.

MS. STEELE:  Thank you.

We would move to excuse Juror Number 3 for cause.

MR. LARA:  Your Honor, the Government would object to that.  The juror said multiple times that he could be fair and put aside his biases, that he could consider all the evidence, that he would consider the weight of the evidence based on firsthand, based on secondhand, based on thirdhand accounts, based on outside evidence, so for that reason, your Honor, the Government doesn't think he should be excused for cause.

THE COURT:  I don't either.  I think --

1          MS. STEELE:  Well, your Honor, he said that he's

2    biased.  He said that between the FBI agent and the defendant

3    he would believe the FBI agent --

4          THE COURT:  Yes.

5          MS. STEELE:  -- based on his experience.

6          THE COURT:  Yes.

7          MS. STEELE:  But we need our jurors who would say,

8    no, I would not be biased towards the FBI or against the

9    defendant, I would listen to both and I would determine who's

10   telling the truth.

11         THE COURT:  Well, I think that's pretty much what he

12   said.  He said he's going to listen to the evidence, but he has

13   a -- he goes into this thing with an organizational bias in

14   favor of the FBI.  Who the hell doesn't?  I mean, you know what

15   I find interesting?  Someone so in the bag over this corrupt

16   sheriff's department.  I find that incredible.  But anyway,

17   that's just me.

18         MS. CHRISTERNA:  Just one last thing.  He said,

19   because the FBI doesn't expel resources unless someone's

20   guilty, he's more likely to find --

21         THE COURT:  I think that's true, yeah.  That's

22   common sense.  It's common sense.

23         MS. CHRISTERNA:  But that shows that he has a bias.

24         THE COURT:  He said that.  He started off with that.

25   He worked seven years.

1          MS. CHRISTERNA:  And he could not be fair because of

2   that.

3          THE COURT:  He did not say that.  He did not say

4   that.  Okay.  But he will be there.

5          COURTROOM DEPUTY:  Cross?

6          THE COURT:  No.

7          MR. LARA:  No.

8          COURTROOM DEPUTY:  Okay.  I'm ready to sit because

9   it's almost lunch.

10          THE COURT:  Yes.  And we have to give them a real

11   lunch today?

12          COURTROOM DEPUTY:  Yes.

13          THE COURT:  Is it noon?

14          COURTROOM DEPUTY:  Yes.  It's ten after 12:00.

15          MS. CHRISTERNA:  The jurors that you're discussing

16   for cause, we can probably --

17          COURTROOM DEPUTY:  No.  No.  No.  I've got that.  I

18   just need to seat them.

19          THE COURT:  Go ahead and let them go.  Do whatever

20   you need to do.

21          (The following proceedings were held in open court.)

22          COURTROOM DEPUTY:  Let me seat everybody so

23   that's -- then they'll have to come back and sit in their same

24   seat.

25          THE COURT:  All right.

1          COURTROOM DEPUTY:  And then we'll do questions after

2   lunch.

3          THE COURT:  Yeah.  1:30, right?  Well, actually,

4   more than that.  Make it 1:45.

5          MR. LARA:  Yes, your Honor.

6          THE COURT:  So everybody gets a whole...

7          MR. LARA:  Thank you, your Honor.

8          THE COURT:  I apologize.  This has gone way longer

9   than I expected.  I thought we'd have a jury by now.  Okay.  Go

10  let them go.

11         COURTROOM DEPUTY:  No.  No.  No.  Seat them.  Have a

12  seat.

13         THE COURT:  Really?  All right.

14         COURTROOM DEPUTY:  Okay.  When I call your name,

15  this is Seat 1, 2, and so forth, 9, so forth.  When we get out

16  here, I'll ask everybody to move over there, then I'll seat

17  you.  Okay?  This will go quickly, and then we'll go to lunch.

18         So my first name is Elizabeth Dubbs.  Pradeep

19  Ramamurthy, Number 2.  Ana Romero.  Grab all your belongings.

20  Aliya Guzman.  Carlos Cardenas.  Susan Murphy.  Madeline

21  Obannon.  Thomas Cotugno.  Norma Umekubo.  Steve Dances.  Toni

22  Rodriguez.  Justin Gullien Torres.  Nohemy Estrada.  Luz Loza.

23  Mario Peres.  Tony Lucas.  Susan Wood.  Benjamin Platt.

24  Raymond Macias.  Miranda Dinardo.  Hannah Kwon.  Isabelle

25  Newman.  Robyn Millen.  Jeffrey Eisen.  Daniel Moyer.  Oksana

Dutchak.  Adam Matthews.  Scott Brooks.  Joshua Soto.  Trisha

Kozlowski.  Vir Vergel.  Kathy Tichenor.  Erick Rodriguez.

Emily Gardner.  Byron Marin.  Maxwell Tufeld.  Leyla Huite.

Erica Onugha.  Linus Lau.  Penelope Garcia.  Diane Ratcliff.

Asaf Zairi, James Lodato.  Catherine Carrascoames.  Dorothy

Wong.  Teawhan Cho.  Justina Lange.  Cheng Chen.  Janet

Vanriper.  Stella Lee.

THE COURT:  All right.  We're going to break for

lunch, a real lunch, probably the only real lunch we'll have in

this trial.  But before we break and before every break and

before we adjourn for the evening, I'm going to give you an

admonition, which basically says, you are to decide this case

based upon the evidence, which means testimony and documents,

et cetera, that you receive from this room, not from any other

source.  And I know all things are knowable from the internet,

but I want you to stay off the internet in terms of doing any

research on this.  Everything that you need in order to reach a

verdict is going to be presented to you here.

And why it's important that all of you are exposed

to the same evidence is that the evidence you get here will be

subject to the crucible of a trial, cross-examination, et

cetera, in order to test the legitimacy, veracity, authenticity

of that evidence.  Now, if you get something from the internet

on your own, that information isn't going to be subjected to

this truth-finding crucible, trial.

1             You will have a piece of information that no one

2     else will have.  And I can guarantee you we will declare a

3     mistrial and we'll have to do it all over again and we're going

4     to bring you back as jurors.  So I'm going to give you much

5     more detailed things about don't talk to anyone, don't let

6     anyone talk to you, et cetera, et cetera.  One caution.  You

7     may see these people out in public areas, and because you're

8     all nice and polite people, you may speak.  They will not

9     acknowledge you.  They're not stuck up -- well, maybe they are,

10    but that isn't the reason.  As trial participants, they

11    cannot -- they cannot communicate with the fact-finders in a

12    trial that they're trying.  So they will blow you off, but it

13    is not because they're not nice people.  It's like under

14    penalty of death, they cannot communicate with the jury, right?

15    So best practice, if they're not wearing a white badge, don't

16    talk to them.  But anyway, we'll talk about this later.

17    Remember where you're seated because there will be a test later

18    on.

19             COURTROOM DEPUTY:  Yeah, remember where you're

20    sitting because I don't know you yet.

21             (Jury pool out.)

22             (Recess from 12:22 p.m. to 1:45 p.m.)

23             (Jury pool in.)

24             COURTROOM DEPUTY:  Okay.  You may be seated.  This

25    court is once again in session.

1          THE COURT:  All right.  All counsel and defendant

2     are present, as is the entire panel, so we'll continue with the

3     jury selection.

4          All right.  Ladies and gentlemen, I'm going to pose

5     some questions to you as a group; otherwise, we will never get

6     out of here.  I've already asked questions dealing with the

7     various law enforcement agencies whose -- who will have

8     representatives here testifying, and we've gotten some input

9     regarding various people's feelings about these law enforcement

10    agencies.  One of the things that we have not dealt with is

11    whether or not we have any people here who have had really

12    unpleasant experiences with law enforcement.  Now, I'm not

13    really interested in law enforcement in general.  We've got

14    L.A. Sheriffs, FBI, and Fresno.  That's who we're really going

15    to have here in court testifying.

16         Now, unless you have had, for example, a really,

17    really, really bad experience with LAPD that has you pissed off

18    with Fresno, okay, fine, I'd like to hear about that, okay,

19    because it is possible that you can have a bad experience with

20    law enforcement and then there's a spillover, you hate them all

21    and don't trust any of them and won't believe anything that any

22    of them say.  We need to know about that.  We need to know

23    about that because I don't know that much about this case, but

24    it's my understanding that a great deal of the evidence is

25    going to come from law enforcement.  So if we have people here

1   who will just simply tune out all of law enforcement, then I

2   think that's going to pretty fairly indicate that the

3   Government's not going to get a fair trial from you, so -- and

4   it's all right if that's the way you feel, it is, but I need to

5   know about it.  We all need to know about it.  Anybody have

6   some real negative views of law enforcement?  And I'm sure it

7   comes from, you know, a place of love.  I'm sure that there is

8   a legitimate reason for it.  And that's fine.  Don't care about

9   that.  We just simply care to find out whether or not it

10  exists.  Anybody really pissed off with law enforcement in

11  general?  I've had some tickets that I didn't think I deserved,

12  so I do fall in that category, but that's just me.  Anybody

13  else?  No?  Okay.  That's fine.

14          Anybody have any really strongly-held personal

15  beliefs or opinions regarding commercial sex work?  Okay.

16          Anybody have any strongly-held beliefs or opinions

17  that they wish to publicly admit to?  No?  Okay.

18          Anybody have any close friends or family members who

19  have had interactions with people engaged in commercial sex

20  work?

21          Now, this one maybe nobody wants to just -- all

22  right.  You know what I need to do?  I need to start stacking

23  up some that we can address at sidebar, just a whole group of

24  things, so that when you ask for a sidebar, no one says, oh, I

25  know what it is, it's in response to this question:  Have any

1  of you ever been accused of sexual misconduct?  That question,

2  right?  So put that one on your list, and that will be one of

3  the ones we can talk about at sidebar.  I think I do have some

4  others.

5         Any of you believe that a commercial sex worker

6  should not be able to withhold consent to engage in sexual

7  activities with a given person?  Do you believe that a

8  commercial sex worker doesn't have the right to decline a

9  particular customer, or do you believe that commercial sex

10 workers should not have the right to decline to engage in

11 certain sexual acts?  Anybody believe any of those things?  Did

12 they all go to sleep after lunch?

13        COURTROOM DEPUTY:  Hopefully.

14        THE COURT:  All right.  Cool.  All right.

15        MS. CHRISTERNA:  Your Honor, can you repeat that

16 question, please?

17        THE COURT:  Yes, because I enjoyed it.

18        Do any of you hold a belief that a commercial sex

19 worker cannot withdraw consent or cannot decline a customer or

20 cannot decline certain sex acts?  Do any of you believe that a

21 commercial sex worker does not have those rights?  Oh, I saw

22 movement.  It wasn't like a real show of a hand, but it was

23 like a movement.  No?  All right.

24        Oh, yes, this is the one that will wake you up.  Do

25 any of you have any general feelings or beliefs about the

criminal justice system that would prevent you from being able

to give fair and impartial consideration to the evidence in

this case?  I had a bunch of those people who have had a family

member go through the system, and they didn't think that the

family member was treated fairly, so they've got a real problem

with the entire system.  I understand.  Do we have that?

COURTROOM DEPUTY:  Say your name.

THE COURT:  There you go.  You're awake.  You're the

only one that's awake.

PROSPECTIVE JUROR:  My name is Madeline Obannon.

THE COURT:  And what number are you, Madeline

Obannon?

PROSPECTIVE JUROR:  Number 8.

COURTROOM DEPUTY:  On the list, that is.

THE COURT:  Madeline D. Obannon.

PROSPECTIVE JUROR:  Madeline Diane Obannon.

THE COURT:  All right.  Ms. Obannon?

PROSPECTIVE JUROR:  I had -- well, I have two

nephews that, while in their 20's, were arrested for some drug

dealings, I guess, and some people that they were with

pleaded -- how do you say it, they --

THE COURT:  Nolo contendere?

PROSPECTIVE JUROR:  Yeah, they pled -- they

bargained, plea bargain.  And my two nephews decided to fight.

And they ended up spending 25 years in Federal prison, where

1  the other guys got off within a year.  So I just had a problem

2  with that.  I didn't quite understand.  I mean --

3  THE COURT:  No.  The problem is your nephews didn't

4  watch TV.  That's where you get your best legal advice.  Do a

5  deal.  All right.

6  PROSPECTIVE JUROR:  But --

7  THE COURT:  Now, so is that the system, you think?

8  Now -- well...

9  PROSPECTIVE JUROR:  Well, I felt that it was

10  because, I mean, the other guys got one year, and then they got

11  25 years.  They were in their 50's when they got out.  I

12  thought that was pretty harsh, even -- they may have been

13  guilty, you know, but 25 years, two years, you know, I didn't

14  understand it.

15  But another thing, my best friend's daughter made

16  the documentary "13," and after looking at that, I just

17  completely -- you know, the system needs work.  I know it's our

18  only system and it's the best that we have, but that

19  documentary really touched me, and it's just a lot of

20  unfairness in the system.  You know?  I don't want to go into

21  it, but --

22  THE COURT:  I know.

23  PROSPECTIVE JUROR:  -- you know, most people know,

24  you know, things are just not quite fair.

25  THE COURT:  If we were at Starbucks, I've got some

1    stories.  But what you're saying is true, the system can be

2    fixed, repaired, corrected, improved in a lot of ways, a lot of

3    ways, so I'm not going to pretend that that isn't so.  I'm not

4    going to pretend that there aren't some inequities.  I'm not

5    going to pretend that your life will turn out differently

6    depending upon whether the DA prosecutes you or the United

7    States Attorney.  Be that as it may, and as you say, this is

8    what we've got for now.  Okay?

9              PROSPECTIVE JUROR:  Uh-huh.

10             THE COURT:  Until you, Ms. Obannon, become Queen and

11   fix this mess.  Can we work with it?  Can we work with what

12   we've got?  And to the extent that we as individuals can

13   improve it, are we willing to try that, do our part to improve

14   it in the smallest way that we possibly can?

15             PROSPECTIVE JUROR:  We have no choice.  We have to.

16             THE COURT:  I think that's correct.  I think that's

17   the right answer.  Okay?  Nothing that I'm aware of on this

18   planet is perfect, but we as individuals can do our part to try

19   to improve it in the little ways that we can.  And I think that

20   we're trying to do that here.  Okay?  This is not perfect.  God

21   knows it is not perfect.  And try as we might, we're not going

22   to get a perfect result here.  But we're going to do our

23   damnedest.  And it starts with who we put in these seats over

24   here.  This is the most important thing.  This is the most

25   important thing, that we have put ourselves in charge of

1  sitting in judgment of ourselves.  I don't think anybody else,

2  you know, has the vested interest other than us.  We want a

3  system that is going to treat us fairly.  So this is why we've

4  spent almost all day trying to get, you know, 12, 13, 14, 15

5  people who will treat both the Government and this lady fairly.

6  Okay?

7              PROSPECTIVE JUROR:  Okay.

8              THE COURT:  So what are you telling me?  At the end

9  of the day...  It's terrible.  Okay.  At the end of the day,

10  your nephews are doing a lot of time, and hopefully, you

11  know --

12             PROSPECTIVE JUROR:  They're out.  They're in their

13  50's.

14             THE COURT:  Okay.  Good.  That part's good.

15             PROSPECTIVE JUROR:  Yeah.  Yeah.  And they're doing

16  well.

17             THE COURT:  So you can put that aside, right?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  And we can deal with this, this case --

20  the prospect of you being a juror on this case, right?

21             PROSPECTIVE JUROR:  Uh-huh.

22             THE COURT:  Can you do that and do what it is that

23  we've been asking people, you know, are you able to do this,

24  can you be fair, can you sit as a fair and impartial, objective

25  juror and listen to all the evidence and make a conscientious

1  decision as to whether or not the Government has established

2  this lady's guilt beyond a reasonable doubt?  And if in your

3  mind you don't think they have, boom, set her free.  Can you do

4  that?

5          PROSPECTIVE JUROR:  I can.

6          THE COURT:  All right.  That's all I want to hear

7  from everyone, an emphatic "I can."  Okay.

8          By the way, there's going to be an awful lot of

9  instructions on this subject:  Does anyone in here speak

10 Mandarin, Chinese dialect?  Oh my God, a hand went up.  You

11 speak Mandarin way back there, sir?

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Okay.  You're disqualified.  What is

14 your name, sir?

15         PROSPECTIVE JUROR:  Last name Chen, Cheng Chen.

16         THE COURT:  Oh, why did I ask?  I'm going to go

17 through each one of these pages until I find something that

18 looks or sounds like --

19         MS. DIAZ:  Number 61, your Honor.

20         THE COURT:  Number 61?

21         MS. DIAZ:  I believe so.

22         THE COURT:  Okay.  Thank you.  I'll bet that's

23 probably right.  Are you a construction contractor, sir?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Excellent.  We have tracked you down.

1   All right.  Okay.  Now, here, here's the deal:  It is my

2   understanding -- I don't know this, but it is my understanding

3   that conversations took place in Mandarin Chinese.  We're

4   going -- we have -- the parties have had documents and

5   recordings translated into English from Mandarin, but it's also

6   my understanding that you're actually going to hear the spoken

7   word in Mandarin.  And I guess that will be accompanied by a

8   transcript of these recordings into English.  And you'll be

9   getting an instruction that says, basically, some of you speak,

10  you know, Mandarin Chinese, but you are required to listen to

11  and only consider the English translation, even though some of

12  you may speak Mandarin and you may interpret some of these

13  words differently.  And even so, even if you believe your

14  translation is superior to the official court interpreter's

15  translation, you must agree to follow the Court interpreter's

16  translation.  Would you be able to do that, sir?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Thank you.  It only took me 45 minutes

19  to ask that question.

20          All right.  Let me see if there's anything else I

21  need to...

22          Oh, this is real:  Here in the age of CSI, do you

23  believe that the Government should be required to prove someone

24  guilty of a crime by use of forensic evidence; DNA,

25  fingerprints, audio, video recordings, in order to conclusively

establish guilt?  I have heard people say in the damnedest kind
of case that there was no forensic evidence to establish
someone's identity.  I'm just kind of wondering whether or not
any of you hold that belief.  Do you need to see a chalk
outline of a body?  Do you need to have DNA evidence here in
this case in order to feel that the Government has adequately
done its job?  Nothing?  No one needs -- oh, look at that.
There's someone.

                    COURTROOM DEPUTY:  Okay.  Wait a minute.

                    THE COURT:  You know I'm going to ridicule you,
right?

                    PROSPECTIVE JUROR:  My name is Oksana Dutchak, and I
believe that government agencies should have something to prove
the crime, at least, like, some videos that should be video,
maybe even, like, DNA test, which can show a lot of -- that can
prove the crime or opposite.

                    THE COURT:  What is your name again?

                    PROSPECTIVE JUROR:  Oksana.

                    THE COURT:  Oksana?

                    PROSPECTIVE JUROR:  Uh-huh.

                    THE COURT:  I don't want to forget you.

                    PROSPECTIVE JUROR:  Dutchak.

                    COURTROOM DEPUTY:  34.

                    THE COURT:  34?  Oksana.  There you are.  Okay.
Thank you.  You're an accountant, right?

1          PROSPECTIVE JUROR:  Correct.

2          THE COURT:  Okay.  I just want to say this:  If we

3    have a situation where the identity of the potential

4    perpetrator is in doubt, it's in question, we're not really

5    sure, then I think that is a perfect situation for scientific

6    evidence to confirm or deny someone's identity.  In many

7    crimes, biological trace evidence has been left behind, and

8    sometimes you do need to rely on science to collect, analyze

9    that trace evidence, and compare it to known subjects.  We

10   don't have that kind of case here.  We don't have that kind of

11   case, and are you going to be troubled by the fact that there's

12   going to be this scientific void in this case?

13         PROSPECTIVE JUROR:  It's not, like, required to have

14   scientific, you know, like, but something that might show that

15   that situation was real and something can prove that.  I think

16   so.  How can anyone just rely on words if those words are not

17   proved by some way?  People are different, and different people

18   can say different things.

19         THE COURT:  Okay.  Understood.  All right.  Hang on.

20   Hang on.  Hang on.

21         For everyone who understands her point, any

22   agreement?  She's got a lot of disciples here.  So those of you

23   who raised your hand, it is your position that a witness'

24   testimony regarding having been a victim of a crime is not

25   enough; you're going to need some other kind of evidence?  And

1  you are nodding your head vigorously, sir.  What is your name?

2        PROSPECTIVE JUROR:  My name is Carlos Cardenas.  And

3  you said it before, everybody's innocent until he's proven

4  otherwise.

5        THE COURT:  Yes.

6        PROSPECTIVE JUROR:  And, to me, if there is video,

7  if there is evidence, yeah, the Government should prove that.

8  It's not about he said or she said.

9        THE COURT:  But no matter what, testimony alone is

10  not sufficient?  Is that what you're saying?

11        PROSPECTIVE JUROR:  Exactly.

12        THE COURT:  Okay.  Anybody else feel that way?

13  Everybody else over here feels that way.  Okay.  Your name?

14        PROSPECTIVE JUROR:  My name is Susan Murphy.

15        COURTROOM DEPUTY:  7.

16        THE COURT:  Okay.  Do you want to elaborate at all?

17  You don't have to, but...

18        PROSPECTIVE JUROR:  I just agree that there should

19  be some sort of physical evidence or some sort of tangible

20  evidence.  Just going by hearsay -- because anybody --

21  otherwise, it becomes a he said/she said type of situation and

22  anybody's words can change at anytime and anybody's story

23  changes later on when given in a certain circumstance, when

24  they're pushed against a wall.  So I do feel that stories can

25  change.  People can elaborate.  People can exaggerate.  People

can add their own of what they view is reality at some point

may not be the case in the end.  So I do rely -- I do believe

more in physical and tangible evidence.

THE COURT:  All right.  There were four of you in a

row, right?

COURTROOM DEPUTY:  Oh, did you have --

PROSPECTIVE JUROR:  Yes.

THE COURT:  Yes, you did.

PROSPECTIVE JUROR:  My name is Aliya Guzman.

THE COURT:  Yes.

PROSPECTIVE JUROR:  Going off of what Susan said, I

agree with the hearsay, as well as I don't know these -- the

victims, or you said the -- there were two or three, I don't

know how many there were, but against the client's case.  I'm

not sure they could be -- it could just be misinformation or

they could just not want to stay in that line of work and

they're trying to go against her, I'm not so sure, so it is

hearsay.  And without -- without evidence, I really -- I really

don't see how -- or it would be easy to believe them, if I'm

making myself clear.

THE COURT:  All right.  So the people who claim that

they were forced into sex work, you don't believe it would be

possible to believe them without some sort of physical

evidence?

PROSPECTIVE JUROR:  Again, I'm not knocking their

1  case because --
2          THE COURT:  Right.  I'm just trying to figure out
3  your position.
4          PROSPECTIVE JUROR:  They probably -- you know, it
5  probably did happen, I'm not sure, but again, without hard
6  evidence, I just -- I would have a hard time kind of
7  deciphering which way I would stand.
8          THE COURT:  Okay.  Fair enough.  Good.
9          All right.
10         COURTROOM DEPUTY:  Judge?  We have some out here.
11         PROSPECTIVE JUROR:  Hi.  My name is Erick Rodriguez.
12         THE COURT:  Okay, Mr. Rodriguez.  Hang on one second
13  here.
14         PROSPECTIVE JUROR:  Yep.
15         THE COURT:  I found Tony.  Can you be Tony?
16         COURTROOM DEPUTY:  Try 43.
17         MS. DIAZ:  Erick Rodriguez in 43, yes.
18         PROSPECTIVE JUROR:  Yes, Erick.
19         THE COURT:  43.  Okay, Mr. Rodriguez.
20         PROSPECTIVE JUROR:  Honestly, I do feel the same
21  way.  I feel like you do need some kind of evidence or
22  something that shows -- or that proves a case.  I don't -- I
23  think that testimony is important, but, in my opinion, I feel
24  like there should be something to accompany that that proves a
25  case, that proves beyond a reasonable doubt, and that's how

1  I -- that's what I believe.

2           THE COURT:  Okay.  That's fine.  All right.

3           Is that it?  All right.

4           What I wish to do right now -- yes, sir?

5           MR. LARA:  Your Honor, I believe there were more

6  people in the jury box who had raised their hand in the jury

7  box.  I believe there were four in a row, and I believe --

8           THE COURT:  Four in a row.  Anybody in the back row?

9  No?  That's it.

10          Okay.  My question to the lawyers, I want to let the

11 lawyers examine briefly.  My question right this minute is,

12 based upon what we've heard so far, any challenges for cause?

13 And we can talk about it at sidebar.

14          MS. DIAZ:  Thank you, your Honor.

15          (The following proceedings were held at the bench,

16 outside the hearing of the jury.)

17          MS. DIAZ:  Your Honor, this is Damaris Diaz.  Are we

18 talking about everyone in the room or just the ones in the box?

19          THE COURT:  No.  No.  No.  No.  No.  This is for

20 cause, so it doesn't matter.  But when we -- after you guys

21 finish your limited voir dire and we start exercising

22 peremptories -- what are you going to have, three?

23          COURTROOM DEPUTY:  Uh-huh.

24          THE COURT:  Three?

25          COURTROOM DEPUTY:  Uh-huh.

 1          THE COURT:  So it's everybody there plus, what, the

 2    first lady over here?

 3          COURTROOM DEPUTY:  We have 16 in the box.

 4          MS. DIAZ:  There are 16 in there.

 5          THE COURT:  Oh, that's right, we're going to do 15?

 6    Is that what it is, a total of 15?

 7          COURTROOM DEPUTY:  Right.

 8          THE COURT:  So don't exercise your peremptories

 9    beyond the box.  Don't waste them.  Now, do we have any

10    challenges for cause?

11          MR. LARA:  Yes.  This is Scott.  Yes.  We have a

12    few.  We can lump them altogether if your Honor wants.

13          THE COURT:  No.  Let's talk about them individually.

14          MR. LARA:  Okay, let's talk about them individually.

15    Juror Number 7, she -- Susan Murphy --

16          THE COURT:  She's the one who started this.  Well,

17    started it...

18          MR. LARA:  She said that she can't rely on

19    hearsay --

20          THE COURT:  Go slowly and take your mask off.

21          MR. LARA:  Yes, your Honor.  Juror Number 7, she

22    said that she -- in response to your Honor's question about CSI

23    and video and DNA evidence, she said that there needs to be

24    tangible evidence, that she can't rely just on witness

25    testimony.

1    THE COURT:  Did anybody else cringe at the word
2    "hearsay"?  They're turning this around as if they know what it
3    is.
4        MS. DIAZ:  It's the Johnny Depp trial.
5        THE COURT:  Oh.  Who's Johnny Depp?
6        MR. LARA:  So, your Honor, the fact that she
7    essentially said that she can't believe witness testimony alone
8    means that she can't possibly be fair to the Government's case
9    here.  She's saying that she needs some sort -- some category
10   of evidence which your Honor knows isn't required by the rules.
11   We can have testamentary evidence to prove our case.  The fact
12   that she can't get there means that she should be stricken for
13   cause.
14       THE COURT:  Well, in a minute here Ms. Christerna's
15   going to tell me about what would be satisfactory physical
16   evidence to prove this case, because right now, I can't imagine
17   what the hell it's going to take.
18       MR. LARA:  Yes, your Honor.  That's entirely my
19   point, your Honor.  In a case like this where victims say that
20   they were --
21       THE COURT:  Yeah.  Right.
22       MR. LARA:  -- victimized, it's unlikely that they
23   would have been taking a film of Ms. Xing threatening to kill
24   them while forcing them into sex work.  So in a case like this,
25   it sounds like these jurors are all saying that they could not

1   possibly convict.

2         THE COURT:  Okay.  That's kind of what I'm hearing,

3   but you -- I'm sure you've got another view of this.

4         MS. CHRISTERNA:  Well, first of all, the Government

5   does intend to produce some physical evidence.  This is Neha

6   speaking.  And, second of all, we didn't ask them, if you

7   were -- they don't have a clear understanding of what hearsay

8   is, right?  It's going to be the witness' firsthand testimony

9   of what happened to them.  So we didn't ask them related

10   questions of whether they could still be fair if the judge

11   instructs you --

12         THE COURT:  Okay.

13         MS. CHRISTERNA:  -- to weigh all the evidence, to

14   listen to the witnesses, to weigh their credibility, which is a

15   jury instruction.

16         THE COURT:  What are we going to do about these

17   people who say that this testimony is not going to be enough,

18   you know, we are in that CSI environment now.  People want to

19   see hard evidence, and hearsay just doesn't --

20         MS. CHRISTERNA:  And the Government does have hard

21   evidence.  They have cell phone messages and audio calls.

22   There is forensic physical evidence.  They have pictures that

23   they want to admit into evidence.

24         MR. LARA:  Your Honor, may I be heard on that?

25         THE COURT:  As a matter of fact, I think it's going

to be more than heard.  I think you need to talk to these

people about that, because I don't know what you've got.  I

guess I should know from some of the fights.

MR. LARA:  Your Honor --

MS. DIAZ:  We prefer calling them discussions.

MR. LARA:  I would say that the hard physical

evidence that Ms. Christerna is referring to is mostly post

arrest interviews in which Ms. Xing denies that she committed

the crime and evidence that sex work occurred, which my

understanding from this case in general is that that's not

going to really be disputed.  What will be disputed is whether

or not coercion occurred, and there is no physical evidence of

that.  That's the element that is going to be argued over by

the parties that's going to be supported by the victims'

testimony.  That's the Government's -- the crux of their

argument.

Also, your Honor, for Juror Number 7 in particular,

she said, quote, to show something -- show something to show

the situation is real, you can't rely on just words.  So if she

is going to accept the Government's forensic evidence as to sex

work but not accept the victims' testimony alone as to

coercion, the Government would lose in her eyes, meaning the

Government couldn't possibly prove all the elements of its case

based on what she's saying.

And I will say, too, that she agreed to victim -- or

1    to Juror 6 and Juror 5 who all said essentially the same thing.

2    Juror 6, for example, said it's not about he said/she said,

3    testimony alone is not sufficient.  And Juror 5 agreed with

4    both of what they were saying.  So they adopted those

5    statements and said, not easy to believe them.  I need physical

6    evidence to convict and we need -- they would need physical

7    evidence as to each element, your Honor.  And the one element

8    that we will probably not have any physical evidence on is the

9    coercion, which, as your Honor pointed out, the key element

10   that is going to be in dispute here.

11          THE COURT:  By the way, I meant to make a note on

12   this.  One of those, it was one of the ladies, so one of those

13   three ladies, I had difficulty understanding her.  Now, I know

14   we had this issue once before with someone else, this lady

15   wanted to disqualify herself because she didn't feel

16   comfortable with English, the Japanese lady.  There's a bigger

17   problem there.

18          MR. LARA:  Yes, your Honor.

19          THE COURT:  And I was going to ask you all whether

20   or not you wanted to excuse her just based upon language

21   because, in my personal view, if you cannot articulate your

22   views in the jury assembly room, or deliberation room, you're

23   not a juror, you just aren't.  You're not there.  I don't care

24   what your vote is, you can't articulate it, you can't

25   communicate it to your fellow jurors, or persuade them.  Jesus.

But, anyway, if I'm the only one that feels that, let's not worry about it.

So we're still stuck on --

MR. LARA:  Juror Number 7, although I still contend that it's all related since they're all saying that they agree --

THE COURT:  Jurors 5, 6, and 7 are the same.

MS. CHRISTERNA:  Yes, your Honor, but I think you suggested that we should ask further questioning.

THE COURT:  Yes.  I think you all should follow up and see if you can rehabilitate or whatever, but right now I'm very troubled by the fact that they all need physical evidence, and I don't know the extent to which we're going to have much of that.

MR. LARA:  Yes, your Honor.  And I would point out for the record that Number 43 also agreed.  That was the person out in the gallery who spoke, Mr. Rodriguez.  He said he feels the same way, needs to see more testimony to prove more than -- to get to reasonable doubt.

MS. DIAZ:  And also Number 34.

THE COURT:  And Number 34.

MS. DIAZ:  First name Oksana, yes.

THE COURT:  Oh, that's the one.  That's where I wrote down "language is a real problem."

MR. LARA:  We agree, your Honor.

1          THE COURT:  Just think about that because, if you

2   want, I'll excuse her just on language alone.

3          MR. LARA:  We agree on that.

4          MS. CHRISTERNA:  We would object.  This is Neha from

5   the Federal Public Defender.

6          MR. LARA:  And, your Honor, I believe you had

7   commented on this, and this is what I saw, too, that four

8   people in a row had raised their hand, but we only have three

9   that were questioned.  So I thought it was 7, 6, 5, and 4, but

10  the only people who were questioned were 7, 6, and 5.

11         MS. CHRISTERNA:  7, 6, 5, and 4 were questioned.

12         MS. DIAZ:  4 was not questioned on the CSI question

13  as well, but she did raise her had.

14         THE COURT:  She did, yes.

15         MS. CHRISTERNA:  I'm sorry.  But I think she's 8.

16         THE COURT:  Was it 7?  Because 7 is Obannon.

17         MS. DIAZ:  This is the one that raised her hand but

18  didn't say anything.

19         MR. LARA:  That's correct.  And it was also someone

20  in the back whom I believe was Juror Number 16, Nohemy, I

21  believe she also raised her hand.  I believe I saw that.  But

22  when followed up, I think she was nervous to re-raise her hand

23  after the questions.  So we would say that the individuals that

24  agree with these statements and raised their hand should also

25  be excluded for cause.  We're happy to --

1          THE COURT:  And you all object to that?

2          MS. CHRISTERNA:  This is Neha talking.  Object.

3   They haven't even spoken, so they could have said something

4   completely different.  So you can't just strike someone for

5   cause for raising their hand and not speaking.

6          THE COURT:  Well, I wasn't going to do that.  Let's

7   go do this:

8          MR. LARA:  Yes, your Honor.

9          THE COURT:  Let's do it now.  We'll do voir dire for

10  the record, and you can follow up.

11          (The following proceedings were held in open court.)

12          THE COURT:  Are you Ms. Dubbs over there?

13          PROSPECTIVE JUROR:  Yes, sir.

14          THE COURT:  And I don't know if the monitor in front

15  of you is working or not.

16          PROSPECTIVE JUROR:  It is.

17          THE COURT:  And does it have those nine questions on

18  it, and can you read those?

19          PROSPECTIVE JUROR:  Read the question or answer the

20  question?

21          THE COURT:  Thank you, dear.  That was really the

22  ultimate point.  Can you answer the -- no.  No, it's not that.

23  Will you answer those questions?

24          PROSPECTIVE JUROR:  Absolutely.

25          THE COURT:  All right.  Thank you.

1          PROSPECTIVE JUROR:  Yes.  So my full name is

2   Elizabeth Dubbs.  I live in Glendora, California.  I am a nurse

3   midwife and nurse practitioner for 30 years now.  It's hard to

4   believe I was a nurse beginning, but I'm like, wow.  I'm

5   married to a software engineer.  I have children that should be

6   acting like they're grown, but they're young adults and they're

7   in college.  And a high school student, too.  I have served on

8   a jury 30 years ago when I very first got out of school.  It

9   was in Ventura.  I don't remember whether it was civil or

10  criminal.  It was about somebody drunk driving.  I was the jury

11  foreman.  We reached a verdict.  We do have a friend who is an

12  Irvine police officer.  Oh, and I guess my niece just married a

13  brand new police officer.  So we do have a couple of friends in

14  law enforcement.  No negative encounters with the criminal

15  justice system.  And me and none of my family have been subject

16  to criminal investigation.

17          THE COURT:  All right.  Thank you.  And pass the

18  microphone to your right, please.

19          PROSPECTIVE JUROR:  My name is Pradeep Ramamurthy.

20  I live in Los Angeles.  I currently work for a private equity

21  firm.  I've been doing that for about eight years.  My partner

22  works for an impact investing firm.  Don't have any children.

23  I've been in this seat in a jury before but never served

24  fully -- never served on the trial, I guess.  And I've got

25  multiple close -- no family members, but multiple close friends

 1  in law enforcement.

 2          THE COURT:  Thank you.

 3          PROSPECTIVE JUROR:  And no negative encounters with

 4  the criminal justice system and have never been the subject of

 5  a criminal investigation.

 6          THE COURT:  Thank you.

 7          PROSPECTIVE JUROR:  My name is Ana Romero, Ana

 8  Delores Romero.  And I live in Van Nuys.  And my last -- I am

 9  retired now.  I working before in cashier.  I am married.  And

10  if you -- I have three children, three kids, who are older

11  right now.  I have served on a jury before.  It was civil,

12  criminal...  I don't understand that, the last one.  I have --

13  my family member and close friend in law enforcement?  No.  No.

14  Only my -- my kids in the Air Force and the Navy.  That's --

15  that's it.  A member -- a negative...  I have any member of

16  family -- negative...  No.  Justice system, have I any member

17  of the family subject of criminal investigation?  No.

18          THE COURT:  Go ahead, sir -- ma'am.

19          PROSPECTIVE JUROR:  My name is Aliya.  I reside in

20  Downey, California.  I'm a full-time student and part-time

21  dental assistant.  I'm single.  No children.  I have never

22  served before.  I have two close family friends who are police

23  officers.  Me or any family members have never had a negative

24  encounter.  And I have not been subject to a criminal

25  investigation.

1          THE COURT:  All right.  Thank you.

2          PROSPECTIVE JUROR:  My name is Carlos Cardenas.  I

3   live in the San Fernando area.  I've been married for 25 years.

4   My wife is in the medical insurance business.  I have a

5   stepdaughter and a son.  My stepdaughter has a master's degree

6   in family therapy, and my son works for the college that he

7   graduate.  I served before on a DUA case.  We couldn't reach

8   the verdict.

9          THE COURT:  You say you could not reach?

10          PROSPECTIVE JUROR:  No.  The case was dismissed.  I

11   don't have any family in the law enforcement.  Never had a

12   negative -- anything negative in the criminal justice.  And I

13   do have family in jail.

14          THE COURT:  And do you think your family member was

15   treated fairly by the system?

16          PROSPECTIVE JUROR:  Yes.  They just screwed up.

17          THE COURT:  Okay.  Thank you, sir.

18          PROSPECTIVE JUROR:  Name is Susan Murphy.  I

19   currently reside in Sylmar, California.  My current occupation

20   is an AP supervisor.  I am married.  My husband is a system

21   administrator.  We don't have any grown children.  We do have

22   one young daughter who's 15 months.  I've been summoned before

23   for a jury but never served on a jury.  I don't have any really

24   close friends or family in law enforcement.  Nobody's

25   actually -- no negative encounters, and nobody's the subject of

1  criminal investigation, no.

2           THE COURT:  Okay.  Thank you.

3           PROSPECTIVE JUROR:  My name is Madeline Diane

4  Obannon.  I live in Cerritos.  I'm currently a semi-retired

5  loan document signing agent.  And my husband and I are

6  celebrating 50 years this week.  He is a title insurance agent.

7  We have two sons, two grown sons.  My oldest son is a probation

8  officer, and my other son is a high school basketball coach.

9  Let's see.  I have served on a jury.  It must have been about

10 30 years ago.  It was drunk driving, and we did not come to an

11 agreement.  We did not finish that.  Let's see.  Where am I?

12 Jury...  We did not reach a verdict.  Family members?  I've got

13 about five in my family; highway patrol, LAPD, Humboldt County.

14 We have about five in the family.  Any members...  I told you

15 about the negative, my brother's two sons spending 25 years.

16 And, let's see, my immediate family, we have no investigations

17 and no, what is it, members -- negative encounters.

18           PROSPECTIVE JUROR:  My name is Thomas Cotugno.  I am

19 from West Los Angeles.  I am a law student.  My partner's also

20 a law student.  No kids.  Never served on a jury before.  No

21 family members or close friends in law enforcement.  None of us

22 have had negative encounters with the criminal justice system,

23 and none of us have been the subject of a criminal

24 investigation.

25           THE COURT:  Let me ask you a question because,

believe it or not, I have more difficulty with law students

being able to promise me that they will follow the law as I

give it to you as opposed to what you believe the law is, based

upon your 15 or 20 minutes studying the law.  Will you follow

the law as I give it to you?

PROSPECTIVE JUROR:  Yes, I will.

THE COURT:  Thank you, sir.

PROSPECTIVE JUROR:  My name is Norma Umekubo.  I

live in Torrance.  I'm currently retired but my prior

occupation was an accountant for 36 years.  My husband -- I am

married.  My husband is a clinical pharmacy manager at a

hospital.  We have two adult children.  My oldest son is a

digital -- I'm sorry -- a senior digital producer at an

advertising company.  My daughter is a tech and media director

at her church.  I have been summoned before but never served on

a jury.  I don't have any family or friends in law enforcement.

And I have not had, or anyone I know, negative encounters with

the justice system, and we're not -- any of us been the subject

of a criminal investigation.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Hi.  My name is Steve Dances.  I

live in Canoga Park.  I'm a graphic designer for over 25 years.

My wife is an insurance claim examiner.  We have two children,

one grown, one adult, a 21-year-old daughter, college student,

and our other daughter's a high school student.  I have served

on a jury before, criminal, and it was prostitution and it
was -- we came to a verdict.  No to 7, 8, and 9.

THE COURT:  Did you say prostitution?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Thank you, sir.

PROSPECTIVE JUROR:  My name is Toni Rodriguez.  I
reside in Long Beach.  My current occupation is a wellness
advisor at a legal dispensary in L.A.  I don't have any kids.
This is the first time I've ever been summoned for jury duty
before.  I don't have any family members or close friends in
law enforcement.  I haven't had -- not that I know of, my
family, had any negative encounters with the criminal justice
system, but I do have quite a few family members that have been
subject of a criminal investigation.

PROSPECTIVE JUROR:  My name is Justin Guillen
Torres.  I currently live in Long Beach.  I'm an assistant
manager at an optical retailer in Cerritos.  I've been there
for seven years.  I have a girlfriend who is a team lead at a
Target.  No kids.  First time on a jury.  No family or close
friends in law enforcement.  Have not had any negative
encounters with the justice system and have not been the
subject of a criminal investigation.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  My name is Nohemy Estrada and I
live in Santa Maria, California, and I've been working for a

1  Unified Children's Center -- Children's Services for 27 years.

2  I'm married.  My husband is retired.  I have four kids,

3  grown-ups.  One live in Oregon, work for the welfare

4  department.  One in San Rafael, he work for -- he supervise

5  case workers for elderly people.  And I have a daughter that

6  she's a vice-president at the location at Allan Hancock.  And I

7  have a daughter that she's a professor in Channel Island.  And

8  I -- that's the first time that I'm on jury duty.  Family in

9  law enforcement, I have a son-in-law that work for the Lompoc

10 Penitentiary and --

11            THE COURT:  Did you say local?

12            PROSPECTIVE JUROR:  Lompoc.

13            THE COURT:  Oh, Lompoc.

14            PROSPECTIVE JUROR:  Lompoc, California.

15            THE COURT:  Okay.  Thank you.

16            PROSPECTIVE JUROR:  I don't have any negative

17 encounters with criminal justice system.  And I have a nephew

18 that he's in jail for drugs.

19            THE COURT:  Thank you.

20            PROSPECTIVE JUROR:  Luz Loza.  I work for the Los

21 Angeles County Council -- I'm sorry.  I live in Los Angeles and

22 I work for County Council.  I'm a supervisor.  I've been there

23 for 15 years.  I'm married.  I have three kids.  Two are

24 students, and one works for Cedars-Sinai.  I have a husband,

25 and he's a journeyman.  I've been -- I have served for jury for

1  a criminal case, and we did reach a verdict.  My niece's

2  husband works for LAPD.  I have no encounters or

3  investigations.

4          THE COURT:  Thank you.

5          PROSPECTIVE JUROR:  My name is Mariana Vasquez.  I

6  live in Los Angeles.  I am a secretary with the Los Angeles

7  Police Department.  I've been there for 35 years.  I am single.

8  I have an adult daughter, and she's currently a stay-at-home

9  mom.  I have served on both civil and criminal jury, and we did

10 reach verdicts on both.  I have a cousin and several numerous

11 close friends that work for various law enforcement agencies.

12 Me and my family have not had any negative encounters with the

13 criminal justice system, and me and my immediate family members

14 have not been the subject of criminal investigation.

15         THE COURT:  Thank you.

16         PROSPECTIVE JUROR:  My name is Tony Lucas, Tony

17 Delarry Lucas.  I'm from Los Angeles, California, by way of

18 Martin Luther King and Normandie.  I'm retired.  My last job

19 was at Universal Studios.  I worked there for ten years.  I've

20 been married twice.  I'm single now.  My oldest daughter is a

21 mental health supervisor.  And I never served jury duty.  My

22 aunty is a juvenile -- is juvenile custody -- what is that?

23 She works at the jailhouse, the juvenile --

24         THE COURT:  Juvenile, like, Los Padrinos, something

25 like that?

1          PROSPECTIVE JUROR:  Up in the Valley.

2          THE COURT:  MacLaren Hall?

3          PROSPECTIVE JUROR:  In the Valley.

4          THE COURT:  Oh, I was never sent to the Valley.

5          PROSPECTIVE JUROR:  Correctional.  She's a

6    correctional officer.

7          THE COURT:  All right.

8          PROSPECTIVE JUROR:  She was a corrections officer.

9    And never had no negative encounters with the justice system.

10   And my family haven't been criminally investigated.

11         THE COURT:  Thank you, sir.

12         PROSPECTIVE JUROR:  You're welcome.

13         PROSPECTIVE JUROR:  My name is Susan Wood, and I'm

14   from Thousand Oaks.  I'm a communications manager for, I don't

15   know, 30 years.  I'm not married.  I have two grown children.

16   One is in PR, and one is in E-commerce.  I have served on a

17   civil case, and we did come to verdict.  That was, like, 30

18   years ago.  I have no close family or friends in law

19   enforcement, nor negative encounters in the criminal justice

20   system or a criminal investigation, no.

21         THE COURT:  Thank you.

22         PROSPECTIVE JUROR:  My name is Benjamin Platt.  I'm

23   from North Hollywood.  I'm currently a trainer internally for a

24   software company.  Not married.  My partner is an administrator

25   for healthcare.  No children.  Never served on a jury.  No

1  friends or family in law enforcement.  No negative encounters.

2  Not subject to criminal investigation.

3          THE COURT:  Thank you.

4          PROSPECTIVE JUROR:  My name is Raymond Macias.  I

5  reside in Long Beach, California.  Current occupation is

6  bookkeeping, as well as head coach of a youth hockey team.

7  I've been doing both for five years.  Single.  No children.

8  Never served on a jury before.  I have close family and friends

9  that are police officers, and my mom's actually currently

10  dating an LAPD police officer.  And no negative encounters with

11  the criminal justice system.  And no, none of my family members

12  are subject to a criminal investigation.

13          THE COURT:  Thank you.

14          PROSPECTIVE JUROR:  My name is Miranda Dinardo.  I

15  live in Ventura.  My current occupation is a nurse's assistant

16  for only a couple of months now, but before that I was a server

17  and bartender for eight years.  I'm currently single.  I have

18  no children.  I've never served on a jury before.  I do have

19  close friends in law enforcement.  None of my family members

20  have had any negative encounters with the criminal justice

21  system, and none of my family members have been the subject of

22  a criminal investigation.

23          PROSPECTIVE JUROR:  My name is Hannah Kwon.  I am

24  residing in Harbor City.  I was a fashion designer for 15

25  years, but I'm currently just a housewife.  I am married.  My

1   husband works in tech.  He's a business architect.  I am

2   currently pregnant, four months.  I have -- I'm summoned every

3   year.  I served twice.  One was a medical malpractice, which

4   was settled out of court; and one was a child molestation case,

5   which was -- we said it was guilty.  7, 8, 9, no.

6           PROSPECTIVE JUROR:  My name is Isabelle Newman.  I

7   live in Claremont.  I am retired.  My occupation was urban

8   planner for 28 years.  I am single.  I have two grown children.

9   One is a researcher in cellular biology, and one does salmon

10  habitat restoration.  I've served on juries before, both civil

11  and criminal, and we were able to reach a verdict on one and

12  not on the other.  I have no family members or close friends in

13  law enforcement.  I have no members that have had a negative

14  encounter with the criminal justice system.  I have had a

15  family that has been subject to -- the subject of a criminal

16  investigation.

17          PROSPECTIVE JUROR:  My name is Robyn Millen.  I live

18  in Playa Del Rey, California.  I have been at Loyola Marymount

19  for 22 years in accounts payable.  I am divorced.  I have a

20  grown son, 33.  I served on a jury about 10 or 11 years ago.

21  It was criminal.  No verdict.  I have no family members or

22  close friends in law enforcement.  I don't have anyone who's

23  had negative encounters with the criminal justice system;

24  however, when my son was a senior in high school, he got into

25  drugs, stole a car, got arrested, and it saved his life.

1          PROSPECTIVE JUROR:  My name is Jeffrey Eisen.  I

2    live in Manhattan Beach, California.  I've been a lawyer for 32

3    years.  I am married.  My wife is a water aerobics instructor.

4    I have two grown children.  One is just finishing up an MFA

5    degree at UC Irvine, hopes to be a college English professor.

6    My daughter is 24 and is a photographer, model, and social

7    media influencer in the legal cannabis industry here in Los

8    Angeles.  I have served on a civil jury.  To my amazement, they

9    let me be on a jury, and it was an unlawful detainer case in

10   Torrance, and we reached a verdict.  I have a cousin whose wife

11   is a retired Secret Service Agent, and I have a good friend who

12   actually is a reserve deputy sheriff who does the kind of work

13   with things like this case.  I was half expecting to hear his

14   name on the witness list, but I didn't.  I have no -- 8 and 9

15   are no.

16          THE COURT:  Thank you.

17          PROSPECTIVE JUROR:  My name is Daniel Moyer.  I live

18   in Santa Clarita, California.  I am semi-retired.  I now work

19   part-time at my church as a maintenance worker.  I'm married.

20   I've been married for -- I've been married for almost 27 years.

21   My wife is a buyer for a corporation.  I have three grown boys.

22   The oldest is a retired Master Sergeant from the United States

23   Air Force.  Another one is a mechanical engineer.  And then I

24   have another one who's a pharmacist.  I've served on a jury

25   before.  It was about five years ago.  It was in Sylmar

Superior Court.  It was criminal.  It was a gangland murder,

and we came to a verdict.  I have my neighbor -- one of my

neighbors is a L.A. County Sheriff, and I have two friends of

mine from my church that are retired L.A. Police Department

detectives.  I have never had any -- and my family have never

had any negative encounters or there's no criminal -- with the

criminal justice system.  And nobody in my family or friends

have ever been subject to a criminal investigation.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  My name is Oksana Dutchak, and

I'm from Los Angeles.  I am an accountant for five years.  I'm

single.  I have a seven-year-old son.  I haven't been served on

a jury before.  I have family members in law enforcement but in

another country.  I haven't had any negative experience with

criminal justice system.  I also believe that it's not the

whole system but it's only some people might do bad and made

bad choices.  And none of my family and me have been subject to

criminal investigation.

PROSPECTIVE JUROR:  My name is Adam Matthews.  I

live in Goleta, California, and my current occupation is

engineering director for an aerospace corporation.  I've been

there for nine years.  I'm married.  My wife is a stay-at-home

mom.  I have three young children.  I've not served on a jury

before.  I have some friends in law enforcement in Santa

Barbara County but no family members.  Have not had any

1 negative encounters with the criminal justice system and have

2 not been the subject of a criminal investigation.

3         THE COURT:  Thank you.

4         PROSPECTIVE JUROR:  My name is Scott Brooks.  I live

5 in Palos Verdes Estates.  I'm a CPA for just about 30 years.

6 I'm married.  My wife is an account exec for a women's clothing

7 company.  I have one daughter who is a high school student.  I

8 have never served on a jury.  I do have some friends in law

9 enforcement, and the answers to 8 and 9 are no.

10         THE COURT:  Thank you.

11         PROSPECTIVE JUROR:  Good afternoon.  My name is

12 Joshua Soto.  I live in Korea Town, Los Angeles.  My current

13 occupation is a supervisor in a hotel.  I've been working there

14 for five years.  I am currently single.  I have no children

15 yet.  I have not served on a jury before, but I was summoned

16 once and it got postponed until now.  I have a couple of close

17 friends in law enforcement.  I've only encountered one negative

18 occurrence in the criminal justice system, I guess.  And no

19 members of my family have been subject to a criminal

20 investigation.

21         PROSPECTIVE JUROR:  My name is Trisha Kozlowski.  I

22 am from Long Beach.  I am a college instructor and coach for 12

23 years.  I'm married.  My spouse is a scrub master for an IT

24 company.  I don't have any children.  I've never served on a

25 jury.  My brother is a Monroe County Sheriff.  He's in the

1  transport unit and jail in New York.  And I have a close friend

2  that was a Monroe County investigator.  And no to 8 and 9.

3           THE COURT:  Okay.  We'll stop right there for some

4  reason.

5           COURTROOM DEPUTY:  We need a break.

6           THE COURT:  All right.  It's break time already?

7           COURTROOM DEPUTY:  Yes.

8           THE COURT:  All right.  Yeah, let's break till

9  tomorrow.

10          All right, ladies and gentlemen, we're going to take

11 our first afternoon break.  Even with glasses I can't see that

12 far.  Ten minutes?  Okay.  She says ten minutes.  Remember the

13 admonition, don't talk about this thing.

14          (Jury pool out.)

15          (Recess from 2:52 p.m. to 3:09 p.m.)

16          (Jury pool in.)

17          COURTROOM DEPUTY:  You may be seated.  This Court is

18 once again in session.

19          THE COURT:  All right.  Who did we leave off with?

20          PROSPECTIVE JUROR:  My name is Vir Iaesta Vergel De

21 Dios.  I live in the city of Panorama City.  I am currently

22 assistant director of health, promotion, and campus advocacy

23 services for about a year.  I am married.  And my husband's

24 occupation is an electrical engineer.  We have children, but

25 none of them are grown.  I have never served on a jury before.

My brother-in-law is an L.A. Sheriff.  I've never had any negative encounters.  My child is the victim of a sexual assault case.  My nephew is the perpetrator in a criminal assault case.  Sorry.  Ongoing.

PROSPECTIVE JUROR:  My name is Kathy Tichenor.  I live in Montrose.  My current occupation is a chief lending officer of a credit union.  I've been in the business over 40 years.  I am not married.  I have no children.  I have served on a jury before, never came to a verdict, both civil and criminal.  I do have some friends that are in law enforcement, LAPD and Sheriff's and Public Defender's Office.  I don't know of any negative encounters of any of my family with criminal justice.  And no to Number 9.

PROSPECTIVE JUROR:  My name is Erick Rodriguez, and I live in Bellflower, California.  I am a graphic designer. Been there for ten years.  I am married, and my wife is a marriage and family therapist.  I have two little kids, seven and three.  I have served on a jury before.  It was a criminal, and we did reach a verdict.  I don't have any family members or close friends in law enforcement.  My only negative encounter was my brother was arrested for something he didn't do, and later the person came forward and he -- and he was let go.  But basically he was arrested because he was -- he loosely fit the description.  And no, none of my family members or anything are under criminal investigation.

1          PROSPECTIVE JUROR:  My name is Emily Gardner.  I

2     live in North Hollywood.  I am a librarian for Viacom CBS for

3     about eight years.  I am single without any children.  I have

4     never served on a jury.  I do have friends in law enforcement.

5     I have not had any negative encounters with the criminal

6     justice system, and no one in my family has been the subject of

7     a criminal investigation.

8          PROSPECTIVE JUROR:  My name is Byron Marin.  I live

9     in Monrovia.  Currently I work at Wells Fargo Bank in the

10    research department.  I have been there 25 years.  I am single.

11    I have a daughter that's 25 years old currently going to school

12    for her psychology degree.  I have served on a jury before,

13    criminal, and we reached a verdict.  I have a couple of friends

14    that are in law enforcement.  I have never had any negative

15    encounters with the criminal justice system.  However, I did

16    have one cousin that was the subject of a criminal

17    investigation.

18         PROSPECTIVE JUROR:  My name is Maxwell Tufeld.  I

19    live in Korea Town.  I work at the Petersen Automotive Museum

20    for six years now.  I am not married, but my partner works at

21    Sony Pictures.  I do not have any children, and I have not

22    served on a jury.  Both of my parents are former Los Angeles

23    Public Defenders, and no to 8 and 9.

24         PROSPECTIVE JUROR:  My name is Leyla Huite.  I live

25    in North Hollywood, and right now I'm currently a full-time

psychology student and a part-time barista at Starbucks.  I've

only been working there for eight months.  And I'm single, but

I live with my parents and my brother.  My brother is an EMT

and he's a student and he's a manager at a Covid clinic.  My

mom's in insurance, and my dad is a refinish technician.  I

don't have any children, and this is my first time being

summoned.  And no to 7, 8, and 9.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  I'm Erica Onugha.  I live in Los

Angeles.  I am a college professor for about ten years.  I'm

married.  My husband is a cardiothoracic surgeon.  We have two

young children.  I have never served on a jury.  One of my

uncles is a retired L.A. Sheriff member -- member of the L.A.

Sheriff's Department.  When we were younger, my sister and I

were subjected to excessive police violence for Number 8.  And

then no to Number 9.

THE COURT:  What was your name again?

PROSPECTIVE JUROR:  Erica Onugha.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  My name is Linus Lau.  I live in

Long Beach.  I'm a professor at Long Beach City College, and I

also substitute teach in the Long Beach Unified School

District.  I'm not married, no children.  I have been summoned

many times but never served.  I have no family members that are

in law enforcement, no negative feelings, and no one is under

1  investigation.

2  PROSPECTIVE JUROR:  My name is Diane Ratcliff.  I

3  live in Lancaster.  I recently retired from Los Angeles County

4  Child Support Services as a secretary for over 20 years.  I've

5  been married for 49 years.  We have no children.  I have been

6  summoned before, but I've never served on a jury.  I do have

7  some close friends that are in law enforcement, and no to

8  Numbers 8 and 9.

9  PROSPECTIVE JUROR:  My name is Asaf Zairi.  I'm from

10  Los Angeles.  I'm currently an architecture student.  I'm not

11  married, single.  Zero children.  I've never been on a jury

12  before.  I have no family or close friends in law enforcement.

13  I had one encounter with police before I was 18 for

14  trespassing, and none of my family members have ever been

15  subject to a criminal investigation.

16  PROSPECTIVE JUROR:  My name is Penelope Garcia.  I

17  live in La Canada, California.  Currently, I'm working retail

18  part-time, but I was an operator for AT&T for 16 years.  I'm

19  married.  My husband's a case worker for the City of Pasadena.

20  I have a 25-year-old son who's a college graduate and working

21  full-time at a local logistics company.  I've never served on a

22  jury before.  I have a nephew who is working for the L.A.

23  Sheriff -- Lincoln County Sheriff's Department.  Also, I'm a

24  close friend with a Superior Court judge that I play in a

25  string quartet with, but I don't have any negative experiences

1   with the justice system and no family under investigation.

2          PROSPECTIVE JUROR:  My name is James Lodato.  I live

3   in Hawthorne.  I'm the director of production for a video game

4   company.  I've been at that company for about 18 years.  I'm

5   married, and my wife is the director of human resources for a

6   financial company.  We have one small kid.  He's about 18 -- 15

7   months.  I've never been on a jury.  I've been summoned but not

8   served.  And also, no to 7, 8, and 9.

9          PROSPECTIVE JUROR:  I am Catherine Carrascoames.  I

10  live in Thousand Oaks, California.  And I am an underwriting

11  manager for real estate loans, currently in between gigs.  But

12  I've been doing it for a long time, 30 years.  And I'm no

13  longer married.  I have two grown children.  One is 19.  He

14  just graduated, or he's just getting out of school.  And my

15  daughter is 25, and she is a travel advisor at Four Seasons.

16  And no, I have never served on a jury before.  And my

17  ex-father-in-law was LAPD 45 years ago.  And I've never had a

18  negative experience other than paying a fine, and none of my

19  family is under criminal investigation.

20         PROSPECTIVE JUROR:  I'm Dorothy Wong.  I live in

21  South Pasadena.  My current occupation, I'm a clinical

22  pharmacist at a cancer hospital.  Been doing that for 35 years.

23  I'm married.  My husband is a director of pharmacy at a nearby

24  hospital.  I have four kids; two daughters, two sons.  My

25  oldest is an occupational therapist at a hospital.  My second

daughter is an attorney in ERISA law.  My third kid is a son.
He works -- he's a -- I guess an accounts manager at a
professional sports team, local sports team.  And my fourth kid
is a senior in college.  I've been on -- I've served on a jury
before, and we came to a verdict.  That was 20 years ago.  It
was domestic violence.  I don't have any close friends in law
enforcement.  And I haven't had any negative or any of our
family had any negative encounters with the criminal justice
system.  And we've never been the subject of criminal
investigation.

          PROSPECTIVE JUROR:  My name is Teawhan Cho.  I'm
living in Cerritos and I'm working at the architects.  And I
have no family member and no child and no one involved with any
law enforcements.  Only thing is the brother-in-law was LAPD
watch commander.  He's retired.

          PROSPECTIVE JUROR:  My name is Justina Lange.  I
live in Gardena, California.  My current occupation is a
translator and localization coordinator at a video game
company, for about maybe seven, eight years.  I'm single.  I
don't have any children.  My father is a manager at a
pharmaceutical company, and my mother is stay-at-home.  I've
served on a jury before.  That was maybe about five years ago.
We couldn't come to a verdict.  It was criminal.  It was for
breaking and entering.  I don't have any family members or
close friends in law enforcement.  And no to 8 and 9.

1          THE COURT:  Thank you.

2          PROSPECTIVE JUROR:  My name is Cheng Chen.  I'm the

3   first immigration from Taiwan, 61, so 60 years ago.  I'm a

4   construction contractor for the past 35 years and I'm about to

5   retire this year.  And I'm married.  I have three boys; 36, 34,

6   and 29.  They are all married and independent and out of my

7   hands.  And none of my family members are connected or related

8   to any criminal investigation.

9          PROSPECTIVE JUROR:  My name is Janet Vanriper.  I

10  live in Rancho Palos Verdes.  I'm retired.  My last occupation

11  was database manager for a non-profit.  I am married, and my

12  husband is also retired.  He was a bond trader.  I have two

13  grown children.  They are -- one is a retail buyer.  The other

14  is entertainment marketing.  Let's see.  Yes, I was on a jury.

15  It was criminal.  We did come to a verdict.  No close family or

16  friends in law enforcement.  No negative encounters.  I did

17  have a brother that went to jail a long time ago on a drug

18  charge.  It was later pardoned.

19         PROSPECTIVE JUROR:  My name is Stella Lee.  I'm

20  living in Los Angeles.  I'm divorced, but I am not in a

21  relationship right now.  And my job is I working as the patient

22  representative in a dentistry over 14 years.  And I have grown

23  children, but they live with their father overseas many years.

24  I've been summoned on a jury several times but never served as

25  a trier before.  And any family members or close friends in law

1   enforcement?  No.  And have you or any members of your family

2   had negative encounters with the criminal justice system?  No.

3   Number 9, have you or any members of your family been the

4   subject of a criminal investigation?  No.

5           THE COURT:  Well, either of you with the Government

6   may inquire.  You've got a ten-minute time limit.

7           MS. DIAZ:  Thank you, your Honor.

8           Thank you all for your honesty today.  It's been

9   very helpful, and we really appreciate it.  One thing that came

10  up earlier today was whether you could decide something based

11  on people's testimony alone.  Now, in this case you're likely

12  to see and hear a lot of evidence.  You'll see stuff, but one

13  of the elements that the Government is required to prove is

14  whether the victims were caused to engage in commercial sex by

15  force, fraud, or coercion.  So for that element, what we need

16  to prove is what the victims believed.  For those of you who

17  raised your hand about the question about victim testimony, do

18  you feel that you could serve on this jury when one of the

19  things you have to determine is what the victims believed?  Can

20  I start with you shaking your head?

21          PROSPECTIVE JUROR:  I can't.

22          MS. DIAZ:  You cannot?

23          PROSPECTIVE JUROR:  I need proof.

24          MS. DIAZ:  You need proof, like, you need something

25  physical, a video or a recording of something proving what the

victims believed?

PROSPECTIVE JUROR:  Yes.

MS. DIAZ:  You can't just take their word on what was inside their heads?

PROSPECTIVE JUROR:  No.

MS. DIAZ:  Okay.  May I ask the person next to you how you feel about that?

PROSPECTIVE JUROR:  It would actually be very difficult for me to actually believe or serve in that way because I don't really believe in circumstantial evidence as much, you know, as in a belief.  I don't know if what the person is saying is what they truly believed at the moment or what they're just saying right now because they are in the situation that they are and because they try to get out of the situation, they need to change how they believe from how they -- how they believe now from how they believed before.  So it's really hard for me to kind of differentiate that did they truly believe this at the moment or are they just saying they believe it at the moment.

MS. DIAZ:  And so there's nothing that anyone could tell you to make you rest on their belief alone based on what they tell you on the stand?

PROSPECTIVE JUROR:  If there was something like you say, a text message or a conversation, like, anything recorded, a text message, a recording, some concrete more evidence versus

1  more circumstantial, I would feel better about it.

2        MS. DIAZ:  What about Number 5?  What do you think

3  about that?

4        PROSPECTIVE JUROR:  Again, I would have to agree

5  with Susan.  I don't know, I can't speak for other people, but

6  personally, when I want to believe something myself, you repeat

7  it so many times that you actually do start believing it, and

8  that may not be the case.  I'm not, again, trying to knock

9  anybody's testimony down or anything, but it would just be

10  really hard to take someone's word for what happened.

11        MS. DIAZ:  What if you learned that these people had

12  told others about their feelings and their beliefs close in

13  time to the events, later in time, and there are different

14  instances in which they have told their story to people?

15        PROSPECTIVE JUROR:  I...  Again, I think it would

16  still be pretty hard.  I'm a little on the hard-headed side of

17  that.

18        MS. DIAZ:  Do you have your hand up?

19        PROSPECTIVE JUROR:  Yes.

20        MS. DIAZ:  Can we hand her the mic?

21        PROSPECTIVE JUROR:  For me, I'm worried about it

22  that I get confused and I don't understand, you know, what you

23  guys are asking me and say the wrong thing.

24        MS. DIAZ:  Are you saying you don't understand

25  because of language or because of something else?

1        PROSPECTIVE JUROR:  Because language.  You know, I

2   can't speak, you know, regular English, but I know you guys, so

3   you know big words, something I don't understand, and then I

4   say something that I should not be saying.

5        MS. DIAZ:  Okay.  Thank you.  Is there anyone else

6   that feels like they're having language difficulties today?

7   Yeah?  Can we hand the mic to number...

8        COURTROOM DEPUTY:  3.  3 in the box.

9        MS. DIAZ:  3 in the box.

10       PROSPECTIVE JUROR:  It's difficult to understand.  I

11   was explaining how the problem -- the problem I have, it's

12   difficult to...

13       MS. DIAZ:  Okay.

14       PROSPECTIVE JUROR:  ...to explain.

15       MS. DIAZ:  That's okay.  Anyone else with language

16   difficulties understanding today?

17       How about anyone else that raised their hand on this

18   issue?  Do you feel that there's no way that you can determine

19   what somebody believes based on their word alone?  Let's go in

20   order.

21       PROSPECTIVE JUROR:  If it was just -- oh, sorry.

22   Hannah Kwon.  For me, yes, based on words alone, I wouldn't be

23   able to come to an answer because I would need some sort of

24   evidence, whether it be text messages or email, anything.

25       MS. DIAZ:  So you need something other than the

victim's word even if the victim had said the same thing

multiple times over time?

PROSPECTIVE JUROR:  Yes.

MS. DIAZ:  There's no way that you would ever --

PROSPECTIVE JUROR:  Not based on words alone, no.

MS. DIAZ:  Okay.  Thank you.

PROSPECTIVE JUROR:  I have a question.  Did those

people make any, like, complaints to the police?  Did they,

like -- it should be some kind of record that they suffered

something, and they couldn't prevent it at work because they

complained maybe higher, you know, like, and nothing was done,

so in this case those people should come to the police and make

a claim.

THE COURT:  Listen, I understand since we've been at

this all day and you haven't heard any evidence yet you want to

find out what happened, and you're going to find out, but there

is a way.  And I'm going to explain to you what evidence is.

And I want you to get all of the evidence, but asking the

prosecutor standing at a lectern to basically tell you what

happened, that's not the way we receive evidence.  So hang on.

I'm as anxious as you are to find out what happened, but there

is a way.  All right?  So just sit tight.

PROSPECTIVE JUROR:  Okay.

THE COURT:  It's coming.

PROSPECTIVE JUROR:  Thank you.

1          PROSPECTIVE JUROR:  My name is Erick Rodriguez, and
2    I think it would be a bit difficult just to go on words alone.
3    I agree, like I said, I had a bad experience.  My brother was
4    arrested for something he didn't do, and he, like, adamantly,
5    you know, said, like, it wasn't me.  You know?  And I'm pretty
6    sure he'd be in jail if the person hadn't come forward and
7    admitted it.  You know?  And there was no evidence on him or
8    anything, but it was just one of those things where, like, they
9    were going by his word and they were going to prosecute him.
10   And so I really don't think that going by someone's word works
11   because it wasn't working for my brother, you know, even though
12   he was innocent.  And so I have a hard time with that, you
13   know, and I'm -- you know, I think that's one of the things
14   that I'm bogged down with.  So -- and it's hard to quantify
15   whether someone is saying -- is telling the truth or not.  You
16   know?  So that's just -- yeah.

17          COURTROOM DEPUTY:  Anyone else have an answer?

18          MS. DIAZ:  Okay.  So does that mean that everybody
19   else in the courtroom can conceive of finding an element of
20   what the victims believed based on their testimony in court?
21   Can we agree that for the rest of you, you could concede of
22   finding an element based on victim testimony in court?

23          PROSPECTIVE JUROR:  My name is Robyn Millen.  Will
24   there be, you know, corroborating stories or eyewitnesses, or
25   are you just saying -- oh, that's -- gotcha.  Okay.  Sorry.

1          MS. DIAZ:  All right.  Some of the people -- like

2     the jury question whether you have served on a jury and whether

3     you have come to a verdict, for anybody that said that they did

4     not come to a verdict, we don't want to hear what the facts of

5     the case were or what the holdup was, but is there anybody who

6     feels like they can't sit in judgment of someone else or they

7     can't sit on a jury and come to a verdict on any case?  For

8     anybody that said no verdict, is that the case for anybody?

9     Okay.

10          Your Honor, may I have a moment to confer?

11          THE COURT:  Sure.

12          MS. DIAZ:  In this case, you will hear from people

13    who are undocumented immigrants.  I know this is a sensitive

14    issue for a lot of people.  Is there anybody that feels extra

15    suspicion or just uneasiness with listening to the testimony or

16    believing the word of people who are undocumented and in this

17    country?  Okay.

18          Anybody that -- I think Juror Number -- or

19    previously Juror Number...

20          COURTROOM DEPUTY:  What number are they in the box?

21    Oh, you've got their names?  Okay.

22          MS. DIAZ:  Ms. Tichenor, I'm going to pick on you.

23    I'm sorry.  You said you have some friends with the Federal

24    Public Defender's Office.  Do you feel that you could be fair

25    to both sides in this case, given that one side is represented

1 | by the Federal Public Defender's office?

2 | PROSPECTIVE JUROR:  Yeah.  Sure.

3 | MS. DIAZ:  Okay.  And you'll be able to give the

4 | Government a fair shot just like you would give the defendant a

5 | fair shot?

6 | PROSPECTIVE JUROR:  Sure.

7 | MS. DIAZ:  Somebody else -- oh.  Mr. Maxwell, you

8 | had parents that -- both of your parents were public defenders;

9 | is that right?

10 | PROSPECTIVE JUROR:  Correct.

11 | MS. DIAZ:  And do you feel that that makes you lean

12 | more heavily one way or the other in this case?

13 | PROSPECTIVE JUROR:  No.  They had friends in the

14 | DA's office.

15 | MS. DIAZ:  Okay.  Great.  So you'll be fair to both

16 | sides regardless of your personal relationships?

17 | PROSPECTIVE JUROR:  Yes.

18 | MS. DIAZ:  Okay.  Great.  We may have covered this

19 | already, but those of you that have had family members that

20 | have been the subject of criminal investigations, do you feel

21 | that that experience would be weighing on your mind in court

22 | while you're here, that you would be distracted or wouldn't be

23 | able to come to a fair verdict in this case?  No?  Okay.

24 | Ms. Obannon, I'm going to pick on you, too.  You

25 | watched that documentary?

1          PROSPECTIVE JUROR:  I did.

2          MS. DIAZ:  Which was fascinating, I know.  Would you

3  be distracted by what you learned in that, watching that, and

4  your experiences?  Would that come into court with you such

5  that you would be thinking of things outside of what was

6  happening in the witness box as you were here today -- as you

7  were here during trial?

8          PROSPECTIVE JUROR:  I would be able to separate

9  them, although I would be thinking about it.

10          MS. DIAZ:  Okay.  Meaning that you would be

11  evaluating what's happening here in court?

12          PROSPECTIVE JUROR:  Yes.

13          MS. DIAZ:  Based on the things that you have learned

14  about the criminal justice system through that documentary?

15          PROSPECTIVE JUROR:  Yes.

16          MS. DIAZ:  All right.  Is there anything that I have

17  failed to ask that you're sitting there thinking, they should

18  probably know this about me?

19          PROSPECTIVE JUROR:  Nothing negative in that

20  necessary sense, but one thing just keeps kind of ringing in my

21  head from when you were asking about, like, undocumented

22  immigrants are a part of the trial.  I just keep thinking about

23  my parents and the majority of my family that came as

24  undocumented immigrants.  I've seen them as I've grown in my

25  life get work, like whatever company they've been working for,

1  not being able to get time off, not being able to get holidays

2  off, working 6 or 7 days a week.  I just keep thinking -- that

3  just keeps running through my head as you continue to ask all

4  of these questions.

5         MS. DIAZ:  Okay.  Do you think that, given the

6  judge's instructions, would you be able to set that aside and

7  listen to the evidence presented here in court and evaluate it

8  fairly for both the defense and the Government?

9         PROSPECTIVE JUROR:  I think I can, but again, since

10  you've asked that, up until this point, I just keep thinking

11  about my parents and the rest of my family.

12         MS. DIAZ:  And do you think that would be too

13  distracting?  There are other witnesses in this case besides

14  immigrants, so would it be too distracting from your role as a

15  juror?

16         PROSPECTIVE JUROR:  I think it might.

17         MS. DIAZ:  If the Court instructed you to put that

18  aside, could you follow that instruction?

19         PROSPECTIVE JUROR:  Yes.

20         MS. DIAZ:  Okay.  Your Honor, one more moment,

21  please.

22         THE COURT:  Okay.

23         MS. DIAZ:  I have nothing further.  Thank you all

24  for your honesty.

25         MS. STEELE:  Good afternoon.  Ms. Guzman, you

1   indicated that you would like more than testimony in this case,

2   right?

3            PROSPECTIVE JUROR:  Uh-huh.

4            MS. STEELE:  If you had testimony and physical

5   evidence and the judge instructed you that you're to consider

6   all of that, could you be fair and impartial?

7            PROSPECTIVE JUROR:  Are you saying I -- you have --

8   is it testimony and evidence?

9            MS. STEELE:  Yes.

10            PROSPECTIVE JUROR:  In that case, yes.

11            MS. STEELE:  If the judge were to instruct you to

12   consider the evidence as presented to you regardless of what it

13   is, could you do that and be fair and impartial in this matter?

14            PROSPECTIVE JUROR:  I'm not too sure.

15            THE COURT:  Wait a minute.  Hang on a second.  The

16   question is, could you consider the evidence, whatever it is?

17            PROSPECTIVE JUROR:  So, for me, what I'm thinking of

18   is, it's not the same case, but I know some people who are in a

19   domestic violence case to which the woman had presented her own

20   evidence on herself and framed her ex-husband, and she ended up

21   winning.  So I'm saying sometimes evidence and testimonies

22   don't, you know, coincide, like, they're not the same.  In her

23   case, it was all fake.  I'm not saying -- again, I'm not saying

24   anything's fake here, but I just -- I'm very iffy on

25   everything.

1          THE COURT:  The question was could you consider the

2    evidence, regardless of what it is, would you at least consider

3    it; or are you sitting here waiting on CSI and that's the only

4    thing you will pay attention to?

5          PROSPECTIVE JUROR:  I could consider it.

6          THE COURT:  Okay.  There you go.

7          MS. STEELE:  And you could be fair and impartial to

8    both sides of the case?

9          PROSPECTIVE JUROR:  I would like to say so, yes.

10         MS. STEELE:  Thank you very much.

11         Mr. Cardenas, you also indicated that you would like

12   to see evidence.  If the judge instructed you to consider the

13   evidence that has been presented to you, could you do that and

14   be fair and impartial to both sides?

15         PROSPECTIVE JUROR:  I think I will have a hard time

16   just by what people say.  I like to see hard everything.

17         MS. STEELE:  If you had a combination of testimony

18   and some physical evidence and the judge told you to consider

19   what had been presented to you, could you do that?

20         PROSPECTIVE JUROR:  I think I could.

21         MS. STEELE:  Thank you very much.

22         Ms. Murphy, I'm going to ask you the same question.

23   If you had evidence that was presented to you and the judge

24   told you as a juror you're to consider everything and to be

25   fair and impartial, could you be fair and impartial to both

1  sides?

2        PROSPECTIVE JUROR:  I could be fair and impartial to

3  both sides if the evidence itself is both.  If it's one -- if

4  it's -- if it's more circumstantial, like, hearsay, I have a

5  harder time with that because there's a certain doubt in my

6  mind, like, what if this person's just saying this, what if

7  this person is trying to get out of the current situation?

8  What if this person has ulterior motives and they're saying

9  different things?  I have a hard time with one-sided evidence.

10 So if it's both, that's not a problem, but if it's more

11 one-sided, I definitely have an issue with that.

12       MS. STEELE:  So you're saying you're going to

13 consider the reliability of the evidence that you're presented

14 with?

15       PROSPECTIVE JUROR:  Reliability, as in, are you

16 saying in terms of hearsay versus, like, tangible evidence

17 versus intangible evidence?

18       MS. STEELE:  Well, you, the jury, would be able to

19 decide what weight to give to certain evidence.  So if you felt

20 like something was not as reliable because it was hearsay or

21 something versus something that was more solid, you could make

22 that determination, but would you consider all of the evidence

23 as presented to you?

24       PROSPECTIVE JUROR:  I would consider it.  The weight

25 of the evidence, that may be a different story, but I would

consider all of the evidence.

MS. STEELE:  And would you be fair and impartial to both sides?

PROSPECTIVE JUROR:  Absolutely.

MS. STEELE:  Thank you very much.

Ms. Obannon?  You indicated that you, too, would like to see, I guess, substantial -- or you'd be considering the evidence when you listen to the case?

PROSPECTIVE JUROR:  Certainly.

THE COURT:  And would you be able to consider all the evidence that's presented to you and be fair and impartial?

PROSPECTIVE JUROR:  Yes.

MS. STEELE:  And also, even though you have seen the documentary "13," could you set aside anything you saw in that documentary and be fair and impartial to Ms. Xing as well as the defendant in this case?

PROSPECTIVE JUROR:  Yes.

MS. STEELE:  Thank you very much.

Now, Mr. Guillen Torres, you indicated that you have family members that are undocumented and that when you heard there are witnesses that are undocumented, that's something that resonated, but --

PROSPECTIVE JUROR:  They used to be undocumented. They're citizens now.  But, yeah, they've spent many years here undocumented, and, yeah, that definitely resonated with me.

1          MS. STEELE:  And does that experience that your
2   family members have, is that something that would affect you as
3   you're considering the evidence in this case?
4          PROSPECTIVE JUROR:  Possibly.
5          MS. STEELE:  So because of that experience and
6   because some of the witnesses are going to be undocumented, you
7   would have sort of a bias towards them and their situation?
8          PROSPECTIVE JUROR:  I would say so.
9          MS. STEELE:  Thank you very much.
10          Now, Ms. Kwon, you, too, indicated that you would
11   like more than just words when you're listening to the
12   evidence.  If there was a combination of testimony as well as
13   physical evidence and the judge told you to consider what had
14   been provided to you, could you be fair and impartial to both
15   sides?
16          PROSPECTIVE JUROR:  Yes.
17          MS. STEELE:  Thank you very much.
18          Mr. Rodriguez, Erick Neil Rodriguez, you also
19   indicated that you would be considering the evidence and that
20   you would like to have, like, a physical evidence.  If, again,
21   the Court instructed you to consider the evidence that had been
22   presented to you and you received testimony as well as physical
23   evidence, could you be fair and impartial to both Ms. Xing as
24   well as the Government?
25          PROSPECTIVE JUROR:  Yes.

1          MS. STEELE:  Thank you very much.

2          Now I would like to talk to all of the jurors.  This

3  is a case -- and it's kind of hard for a lot of us to think

4  about and talk about, but this is going to be a case about sex

5  workers, people who -- women who perform sex acts for money.

6  Does anyone believe that that can't be done voluntarily?  Does

7  anyone think that anyone that's a sex worker must be somehow

8  forced to do it?  Ma'am?  What's your name, please?

9          PROSPECTIVE JUROR:  My name is Oksana Dutchak.  Yes,

10  there are so many cases that women or children are forced to do

11  that, and especially when they are, like, immigrants, illegal.

12  I've heard a lot of those stories.

13          MS. STEELE:  So you're saying that based on things

14  that you've heard, when you hear that someone is a sex worker,

15  you think they must have been forced?

16          PROSPECTIVE JUROR:  They might.  Not must.  Some of

17  the people, they force some people, but not, like, all of them.

18          MS. STEELE:  And you think that that's especially

19  true for immigrants?

20          PROSPECTIVE JUROR:  I can say that there are some

21  bad people who try to use that to make money, but some people.

22          MS. STEELE:  So you're saying that some people take

23  advantage of immigrants?

24          PROSPECTIVE JUROR:  Yes.  Exactly.

25          MS. STEELE:  Thank you very much.

1          Does anyone else feel similarly?  And if you could

2     say your former juror number, that would be great.

3          PROSPECTIVE JUROR:  I have no idea what that is.

4     Pradeep Ramamurthy.

5          COURTROOM DEPUTY:  He's Number 3 on the list.

6          PROSPECTIVE JUROR:  Pradeep Ramamurthy.  I guess

7     what I would say in reaction to that comment is, I certainly

8     think that it's possible to voluntarily choose prostitution,

9     but it is probably very unlikely if you're in an economically

10    complicated situation and a legally complicated situation.  So

11    do I think that, you know, people that are economically secure

12    and where prostitution is not illegal, could they choose to be

13    prostitutes?  Yes.  Do I think it's very unlikely in an

14    American context and where prostitution is illegal and where

15    the people involved in it are likely to be economically

16    deprived?  I think it's pretty unlikely.

17         MS. STEELE:  So are you saying in a situation where

18    prostitution is illegal and the person is -- and I don't want

19    to put words in your mouth, but, like, an immigrant and

20    probably economically disadvantaged, that you could not believe

21    that that person could be a sex worker voluntarily?

22         PROSPECTIVE JUROR:  By pure choice?  I would find

23    that very hard to believe.

24         MS. STEELE:  Thank you very much.

25         Does anyone else feel similarly?  I think, sir, in

1 the back?

2          PROSPECTIVE JUROR:  My name is Steve Dances.

3          MS. STEELE:  And what is your position on that?

4          PROSPECTIVE JUROR:  I think there are people that

5 can be exploited and, in certain circumstances undocumented,

6 they could be exploited and into -- and pressured into this,

7 but again, I don't know the case, but I think it's possible.

8          MS. STEELE:  Do you think that people that are in

9 that situation that are here not -- they don't have status,

10 they're not here legally and they don't have a lot of money,

11 that they could choose, then, to be sex workers voluntarily?

12          PROSPECTIVE JUROR:  It could go either way.  I mean,

13 I think they could either be forced into it or it's possible

14 that they could choose it.  Everybody has their own -- I don't

15 know exactly, but I think it's possible they could be forced

16 into it.

17          MS. STEELE:  Do you think that it's more likely that

18 they're forced under those circumstances?

19          PROSPECTIVE JUROR:  I don't know the evidence.  I

20 can't really say that.  I don't have a pre-determined idea on

21 that.

22          MS. STEELE:  Thank you.

23          Is there anyone else that agrees?  Ma'am in the

24 back?  Please state your name.

25          PROSPECTIVE JUROR:  Catherine Carrascoames.  Yeah, I

believe there can be both.  You can be forced into it, and some
people of free will choose it as a profession.  But a lot of
people are forced into it as well, and not only illegal
immigrants.

MS. STEELE:  So if you were to hear evidence that
someone said that they were forced, would you be more likely to
believe that they were forced into sex work?

PROSPECTIVE JUROR:  Yeah, I would.  I mean, as long
as there's stuff to support it, yes.

MS. STEELE:  Thank you.

Anyone else?  Ma'am?

PROSPECTIVE JUROR:  Okay.  So although I certainly
believe that people have agency and choice, I'd be very
skeptical of a situation where someone who's economically
disadvantaged, had potential immigration issues, had the luxury
of choice when it came to sex work in the United States.  So
although I would do my best to be skeptical, I'd be very
skeptical, and that would be a high bar.

One other possibly related thing specific to my
situation is I'm a human rights educator, so I teach courses
related to human rights, sometimes focusing on human
trafficking, and, in fact, my students are currently working on
research papers including human trafficking, so I will
simultaneously be overseeing their online research of current
research -- human trafficking topics.

1          MS. STEELE:  And based on your human rights

2     educating, I guess your role, would it be difficult for you to

3     be fair and impartial in this case where there's alleged

4     trafficking?

5          PROSPECTIVE JUROR:  I would do my best.  I think the

6     challenge for me is just having read so much, and it would be

7     hard to separate and limit myself to what's presented to be the

8     facts in the case and separate that from the external readings

9     that I've done.

10          MS. STEELE:  So based on what you've read and what

11     you teach, you would not be a good juror in this case because

12     you couldn't be fair and impartial?

13          PROSPECTIVE JUROR:  I hesitate to say yes, but I do

14     think that my teaching does present a complicating factor.

15          MS. STEELE:  Thank you.  And what was your name

16     again?

17          PROSPECTIVE JUROR:  Erica Onugha.

18          MS. STEELE:  Thank you very much.

19          Do other people feel similarly as the last people

20     who have spoken?  Oh, Ms. Murphy.

21          PROSPECTIVE JUROR:  I'm Kathy Tichenor, and, you

22     know, it's -- these types of things are so in the forefront

23     today in media, and, you know, being very like-minded with the

24     last speaker, it's -- this is a very, very difficult and

25     horrendous thing that happens, and, you know, people can be

1  easily coerced, you know, especially if they come over with

2  promises and then they're forced into that to repay their debt.

3  So, you know, it's just another type of bondage.

4          MS. STEELE:  And based on the things that you've

5  heard about, read about, would it be difficult -- it would be

6  difficult for you in this case to set that aside and be fair

7  and impartial?

8          PROSPECTIVE JUROR:  I think it would be somewhat

9  difficult because it's so present right now.  And I would, of

10  course, try to do my best, but, you know, when it's still

11  floating around in the world, you know, I don't want to say,

12  but subconsciously it could.

13          MS. STEELE:  Thank you.  Thank you for your honesty.

14          Is there anyone else that feels this way?

15  Ms. Murphy?  Is there someone else here that I saw raise their

16  hand?

17          COURTROOM DEPUTY:  Over here.

18          MS. STEELE:  Yeah, Ms. Murphy.

19          PROSPECTIVE JUROR:  I won't take up too much of your

20  time, but I just want to agree with the juror here.  I think it

21  is a choice.  It can be a choice, but due to certain economic

22  status and due to the immigration status, I don't see it as

23  much of an option to be -- to choose prostitution.

24          MS. STEELE:  I don't understand.  Could you please

25  explain?

1          PROSPECTIVE JUROR:  Well, saying that I was -- I

2   don't see it as much of an option to choose, to have a choice

3   of prostitution, when you're not in a situation of economic --

4   when you can actually be able to afford and have some

5   resources.  If you have the resources, you probably wouldn't

6   choose to go into prostitution.

7          MS. STEELE:  Okay.  So you're saying that if someone

8   has limited resources, that it's not really a choice?

9          PROSPECTIVE JUROR:  Correct.

10          MS. STEELE:  But would you say that anyone that does

11   that, under those circumstances, is then forced?

12          PROSPECTIVE JUROR:  I don't know if I can say it's

13   completely forced or if it's something that's agreed upon.

14          MS. STEELE:  I didn't hear the last part of what you

15   said.

16          PROSPECTIVE JUROR:  Or if it's something that's

17   agreed upon.  That, I can't say it was forced or agreed upon.

18   But I do -- I do see it being more forced.  As the juror down

19   there had said, it's more affront nowadays, in the forefront,

20   with a lot of, unfortunately, undocumented immigrants.

21          MS. STEELE:  Thank you very much.

22          Another issue that has been brought up is that the

23   witnesses that are going to testify, many of them have

24   immigration consequences, they don't have status in the

25   country.  Do people believe that someone might testify falsely

to get an immigration benefit?  Is there anyone that thinks

that no one would ever testify falsely to get an immigration

benefit, that that would never happen or almost never happen?

PROSPECTIVE JUROR:  I don't understand what -- how

testifying would help support the...

MS. STEELE:  If there's some kind of mechanism in

the law where you're some sort of a victim and then if you

claim to be a victim, then you get an immigration benefit, you

might get a visa or something, do you think someone would

falsely claim that they're a victim --

PROSPECTIVE JUROR:  Who's going to be giving this

benefit?

MS. STEELE:  Witnesses.

PROSPECTIVE JUROR:  Right.  To the witness?

MS. STEELE:  Say it again.

PROSPECTIVE JUROR:  If someone's testifying, not

telling the truth, and there's a benefit attached, I'm just

wondering who's giving the benefit.

MS. STEELE:  When I say, like, an immigration

benefit, like, to be able to stay here, some sort of a visa.

MS. DIAZ:  Your Honor, objection.

THE COURT:  I think so.  We're -- let's not do this.

MS. DIAZ:  I think we're over ten minutes as well.

MS. CHRISTERNA:  You went over ten minutes.

THE COURT:  Let me deal with that.

1          MS. STEELE:  May I have a moment, your Honor?

2          THE COURT:  Sure.

3          MS. STEELE:  I just have one other question that's a

4    little bit based on that one but more general.  Does anyone

5    believe that someone might testify falsely to get a benefit,

6    just in general?  Does anyone --

7          PROSPECTIVE JUROR:  I certainly think it's possible,

8    but I also heard a series of accusers, I guess, so I would say

9    that the odds of multiple accused people -- it's basically like

10   a mathematics problem, right?  One person, maybe.  Two people,

11   three people, four people, it gets more and more unlikely as

12   the number of people involved increases.

13         MS. STEELE:  Okay.  Thank you.

14         Anyone else have an opinion as to that, whether or

15   not people will testify falsely to obtain a benefit?

16   Ms. Murphy.

17         PROSPECTIVE JUROR:  I do because of a personal

18   experience.  My father was actually dating somebody who first

19   actually -- we actually warned him about her, too, but

20   everybody has heard these stories where somebody was actually

21   dating him, using him for a visa, for a green card.  We warned

22   him about it.  Well, when she came here to the U.S., she

23   actually started calling cops and accusing him of abuse and

24   spousal abuse, which was not true.  It got to the point where

25   he was starting to set up cameras to prove his innocence around

1  the house.  So do I believe an accuser can actually do this?

2  Yes, make false statements.

3            MS. STEELE:  Thank you very much.

4            Does anyone feel differently, that they don't think

5  that that could ever happen?

6            THE COURT:  Okay.  Let's wind it up.

7            MS. STEELE:  Okay.  Thank you very much.

8            THE COURT:  All right.  Ladies and gentlemen, we're

9  at the phase now where I'm going to give the attorneys a few

10 moments to give some thought to some of your comments, and then

11 they will have the opportunity to exercise challenges.  And

12 we're going to start thinning the group until we actually get

13 down to what we need.  We need 12 jurors and three alternates,

14 and once we get to that point, we will have our jury and the

15 rest of you will be excused.

16            So, Counsel, I'm going to give you five minutes, and

17 when I come back after five minutes, I don't want to just hear

18 that you've made your first one or two selections.  Let's get

19 this done because we've been at it all day and these people

20 would like to get back to their lives.

21            MR. LARA:  Your Honor?

22            THE COURT:  What?

23            MR. LARA:  I believe we still need to deal with some

24 cause challenges before we get to the --

25            THE COURT:  Yeah.  Yeah.

1          MR. LARA:  Thank you.

2          THE COURT:  I want to talk to you after I -- after I

3    come back, I want to talk to you, and we want to discuss the

4    cause before we get into the peremptories.  Okay?

5          MR. LARA:  Yes, your Honor.

6          THE COURT:  All right.

7          (Recess from 4:04 p.m. to 4:12 p.m.)

8          (The following proceedings were held at the bench,

9    outside the hearing of the jury.)

10          THE COURT:  Okay.  Let's deal with the issue of

11   cause.

12          MR. LARA:  Yes, your Honor.  And just for the record

13   so that we're all on the same page, what we understand from the

14   courtroom deputy, Numbers -- the way that they're sitting in

15   the box is the number that we're going to refer to them while

16   they're in the box, whereas the numbers on the list are what

17   we're going to refer to if they're out in the gallery.  So

18   we're going to make sure we're talking about the same persons.

19   And my colleagues know that I'm bad at this, so they may jump

20   in and tell me that I'm talking about the wrong person.

21          For the Government, first we would like to talk

22   about Juror Number 6.  First name is Susan.

23          THE COURT:  Oh, Susan Murphy?

24          COURTROOM DEPUTY:  Actually, she's 7 on the list.

25          MR. LARA:  So when my colleague was questioning her,

1  she kept saying, you know, hearsay is not enough, she needs

2  tangible evidence.  When posed the question of if you get

3  tangible evidence and it's useless hearsay thing, can you

4  consider it, she said, "Sure," but really, at the end of the

5  day, what she's saying is she didn't consider hearsay at all,

6  she only considers tangible evidence which she decides is,

7  like, the CSI-related thing.  And what's really important, and

8  I believe the point I made earlier, is that there this a

9  certain element that we're all going to be arguing about this

10  entire trial, the force, fraud, or coercion that will only be

11  supported by testimony.  So if that's the case, she's saying

12  she cannot possibly find a guilty verdict.  And your Honor

13  knows that testimony must be considered like anything else, she

14  can't discount it or completely say that it's not useful for

15  her, throw it out, must acquit.

16          THE COURT:  Yeah.  And the thing is, I don't know if

17  it was you, but she was given an opportunity to address it,

18  that exact point, the point of force and coercion, so --

19          MS. STEELE:  Your Honor, if we may be heard?

20          THE COURT:  Sure.

21          MS. STEELE:  I think with respect to Ms. Murphy, I

22  did tell her that if the Court told her to evaluate the

23  evidence -- and I think what a lot of these witnesses are

24  saying is that they are going to evaluate the evidence, just

25  like we do as lawyers and the judges do when there's hearsay or

multiple hearsay, the Court says that there's not enough of an indicia of reliability when it's something that someone else said and that someone else said and that's something they're supposed to take as a fact.  This juror is saying -- oh, she can't hear me?

THE COURT:  No.  She can hear you fine.

MS. STEELE:  Too fast?

THE COURT:  Yes.  Bring it down to one, two.

MS. STEELE:  Got it.  What I was saying, and I'll try to repeat myself, is that with respect to Susan Murphy, it seems like what she was saying is she's going to evaluate the indicia of reliability of the evidence just like judges do.  So if something comes to her and it's multiple hearsay, she would not think that that's as strong of an evidence as, like, a physical object or something.  I think that that's what we ask the jurors to do as the triers-of-fact to evaluate the evidence.  When I asked her on the last question, could you listen to -- you know, address all the evidence, whatever that's given to you and the judge tells you to, you know, assess the evidence, could you do that and be fair and impartial to both sides, and she said, "Yes."  She was unequivocal, she said, "Yes."  So I think that it's not fair to say when a witness says, I am -- I have a little bit of problem with hearsay, you know, something that somebody told somebody else somewhere out of court that you asked me to believe versus

1    tangible evidence where you say, let's say it's a gun case and

2    you bring the gun and say, this is the gun that was found in

3    his pocket.  I think she's saying that when you have the

4    physical evidence, that has more of an indicia of reliability

5    than someone saying that someone else said something or someone

6    just coming in and saying that something happened.  So I

7    believe that her last question -- her answer to the last

8    question, can you be fair and impartial to both sides, "yes,"

9    indicates that she is still an appropriate juror here.

10              MR. LARA:  Your Honor, may I be heard on that point,

11   or do you not need any further argument?

12              THE COURT:  No, I heard from an experienced

13   litigator here, you know, shaping what we all heard.  She was

14   unequivocal about she needs tangible evidence.  Now, I

15   appreciate what you just said, but she's gone.

16              MR. LARA:  Yes, your Honor.  Related to that, your

17   Honor, there were multiple witnesses that were --

18              THE COURT:  Yes.

19              MR. LARA:  -- were shaking their heads.

20              THE COURT:  Yes.  And we heard from all of them.

21              MR. LARA:  Yes.  And so the Government would move

22   for cause for the same reasons for all of those particular

23   individuals.

24              THE COURT:  Ms. Cardenas.

25              COURTROOM DEPUTY:  That was Number 6 on the list.

1          THE COURT:  Guzman.

2          COURTROOM DEPUTY:  5 on the list and 4 in the box.

3          MR. LARA:  And I would also note that Juror Number 3

4    in the box, 4 on the list, was also shaking her head on this

5    point but didn't make statements on this point one way or the

6    other.

7          THE COURT:  By the way, while we're talking about 3

8    in the box --

9          MS. DIAZ:  She's the one with the language

10   difficulty.

11         THE COURT:  Does anybody take issue with that?

12         MS. STEELE:  Your Honor, we would object to it being

13   a for cause challenge.  And also --

14         THE COURT:  Wait, wait, wait.  You mean just

15   philosophically you don't think it should be a for cause

16   challenge?

17         MS. STEELE:  No, your Honor.  Some people, although

18   they can't articulate themselves as well, they still have a

19   right to be jurors and they should not be -- they should not be

20   excluded on that basis.

21         THE COURT:  That they can't communicate their ideas,

22   their views, et cetera, to their fellow jurors?

23         MS. STEELE:  Well, your Honor, I didn't think that

24   her language abilities were so low that she couldn't

25   communicate her ideas.  It was a little bit more difficult to

1  understand, but she did communicate her ideas.

2          MR. LARA:  Your Honor, may I be heard on that?

3          MS. STEELE:  She's also a retired cashier, so that

4  means she's someone who dealt with the public and spoke to the

5  public and communicated with them every day.  And one of the

6  reasons the Government argued for her to be excluded for cause

7  is because she shook her head when someone else was talking.

8  That's not -- shaking one's head is not enough.  If they didn't

9  do the follow-up questions to find out why she was shaking her

10  head, that's not a reason to excuse her for cause.

11          THE COURT:  I agree with that, but the language

12  thing --

13          MS. DIAZ:  She said she didn't understand the

14  proceedings.

15          MS. CHRISTERNA:  This is Neha talking.  She said it

16  was hard to understand.

17          THE COURT:  Yes.  And it's hard to understand her as

18  well.  It's mutual.

19          COURTROOM DEPUTY:  Can I say something that you guys

20  may have missed?  She also had the girl help her read the

21  questions.

22          THE COURT:  Oh, I forgot about that one.  Okay.

23  Wait, wait, wait.  Do we remember that?

24          MR. LARA:  Yes, your Honor.

25          MS. DIAZ:  Yes.

1          MS. STEELE:  The difficulty --

2          THE COURT:  No.  No.  No.  Seriously, if you all

3    want to continue to have credibility, there are some things you

4    are just going to have to concede.  She could not read the

5    questionnaire, true?

6          MS. STEELE:  She did have someone assist her in

7    reading the questionnaire.

8          THE COURT:  But you want to stand firm that her

9    language skills are sufficient?

10          MS. STEELE:  I believe when she was communicating

11   her answers, I could understand what she was saying.

12          THE COURT:  You and who else?

13          MS. DIAZ:  This is Damaris.  We could understand her

14   saying that she doesn't understand.

15          COURTROOM DEPUTY:  Are we still talking about Number

16   4 on the list?

17          MS. DIAZ:  Yes.

18          MS. STEELE:  I think one of the dangers, your Honor,

19   in excluding a juror who has language issues is that, you know,

20   Ms. Xing is entitled to a cross-section of the community, and

21   the people that have language issues are generally people of

22   color.  So if we're going to exclude people because they have a

23   slight difficulty in articulating themselves or maybe had some

24   difficulty with the questionnaire and needed someone to -- it's

25   not like the person next to her was translating it into another

1   language.  She was just telling her in English what it said.

2            MS. DIAZ:  She was speaking to her in Spanish.

3            MS. STEELE:  Oh, I didn't hear that.  I'm sorry.  I

4   couldn't hear that across the room.

5            MR. LARA:  Yes, she was speaking to her in Spanish.

6            MS. STEELE:  I'm sorry.  I did not hear that.

7            THE COURT:  Here's the deal:  That lady could be

8   absolutely on your client's side, absolutely, right?  Don't you

9   think she needs to be replaced by somebody else that's on your

10  client's side?  Because she can't persuade anyone.  Your client

11  could very well be in the position of losing an advocate by

12  having her on the jury.

13           MS. STEELE:  Or gaining one by having her on the

14  jury.

15           THE COURT:  How?  She can't communicate.

16           MS. STEELE:  Well, your Honor, I think -- I

17  disagree.  I respectfully disagree.

18           THE COURT:  But I don't think you're sincere.  I

19  think you're just simply being an advocate here.

20           MS. STEELE:  No, your Honor.

21           THE COURT:  You can't possibly think that after what

22  we've seen with her, she can't read anything, somebody else had

23  to read the damn thing for her in Spanish.

24           MS. STEELE:  I didn't --

25           THE COURT:  All of us are having this discussion

because we have all witnessed her lack of fluency in English. This is why we're talking about it. It's obvious to everyone, not you and Neha. Come on.

MS. STEELE: Your Honor --

THE COURT: Okay. You going to stick to your thing?

MS. STEELE: Yes, your Honor.

THE COURT: Okay. I respect that.

MR. LARA: Your Honor, speaking of --

MS. DIAZ: I'm sorry. Did your Honor make a decision on Ms. Romero?

THE COURT: No. I'm going to leave it alone. I'm not going to go ahead and remove her for cause even though I think it's appropriate to do so.

MS. DIAZ: Okay.

MS. STEELE: Thank you, your Honor.

THE COURT: Oh, trust me, don't thank me. I'm just being stupid.

MR. LARA: Your Honor, respectfully, if she doesn't -- if she's not able to read in English, a lot of the evidence is in paper form. She won't be able to understand -- yes, your Honor. There's written documents that are translated from Chinese into English. If she's not able to understand the documents that are placed before her, she's not able to actually actively consider the Government's evidence.

THE COURT: So what we need is someone to be on the

1  jury that can translate these documents in Spanish for her?

2          MR. LARA:  From -- yes, your Honor.  Which is

3  obviously not proper.

4          MS. STEELE:  Your Honor, I believe that if he's

5  talking about the transcripts that are going to be in evidence,

6  the transcripts are not the evidence; it is the -- like, the

7  video or the audio.

8          MS. DIAZ:  That's incorrect.

9          MR. LARA:  Ms. Steele --

10          MS. STEELE:  You are saying the transcripts are

11  evidence?

12          MS. DIAZ:  If the evidence is in a foreign language,

13  the evidence is the transcript.

14          THE COURT:  Is the transcript.

15          MS. DIAZ:  Is the transcript in English.

16          MR. LARA:  Correct.  Because no one on the jury

17  understands Chinese, presumably.

18          THE COURT:  I know what you're saying.  I know

19  exactly what you're saying.

20          MS. DIAZ:  When there's a recording in English and

21  there's a transcript, the evidence is the recording.  When

22  there's a recording in a foreign language and there's a

23  translation and transcript, the evidence is the translated

24  transcript.

25          THE COURT:  Yeah.

1          MR. LARA:  So, your Honor, because this juror is

2     unable to understand the evidence that will be placed before

3     her and brought back to the jury room because she has English

4     language deficiencies as shown by her not being able to read

5     the questionnaire, the Government respectfully thinks that she

6     should be able to be challenged for cause.

7          THE COURT:  All right.  Part of the problem is I

8     don't know what the evidence is in this case, but is this

9     hypothetical or is this the real deal?

10          MR. LARA:  This is real, your Honor.  The Government

11     does have multiple things that will be in English written that

12     the jurors will need to read.  For example, we have a pretext

13     call that's entirely in Chinese that's translated into English.

14     We also have a partnership -- we also have multiple documents

15     that were seized from Ms. Xing's home that were written in

16     Chinese that are translated into English.  There are other

17     documents throughout this case that were translated into

18     English.  There's not an audio form of that in English.  And

19     there are also sex ads, your Honor, that were translated from

20     Chinese into English -- or sorry -- advertisements to recruit

21     for masseuses from Chinese into English.

22          MS. DIAZ:  And also, there's evidence in English

23     such as the partnership agreement, which is a good 15, 20-page

24     document in English.  We have the back page and spot -- the

25     illicit sex or those website ads that are in English.  The jury

1   has to be able to read English, read the evidence before it.

2   The juror cannot fulfill her role if she cannot consider the

3   evidence.

4            THE COURT:  Okay.  In light of this information and

5   in light of the fact that we have evidence with our own eyes

6   that she cannot read English, do you want to rethink this?

7            MS. STEELE:  May I have a moment, your Honor?

8            THE COURT:  Sure.

9            (Off the record.)

10           THE COURT:  Counsel?

11           MS. CHRISTERNA:  Okay.  So we understand the Court's

12  comments, but we're going to maintain our objection.  We think

13  that the Government should have to use a peremptory.  We only

14  saw a few seconds of her being assisted.  We don't know why.

15  Maybe she was nervous.  We don't have adequate information.

16  She might be able to read English.  And I know I -- I

17  understand better Spanish than I can speak, but I understand

18  it.  So there are people that fully understand everything they

19  read and hear, and just because they can't articulate in a way

20  that's satisfactory to people doesn't mean that they have a

21  language barrier.  So we would just maintain our objection,

22  your Honor.

23           THE COURT:  All right.  I'm going to overrule it.

24  She's gone for cause.  She needs to have a much better grasp

25  with English.  She says she had an issue with the language.

1          Yeah?

2          COURTROOM DEPUTY:  Yes.

3          THE COURT:  What is this?  What am I looking at?

4          COURTROOM DEPUTY:  I wrote that to you.  I was

5    giving you a note.

6          THE COURT:  I was talking to counsel and I said I've

7    gotta stop talking because she has no empathy.  She is just

8    cold-blooded.

9          MR. LARA:  Should we continue with --

10          COURTROOM DEPUTY:  Wait, wait, wait.  I'm sorry.

11    What is it?  Gone for cause?

12          THE COURT:  Yes, she's gone for cause.

13          MR. LARA:  This is Scott again.  Continuing with I'm

14    just going to call it CSI questions --

15          COURTROOM DEPUTY:  Wait.  Are you on the list?

16          MR. LARA:  I'm on the list.  Jurors Numbers 16, 28,

17    34, 43, all of these individuals raised their hands when my

18    colleague asked them whether they needed more than just

19    testimony to convict.  Again, your Honor, same argument --

20          THE COURT:  It's the same argument.

21          MS. STEELE:  If we can go with each one, 16 we have

22    no objection.

23          COURTROOM DEPUTY:  So that's cause?

24          MS. STEELE:  Yes.

25          THE COURT:  Next one is 24 --

1          MR. LARA:  28.

2          THE COURT:  24.

3          COURTROOM DEPUTY:  No.  No.  24 is already gone.

4          THE COURT:  Oh, that's right.

5          MR. LARA:  28.

6          MS. DIAZ:  Hannah Kwon.

7          MS. STEELE:  I believe that Hannah Kwon was

8    rehabilitated.  I did question her and I did ask her if she

9    were to receive all of the evidence and the Court were to tell

10   her to consider what it is that she received, could she be fair

11   and impartial, and she said, "Yes."

12         THE COURT:  You like pulling teeth.  You coaxed that

13   out of her.

14         MS. STEELE:  Your Honor, that's exactly what was

15   done when we made our peremptory challenges earlier today.

16   Most people remained on the jury.

17         MR. LARA:  Your Honor, may I be heard?

18         THE COURT:  Sure.

19         MR. LARA:  One of the things that defense counsel

20   did was say, if you could consider testimony and other things

21   that you actually -- would in parentheses, you know, the

22   subtext of that is things that you actually consider evidence,

23   like DNA or video, would you be able to convict or be able to

24   consider that evidence, and of course everyone would say yes.

25   If you're given more evidence, some that you actually consider

1   and some that you think is trash, of course that's still

2   evidence that you have overall.  But what they didn't say was,

3   well, if only I got testimony, then I could convict.  In fact,

4   they said the opposite when Ms. Diaz questioned them.  And like

5   we said, your Honor, there are going to be elements here.  The

6   main element that's going to be at dispute is going to be based

7   purely on testimony.  And if that is the case and they think

8   it's not worthy to reach beyond a reasonable doubt, they can't

9   be jurors on this case because they can't fairly judge the

10  evidence.

11          MS. STEELE:  Your Honor, the Government is saying --

12  the Government has more than just testimony.  The Government

13  has condoms --

14          THE COURT:  Wait a minute.  Wait, wait, wait.  Does

15  the Government have tangible evidence to demonstrate fear or

16  coercion?

17          MS. STEELE:  What do you mean tangible evidence?

18  Like, what tangible evidence?

19          MS. DIAZ:  Physical evidence.

20          THE COURT:  I don't know.  What do they mean?

21          MS. STEELE:  Well, your Honor, the Government is

22  acting as if they're going to have these witnesses come in and

23  just say --

24          THE COURT:  You're not going to answer my question,

25  are you?

1              MS. STEELE:  I will, your Honor.

2              THE COURT:  Eventually, when you get around to it?

3              MS. STEELE:  Yes, your Honor.

4              THE COURT:  You know I don't play it that way.

5    We're done.

6              MS. STEELE:  I'm just trying to put it all in

7    context.

8              THE COURT:  No.  No.  It's past my bedtime.  All

9    right?  So we're only going to do this up to a point.  When I

10   ask you a question, I need an answer to my question so we can

11   move on and get out of here.

12             MS. STEELE:  I'll answer your question.

13             THE COURT:  Okay.  Cool.  Tangible evidence to

14   demonstrate fear.

15             MS. STEELE:  What is tangible?

16             THE COURT:  Thank you.

17             MS. STEELE:  No, no, I'm just saying --

18             THE COURT:  Thank you.

19             MS. STEELE:  But I'm just saying --

20             THE COURT:  No, no, you want to play games.  What is

21   tangible?  Is that what you're asking me?

22             MS. STEELE:  No, no, I'm saying, like, what are you

23   saying, what tangible evidence demonstrates fear, like what is

24   there?

25             THE COURT:  There are six people over there who

1  would only consider tangible physical evidence.  They will not

2  accept someone's testimony.

3          MS. STEELE:  But they did --

4          THE COURT:  That's a problem, isn't it?

5          MS. STEELE:  I don't think so, your Honor,

6  because --

7          THE COURT:  Okay.  Fine.

8          MS. STEELE:  -- I know what the evidence is.

9          THE COURT:  There's an element in this case that

10  really goes to nothing except one's state of mind.

11          MS. STEELE:  Well, there's also things that

12  corroborate it that the Government's going to be bringing in.

13          THE COURT:  I don't know anything about it, I really

14  don't.  I'm serious about it.  I don't know.  I'm asking you,

15  what is it?

16          MS. STEELE:  They have evidence that these women

17  worked in these massage parlors.  They have evidence that they

18  had engaged in sex in Ms. Xing's home on the third floor of her

19  townhouse.  They found condoms.

20          THE COURT:  How does this address whether or not

21  they stayed because of fear?  How does this address the issue

22  of the police -- so-called police officer running around?  I

23  mean, there -- she had things working for them.  It could have

24  had psychological effect on these women.  Even the damn rumors

25  that are being circulated, right?  And that's going to be quite

1   interesting legally, but it's a fact.  There's a lot of things

2   that were playing on these women's psyche forcing them to stay

3   in line.  But my question is -- is that her?  I can't see worth

4   shit.  Is that her?

5          COURTROOM DEPUTY:  Yes.

6          THE COURT:  You know what?  Should we bring her over

7   here?

8          MS. STEELE:  Yes, your Honor.  I think so.

9          MR. LARA:  Your Honor, this is Scott.  The

10  Government doesn't feel like that's necessary.  We've already

11  questioned her quite a bit.  It's already --

12         THE COURT:  I agree.  I agree with what you're

13  saying, but here's the deal:  There's still some follow-up

14  rehab questioning.  And granted it was done in such a way that

15  I think you eliciting the responses that you wanted was pretty

16  unavoidable.  I mean, she'd have to be brain dead not to see

17  what answers you wanted from her.  Okay?

18         MR. LARA:  Your Honor, all I will say on the record

19  here is I feel like we've explored this issue quite a bit.

20         THE COURT:  I agree.

21         MR. LARA:  Yes, it seems that she is willing to --

22  she's going to say --

23         THE COURT:  Will she?  Since she's in the courtroom,

24  let's find out.

25         All right.  I want you to understand something.

1  There are no right or wrong answers; there's only truthful

2  answers.  Okay?  And you're entitled to your truth.  We are

3  confused.  No, I am confused because I'm not quite as sharp as

4  these lawyers are, so I'm going to need you to clarify some

5  stuff for me.

6          PROSPECTIVE JUROR:  Okay.

7          THE COURT:  I'm left with the impression that when

8  it comes to receiving certain kinds of evidence in this case

9  and testimonial, or as you all call it, hearsay evidence,

10 that's not going to be enough for a lot of you.  You're going

11 to need to see some tangible evidence?  Or you tell me what it

12 is you need to see.  But just their testimony is not going to

13 be enough for you, right?

14         PROSPECTIVE JUROR:  Right.

15         THE COURT:  So what is it you're going to need to

16 see?  And did you hear that?

17         MS. STEELE:  Yes, your Honor.

18         THE COURT:  Okay.  What do you need to see?

19         PROSPECTIVE JUROR:  Just any physical evidence,

20 something visible like a text or a recording or an email or, I

21 don't know, something along those lines, yeah.

22         THE COURT:  Okay.  That was quite concise.

23         MS. CHRISTERNA:  And does it change your answer if

24 you knew they spoke to law enforcement before?

25         PROSPECTIVE JUROR:  But wouldn't that be evidence?

1  Wouldn't there be --

2           MS. CHRISTERNA:  Yes.  If the evidence was presented

3  that they spoke to law enforcement before?

4           PROSPECTIVE JUROR:  I would consider that evidence,

5  yes, because it would -- there would be a police report, right?

6           MS. CHRISTERNA:  Is that tangible evidence to you, a

7  police report?

8           PROSPECTIVE JUROR:  Yeah.

9           MS. DIAZ:  This is Damaris.  Are you saying that you

10 have to see the police report?

11          PROSPECTIVE JUROR:  Yes.

12          MR. LARA:  This is Scott.  And if you don't see the

13 police report, which is likely hearsay, then you wouldn't

14 consider it the same as you would --

15          PROSPECTIVE JUROR:  That would just then be, like, a

16 verbal...

17          MS. STEELE:  What if you were informed that the

18 report had been made to the police and that -- on multiple

19 occasions and the police had taken reports and even possibly

20 the police officer would testify that they came and talked to

21 him and that they made the reports?  Is that --

22          PROSPECTIVE JUROR:  I mean, I've made a police

23 report before regarding the IRS thing, but they would always

24 give you a copy.  So the victims or whoever should have that

25 copy, too.

1          MS. STEELE:  Right, but there are certain rules for

2   court that not everything is going to be presented to the jury,

3   so if you were told that police reports were made, that they

4   went in, they reported it to the police and the police officer

5   actually testified these individuals came to me and made these

6   reports, would that be evidence that you would consider?

7          PROSPECTIVE JUROR:  But why wouldn't they be able to

8   show me -- or not show me, but why wouldn't the police be able

9   to say, I do have physical evidence but I can't present it to

10  you?

11         MR. LARA:  Your Honor, I think this goes outside

12  what we're doing here.

13         THE COURT:  We're not going to get into some of

14  these things.

15         PROSPECTIVE JUROR:  Oh, okay.

16         MS. STEELE:  But would you consider that to be

17  tangible evidence if there was a police report?

18         THE COURT:  That she can't see?

19         PROSPECTIVE JUROR:  That I can't see?

20         MS. STEELE:  If you have testimony by the police

21  officer who took the report.

22         PROSPECTIVE JUROR:  But he could be lying, right?

23         MR. LARA:  That's right, because you don't believe

24  the testimony, right?  You need to see the physical document in

25  order to know it exists?

1              PROSPECTIVE JUROR:  Yes.

2              MS. STEELE:  I think the question is, if you think

3     that a police report is tangible evidence and you were told

4     that a police report was taken and that it was taken on several

5     different occasions, would that be tangible evidence to you

6     that there -- that this statement was made outside of court?

7              THE COURT:  Even though you'll never see it.

8              MR. LARA:  Your Honor, I think we've fully explored

9     this --

10             MS. STEELE:  She hasn't answered the question.

11             THE COURT:  Let her answer it.  You brought it up,

12    you need to see tangible evidence?

13             PROSPECTIVE JUROR:  Yes, I would prefer to see --

14             THE COURT:  Because you will not accept just

15    testimony alone.  You don't care who says it, police --

16             PROSPECTIVE JUROR:  I just don't trust anyone.

17             THE COURT:  You don't trust anyone's word.  You need

18    to see it.  So even if a police officer says there was a

19    report, if you can't see the report...

20             PROSPECTIVE JUROR:  I wouldn't trust the police

21    officer, only because what relation are they to them and...

22             THE COURT:  Customer.  All right.  Thank you, dear.

23    Appreciate it.

24             MR. LARA:  Your Honor, I think that this --

25             THE COURT:  Yeah.  Let me write the "C" next to the

1  name.

2           MS. STEELE:  We would respectfully object, your

3  Honor.

4           THE COURT:  Oh, yes, I know.

5           MS. STEELE:  Thank you.

6           THE COURT:  In spite of hearing it again.

7           COURTROOM DEPUTY:  She's gone?

8           MS. DIAZ:  Yes, she's gone.

9           MR. LARA:  Your Honor, the Government with 34 and

10  43, same thing.  And I will also note, your Honor, other than

11  this most recent sidebar --

12           THE COURT:  34, come on.  You have no trouble with

13  34's language abilities either?

14           MS. STEELE:  May I have a moment, your Honor?

15           THE COURT:  Sure.

16           MS. CHRISTERNA:  Who is 34?

17           MR. LARA:  Oksana.

18           MS. STEELE:  I have to find her again.

19           MS. CHRISTERNA:  She just appears to have a heavy

20  accent.  I don't think she appears to have any trouble

21  understanding or articulating herself.

22           THE COURT:  Not like Ms. Guzman.

23           MS. CHRISTERNA:  Yes, I would agree, so I don't know

24  that the language barrier --

25           THE COURT:  You're right.

1          MR. LARA:  Your Honor, I would second that,

2     actually.  I don't think the language is the issue here.  I

3     think for the Government the issue is her requiring tangible

4     evidence, not considering testimony.  Additionally, I will say

5     that when Ms. Diaz questioned them about this issue, when one

6     person would speak, the next person would then adopt what the

7     first person said, so --

8          THE COURT:  Yeah.  I was sitting in a position where

9     I could actually see that occur.  It was like wildfire.

10    Someone -- I don't know if it was Susan who broached the

11    subject to begin with, and then all of these heads started

12    nodding, and before you know it, we've got six people in here

13    that are not going to take just testimony without tangible

14    evidence.

15          MS. STEELE:  We have no objection.

16          MS. CHRISTERNA:  Yes, we have no objection to her.

17          MR. LARA:  Then the same applies, then, for Number

18    43 on the list, I believe.

19          THE COURT:  Where did Sheila go?

20          MS. DIAZ:  Mr. Erick Rodriguez.

21          MR. LARA:  Mr. Erick Rodriguez, he also adopted the

22    same arguments, made the same claims.

23          MS. STEELE:  What number?

24          THE COURT:  Erick Neil Rodriguez?  Yes, I wrote the

25    same thing next to him, that he needs physical evidence in

1    order to establish proof beyond a reasonable doubt.  There she

2    is.  Girl, get over here and do your job.

3           MS. STEELE:  Your Honor, we would object to Erick

4    Neil Rodriguez.  We believe that -- if I may have a moment?

5           THE COURT:  Uh-huh.

6           MS. STEELE:  I did question him on voir dire and I

7    specifically asked him would he consider all the evidence and

8    if the Court told him that he is to consider evidence that has

9    been provided, would he be fair and impartial, and he

10   unequivocally said yes.

11          THE COURT:  Well, that's not the question here.  The

12   question is, is he going to stick to what he said about in

13   order to establish proof beyond a reasonable doubt, he, too,

14   needs physical evidence?  That's the problem.

15          MR. LARA:  Yes, your Honor.  And I would just note

16   for the record that he adopted everything that witness --

17          THE COURT:  6.

18          MR. LARA:  -- 6 said, then 16, then 28, then 40 --

19   and then 34.  And then he was the last to speak in agreeing

20   with everybody else.

21          MS. STEELE:  Well, your Honor, I think that this

22   is -- the Government's motivation partially for getting rid of

23   Mr. Rodriguez is that his brother was arrested and his brother

24   was innocent.

25          MR. LARA:  Your Honor, may I respond to that?

1          MS. STEELE:  I'm just saying, this is the same

2     person that indicated that his brother was arrested and was

3     innocent and would probably not have been exonerated except

4     for --

5          THE COURT:  Except for physical evidence.  Actually,

6     someone recanted, right?

7          MR. LARA:  Right.  Your Honor, I'm going to admit

8     something right now.  Honestly, when I was writing the notes

9     and preparing for this argument, I had forgotten that piece of

10    it, so truly the Government's role here is to exclude everyone

11    who said, yes, I need physical evidence to the CSI question

12    because we believe that's crucial to our case that they --

13         THE COURT:  Well, it's not just that.  I was making

14    the same notes at the same time because I don't have a case,

15    but it's like, wait, there are elements here that are not

16    capable of being fooled by tangible evidence, and for you to

17    tell us -- and I'm going to give you an instruction basically

18    saying, these guys -- oh, this is -- which one of them says

19    that I don't have much faith or belief in circumstantial

20    evidence?  But, anyway, I know I've got to give them an

21    instruction on what evidence is, and we're certainly going to

22    talk about a statement of a witness who was in a position to

23    know or -- and testify.  And they're basically saying, I'm not

24    going to consider that, that's not good enough, and then this

25    lady up here tells me that circumstantial evidence is not good

1    enough for her.  There are entire categories of evidence that

2    they are simply going to ignore.  And I'm thinking, well, no,

3    this isn't going to work.  You can't sit as a juror and just on

4    your own, despite instructions from the Court, just simply say,

5    I'm going to disregard entire categories of evidence.  And I

6    don't care how it comes out, but it's like we're just trying to

7    pick people who are going to be fair.  But these folks have

8    agendas.

9          MS. STEELE:  Your Honor, I feel like with respect to

10   Erick Neil Rodriguez, he says he needs some evidence to prove

11   the case.  "Testimony and more" is what he said.  What I

12   think -- and I know the Court doesn't know all the facts here,

13   but I think what people are saying -- I think what people are

14   saying is, you have someone that comes in and says, I was

15   forced to engage in sex work, and they're saying, is there

16   more?  Is there, like -- they actually had our clients' phone,

17   they evaluated it, are there threats on text messages?  One

18   person said, are there text messages?  Are there, you know,

19   videos, is there something else rather than somebody coming and

20   saying, I was forced?

21          MS. DIAZ:  Exactly.  And there is not.

22          MS. STEELE:  Which they should be able to consider.

23   They should be able to consider that there is not anything

24   other than people walking in and saying, I know you've looked

25   at her phone.  And one witness will say, you've looked at my

1  phone and you can't find her threatening me, but I was

2  threatened.

3          THE COURT:  And like Murphy says, the winner's 2, 3,

4  4.

5          MS. STEELE:  Right.  And they have that.  They have

6  that, one after another after another.

7          THE COURT:  They do.  Now, that's something that is

8  significant to him, but I don't know about anybody else, right?

9  Because he's the only one who's mentioned that.  You know?  One

10 person making a false claim is one thing.  You got two, three,

11 four making the same false claim?

12         MR. LARA:  Your Honor, may I be heard?  One other

13 thing I'd like to highlight is for this particular witness, to

14 Ms. Diaz's questioning he said there was no circumstance where

15 he would find an element based on witness testimony alone.  So

16 I mean, your Honor, it's hard to demonstrate much better than

17 that that this juror cannot possibly be fair to the Government

18 when witness testimony alone is the only thing that we can use

19 to prove a victim's state of mind.

20         THE COURT:  There's not -- he's basically saying

21 he's not going to follow the Court's instruction.

22         MR. LARA:  Correct, your Honor.

23         MS. STEELE:  I don't think that's accurate to say

24 witnesses' testimony alone.  I have had threat cases before --

25 I'm just saying I've had threat cases before, and to say in a

1  threats case, the only thing you will have is testimony, is not

2  true.  I had a case where my client allegedly threatened a

3  Federal judge.  There were letters.  It wasn't just testimony.

4  THE COURT:  That's not in this case.

5  MS. STEELE:  I know, but I'm telling you, in a

6  threats case, this is all you're going to have, no sometimes

7  you have letters, sometimes you have text messages, sometimes

8  you have voicemail messages.

9  THE COURT:  Yeah.  What are we going to have in this

10  case?  I don't know.

11  MS. STEELE:  You have a phone but none of that.

12  MR. LARA:  Your Honor, may I be heard?  So what Ms.

13  Steele and this juror is basically saying is, if you make all

14  of your threats in person verbally, then you're acquitted

15  because you don't have the physical evidence.

16  MS. STEELE:  That's not what I'm saying.

17  MR. LARA:  That's essentially what's being argued

18  here.

19  MS. STEELE:  I'm saying the jurors can consider the

20  lack of evidence, the fact that they have our client's phone

21  and there's no threats coming from it, the fact that they have

22  one of the witness' phones and there's no threats coming from

23  it.  And then the witness is coming in and saying, she

24  threatened me.  They're saying it would --

25  THE COURT:  It's not enough.  That's what some of

1   them are going to say, it's not enough.  Okay?  They need to

2   see those text messages.  That's not unreasonable.  Okay?

3          MS. STEELE:  Well, I think that they're saying, like

4   I said, that there's not -- there's insufficient indicia of

5   reliability if it's just one person coming in and saying

6   something as opposed to other things backing it up.  I don't

7   think that's unreasonable.

8          THE COURT:  No, the way you put that is not

9   unreasonable, but that isn't what we're getting from these

10   people.  They're basically saying, we're not going to consider

11   certain kinds of evidence, and that's problematic.

12          MS. STEELE:  I respectfully object.

13          THE COURT:  Okay.

14          MR. LARA:  I don't think --

15          MS. DIAZ:  I don't think we need more argument.

16          MS. CHRISTERNA:  We have some, too.

17          MR. LARA:  Your Honor, just so we're clear for the

18   record before we move on, this particular person is struck for

19   cause; is that right?  I just want to make sure for the record.

20          THE COURT:  They're all the same.  They all

21   articulated the same reasons.  The basically said they're not

22   going to consider certain categories of evidence.  That's the

23   problem.

24          All right.  Let's get here to a double homicide or

25   something, for crying outloud.

1          MS. CHRISTERNA:  Are you guys done?

2          MR. LARA:  Do we have any more?

3          THE COURT:  I'm no longer interested in this.  Okay.

4    You had something you wanted to talk about?

5          MS. CHRISTERNA:  We're going to move for cause --

6          MS. DIAZ:  Oh.  Can I have one second?

7          Your Honor, Number 7 in the box, 8 on the list,

8    Ms. Obannon, Madeline Obannon, she was the one that talked

9    about the criminal justice and the "13" documentary, and she

10   said that she might be distracted in court by thinking --

11         THE COURT:  I don't understand this distraction

12   thing.  She was asked about that, and I don't understand

13   distracted.  I don't see how --

14         MS. DIAZ:  Thinking about criminal justice issues.

15         THE COURT:  No.  I will think about that.  I'm the

16   one who's going to sentence them.  You're not going to sentence

17   them.  I'm getting ready to add some people to the damn

18   population.  They ain't going to think about shit.

19         MS. STEELE:  Your Honor, I did ask her about "13"

20   and whether or not she could put that aside and be fair and

21   impartial, and she said she could.  It was -- the answer was

22   unequivocal.

23         THE COURT:  That's what I thought.  I don't have a

24   problem with her.  She's not a weak-minded woman.  I do not

25   have a problem with her.  I think she would follow

1  instructions, I do.  But you all can bring her over here and

2  talk to her some more.

3          MS. DIAZ:  No.  That's okay.  Thank you.

4          THE COURT:  All right.

5          MS. CHRISTERNA:  All right.  So we have -- we're

6  going to move for cause for Number 2 in the box, and the reason

7  being that he said --

8          THE COURT:  Oh, about being a biased FBI?

9          MS. CHRISTERNA:  Well, that we addressed earlier,

10 but he also said that because they're immigrants of low

11 economic status that they had to be forced.  And also, he said

12 that there's -- if there's multiple witnesses, he's more likely

13 to believe that it's true.

14         MR. LARA:  Your Honor, may I be heard on both of

15 those points?  Unless you don't need argument.

16         THE COURT:  I really don't need anything on this one

17 because...

18         MS. CHRISTERNA:  He didn't believe that people can

19 be forced for being immigrants.

20         MS. DIAZ:  He didn't say that definitively.

21         THE COURT:  Wait.  Wait.  What I heard from a couple

22 of these people up there, in a place where it's legal and you

23 are not destitute, you're not under some financial compulsion

24 to just make any money any way you can, then the odds of people

25 being actually forced into doing, you know, prostitution when

1  there is no economic incentive to do it, you don't have to

2  worry about getting arrested, that's quite a leap, right?  It's

3  going to be hard to sell that.  But if you were questionable in

4  terms of your legal status in the country and you have no other

5  way to make a living and right now you're dependent, I guess,

6  probably dependent on this lady just even for housing --

7              MS. STEELE:  That's not correct.

8              THE COURT:  I don't know.  I don't know because I

9  know they came over here, right, and I don't know --

10             MS. STEELE:  They didn't come over -- they didn't

11 even meet her when they came over.

12             THE COURT:  Did they work with somebody else?

13             MS. STEELE:  Yeah, they were working in other

14 massage parlors.

15             MR. LARA:  Your Honor, that's -- first of all,

16 that's not accurate.

17             THE COURT:  Yeah, we can't talk about that.

18             MS. STEELE:  They're getting arrested in houses and

19 saying, oops, I was just here to be a swimsuit model and they

20 came here and arrested me twice.

21             MR. LARA:  Your Honor, this is both off topic and

22 not relevant to what we're here to talk about right now.  And

23 also inaccurate, but I'll leave that alone.

24             MS. CHRISTERNA:  I will move on to Mr. Justin

25 Torres.

1          MS. STEELE:  We need to finish him.

2          THE COURT:  He's finished.

3          MR. LARA:  So that means he's staying on?

4          THE COURT:  Yeah.

5          MR. LARA:  Thank you, your Honor.

6          THE COURT:  Everything he said was reasonable.

7          MS. STEELE:  We don't think so.

8          THE COURT:  Seriously?

9          MS. STEELE:  Oh, your Honor, everything he said from

10    the beginning of the FBI is more credible than --

11          MR. LARA:  Your Honor, can we move this along?  It's

12    4:50 already.

13          MS. STEELE:  Obviously, you can have yours heard,

14    but we can't have ours?  Is that what this is?

15          THE COURT:  Everybody's going to have theirs heard.

16          MS. CHRISTERNA:  So Justin Torres said he would not

17    be able to put aside --

18          COURTROOM DEPUTY:  15 on the list.

19          MS. CHRISTERNA:  Sorry.  He stated he would have a

20    hard time putting aside the fact that his family members are

21    immigrants and treated badly and it would be hard for him to be

22    fair based on that.

23          THE COURT:  He's a problem.  He is a problem.

24          MS. DIAZ:  He said he would try.

25          THE COURT:  I don't know if it's for cause, but he

1   can't stay on the jury, I don't believe.  Someone's got to make

2   him go away.

3          MS. CHRISTERNA:  I think there's enough there for

4   cause, your Honor.

5          MR. LARA:  Your Honor, may I be heard?

6          THE COURT:  Yep.

7          MR. LARA:  It's not incredibly surprising that

8   someone with undocumented parents would be sympathetic towards

9   victims who are undocumented.

10         THE COURT:  Absolutely.

11         MR. LARA:  However, if that person is excluded for

12   cause, then we're going to have a biased jury pool.  As Ms.

13   Steele noted earlier, individuals who are undocumented tend to

14   be of color, so we're going to taint the jury and create a jury

15   that is of, you know, kids of natural-born citizens rather than

16   kids of undocumented people simply because they have sympathy

17   for what their parents went through is not incredibly fair or

18   what this justice system is about.  And in reverse

19   circumstances, your Honor, I've heard the deputy public

20   defenders make this exact same argument.

21         MS. STEELE:  That's not what we argued.  We argued

22   if you're going to exclude people based on language issues,

23   you're going to exclude people of color.  This is someone who

24   specifically stated that, based on his experience, he could not

25   be fair because his parents had been forced to work long hours

**212**

1  and taken advantage of as immigrants.

2          THE COURT:  Doesn't that disqualify him?

3          MS. STEELE:  Yes.  We're asking for him to be

4  excused for cause.

5          THE COURT:  It works for me.

6          MS. STEELE:  Thank you, your Honor.

7          THE COURT:  Bye.

8          MS. CHRISTERNA:  Okay.  And we have one more.

9  Erica...

10          THE COURT:  Oh.  Is this the teacher?

11          MS. CHRISTERNA:  The one that stated that she...

12  Had a hard time being impartial because she studies sex

13  trafficking.

14          THE COURT:  This is, like, really -- it sounded

15  like -- sounded like an excuse of someone who's really wanting

16  to get off the jury.  Fine.  We'll accommodate her because we

17  can't go with that.  We can't just let that slide.

18          MS. CHRISTERNA:  What number is that Erica?

19          THE COURT:  Erica is...

20          COURTROOM DEPUTY:  49.

21          THE COURT:  Goodbye Erica.

22          We've got a lot of C's.  Are we done?  Are you

23  ready?

24          MR. LARA:  Your Honor, may I just -- can we excuse

25  our witness, our first witness that's going to be here?  It

1    sounds like we're not going to have --

2              THE COURT:  No, no, we're not going to take any

3    testimony today.  So thank you.  Sorry.  I suck at this.

4              MS. DIAZ:  Do we go back to our seats for

5    peremptories?

6              THE COURT:  Yeah.  Yeah.  What did you say?  Do we

7    go back to our seats for what?

8              MS. DIAZ:  Peremptories.

9              THE COURT:  Yes.  I thought you said 403.  I'm like,

10   what?

11             MS. DIAZ:  Yeah, I would like to raise that right

12   now.

13             (The following proceedings were held in open court.)

14             THE COURT:  Sorry.  I swear it was necessary.  I

15   also swear during the trial I will not permit those.  Okay.

16   Now, you know what?  I don't trust my sheet because I've got

17   C's all over the place.  Ms. English, for the record, do you

18   want to indicate who we're excusing for cause?  I could do

19   it --

20             COURTROOM DEPUTY:  No, I can do it.  That's fine.

21             THE COURT:  Okay.  Go ahead.

22             COURTROOM DEPUTY:  Okay.  So when I call your name,

23   it's five to 5:00, so I guess you'll have time to go to the

24   jury room.  If someone is there, then I guess you could check

25   out, but otherwise, remember to leave your plastic and take

1  your paper.  So let's see.  First name I have is Ana Delores

2  Romero.  Go down to the jury room.  Aliya Guzman, Carlos

3  Cardenas, Susan Murphy, Justin Guillen Torres, Nohemy Estrada,

4  Mario Peres.  Is he still here?  I think not.

5          MS. DIAZ:  That was earlier.

6          COURTROOM DEPUTY:  Yeah.  Okay.  Hannah Kwon, Oksana

7  Dutchak, Erick Neil Rodriguez, Erica Onugha.

8          Let me get my list.  Do you want me to start filling

9  the box?

10          THE COURT:  Wait, wait, wait, wait, wait.

11          COURTROOM DEPUTY:  When I call your name, step in

12  the jury box.  Susan Wood, take Seat Number 3.  Benjamin Platt,

13  Seat Number 4.  Jonathan Macias, Seat Number 5.  I'm sorry.

14  Raymond Jonathan Macias.  Yeah.  Miranda Dinardo, Seat Number

15  6.  You can just walk around this way.  Isabelle Newman, Seat

16  12.  Robyn Millen, Seat 13.

17          THE COURT:  All right.  At this time we'll begin

18  with the exercise of peremptory challenges, beginning with the

19  Government.

20          MS. DIAZ:  Your Honor?

21          THE COURT:  One challenge.  Yes?

22          MS. DIAZ:  The Government would ask the Court to

23  thank and excuse the juror in Seat 5, Mr. Macias.

24          THE COURT:  All right.  Mr. Macias, you are excused.

25  You can report downstairs to the jury assembly room now.  Thank

1  you.  And we have enjoyed spending the last three weeks with

2  you, sir.

3           All right.  The next peremptory is with the

4  defendant.

5           MS. CHRISTERNA:  Your Honor, we would thank and

6  excuse juror in Box Number 2.

7           THE COURT:  Mr. Ramamurthy, thank you, sir.  You are

8  excused.

9           COURTROOM DEPUTY:  Give me a moment, Judge.  So,

10 remember, you can just leave, but put your plastic down because

11 they're gone.  It's after 5:00.  Just to remind you.

12          MS. DIAZ:  Your Honor, the Government would ask the

13 Court to thank and excuse the juror in Seat Number 7,

14 Ms. Obannon.

15          PROSPECTIVE JUROR:  I thought I was 8.  Oh, okay.

16          COURTROOM DEPUTY:  Yeah, you're 7.

17          THE COURT:  Thank you, Ms. Obannon.

18          MS. CHRISTERNA:  Your Honor, can we have a quick

19 sidebar?

20          THE COURT:  Sure.

21          MS. CHRISTERNA:  Before the juror leaves, your

22 Honor?

23          THE COURT:  Before Ms. Obannon leaves?

24          MS. CHRISTERNA:  Yes, your Honor.

25          COURTROOM DEPUTY:  Just sit in that chair there, the

1  black chair.  Sit right there.

2          (The following proceedings were held at the bench,

3  outside the hearing of the jury.)

4          THE COURT:  We've got a Batson already?

5          MS. STEELE:  This is my favorite challenge.

6          THE COURT:  Okay.

7          MS. STEELE:  Your Honor, we'd like to make a Batson

8  challenge.

9          THE COURT:  Oh, my God, you're serious?

10         MS. STEELE:  Yes.

11         THE COURT:  It's a little early, isn't it?

12         MS. STEELE:  Well, your Honor, as we indicated

13 before, I can't remember the number of the juror, but Ms. Xing

14 is entitled to a cross-section of the community.  As we all

15 know, a lot of the jurors in Federal Court are generally

16 Caucasian, so I believe that -- I didn't count, but I believe

17 that the Government with the peremptories got rid of several

18 jurors -- yes, it was for cause, but it -- language issues that

19 were people of color, and now the first and one of the very few

20 African-American jurors the Government is excusing with their

21 peremptory.

22         THE COURT:  Well, there was -- I'll let them

23 articulate what their reasons are, but...

24         MS. DIAZ:  This is Damaris Diaz for the Government.

25 Has the Court found that the defense has made a prima facie

1  showing?

2          THE COURT:  You heard the part about her two nephews

3  and disparate treatment.

4          MS. STEELE:  Your Honor, you shouldn't give them the

5  answer.  I think the Court has to say that there was a prima

6  facie showing and then Government has to come back with a race

7  neutral issue.

8          THE COURT:  I'm really surprised at this stage that

9  we'd...  I'm trying to figure out the best way to do this.  Do

10  we have them stick around, all of them?  I'm worried about the

11  time of day.  It's like -- I don't think there's anyone

12  downstairs, so should we just put these people in the witness

13  rooms right outside of the court until we've finished with the

14  peremptory challenges so we can see what this thing looks like,

15  see whether or not there's a colorable claim?

16          MS. STEELE:  I don't understand the Court's

17  question.

18          THE COURT:  Okay.  This is their first --

19          MS. DIAZ:  This is our second peremptory.

20          THE COURT:  This is their second challenge.

21          MS. STEELE:  What was the first juror?

22          MS. DIAZ:  Mr. Macias.  I don't know if the defense

23  wants to make any assumption of his race, but he has a Latin

24  last name.  I will note there were additional African-Americans

25  in the pool and the defense struck them for cause and that both

1   parties have been striking jurors for -- and the Court has

2   found cause challenges.  This is the second peremptory, the

3   first African-American.  And, again, I would ask the Court to

4   make a determination of whether the defense has made a prima

5   facie showing.

6   　　　　MS. STEELE:  Also, your Honor, the Government -- I

7   don't think the test is whether or not the defense has stricken

8   a person of color.  That is not the test.  The test is whether

9   or not there's a pattern.  There was -- and as I indicated when

10  we were doing the peremptory challenges, I was concerned with

11  excusing jurors that have language difficulties because they

12  tend to be people of color.  I lost those challenges.  Now the

13  Government has stricken two jurors, both are people of color.

14  　　　　THE COURT:  I seriously...  I think it's way too

15  early in the process for us to be saying that you made a prima

16  facie case that the Government is striking jurors on the basis

17  of some sort of a racial preference or something, not yet.

18  They're on their second challenge.

19  　　　　MS. STEELE:  Second person of color of their two

20  challenges.

21  　　　　THE COURT:  I don't know if it's a person of color

22  or not.  I don't know.

23  　　　　MS. STEELE:  He was Latinx.

24  　　　　THE COURT:  Was he?

25  　　　　MS. STEELE:  Yes.

1        THE COURT:  I don't notice such things, but all

2   right.  I just don't see this.  I'm not saying that, you know,

3   that they're going to be completely color blind here, but not

4   yet.  And this is why I'm asking the question, do we have these

5   people stick around for a while or what?

6        MS. STEELE:  No, your Honor.  The Court can rule.

7   If the Court overrules our objection, we can go forward.

8        THE COURT:  I'm worried about what happens with the

9   second or third or fourth.  Now, if a pattern is set up, then

10  we have another discussion.  But I'm saying right now, no, I

11  don't see it now.

12       MS. STEELE:  Very well, your Honor.

13       MR. LARA:  Your Honor, may I make one point for the

14  record?  Everyone is assuming that this person is Latinx based

15  on his last name.  I have an Hispanic last name as well and I

16  am not Latinx.  It's possible that people with last names from

17  Spain are not Latinx.  So the Government does not know that

18  that first juror that was struck was Latinx.

19       THE COURT:  Would you look at yours and see how he

20  self describes?  Would you say what his ethnicity is self

21  described?  Macias?

22       COURTROOM DEPUTY:  On the -- yeah.  Oh, you want me

23  to look?

24       THE COURT:  Yes.

25       MR. LARA:  Your Honor, I believe what is important

1    is what the Government knew when they struck him, and we didn't

2    know.  We don't know.  As I know from my own personal

3    experience with my last name, that doesn't mean that anyone

4    with the last name coming from Spain is Latinx.

5              MS. STEELE:  But if there is a way to determine, I

6    think we should have the information.

7              THE COURT:  I think what he says is true, regardless

8    of what the facts -- or the true state of affairs are, it's

9    what he is perceived to be and what we thought he was.

10             MS. STEELE:  I thought he was Latinx.

11             THE COURT:  I did, too.

12             MR. LARA:  Your Honor, to be honest with you, I did

13   not because, again, with my own personal family background, I

14   know that just because someone has the last name Lara, for

15   example --

16             THE COURT:  Hispanic?

17             COURTROOM DEPUTY:  Yes.

18             MR. LARA:  Just because someone has the last name

19   Lara does not mean that they are of Latinx descent.  I will

20   also say, your Honor, that someone who is Hispanic is not

21   Latinx.  Those two things are different.  Hispanic means they

22   came from Spain or Portugal, or one of those countries.  Not

23   all those people are Latinx.  That's neither here nor there,

24   but my point, your Honor, is she's trying to establish a

25   pattern with one juror.

1          MS. STEELE:  Two.

2          MR. LARA:  And the first juror doesn't establish

3   that pattern because the Government did not affirmatively know

4   one way or the other.

5          MS. STEELE:  We know now.  The clerk -- for the

6   record, the clerk determined from his self description that

7   Mr. Macias considers himself to be Hispanic, so our argument

8   that there have been -- the Government has used two

9   peremptories after using their for cause strike on a person

10  that had language issues, they've now used their peremptories

11  on two jurors of color, and so we would make the Batson

12  challenge as to Ms. Obannon, I believe her name is.

13         THE COURT:  Well, I don't know, and it's not

14  apparent to me -- I don't recall if in my notes on what basis

15  the Government would wish to remove Mr. Macias from the jury.

16  Ms. Obannon, I think hers was pretty obvious.

17         MS. STEELE:  If I might state for the record that

18  she's African-American, Ms. Obannon.

19         THE COURT:  Yes, she -- she is indeed.

20         MS. DIAZ:  May we state for the record that the last

21  juror stricken for cause by the defense was African-American?

22         MS. STEELE:  If you would like to have a

23  race-neutral reason, we certainly would give it to you.  She

24  also --

25         MS. DIAZ:  I'm not arguing that I made a prima facie

1  showing --

2          THE COURT:  One at a time.

3          MS. STEELE:  She also talked about human

4  trafficking, so that's our race-neutral reason.

5          MS. DIAZ:  I'm not asking for a race-neutral reason,

6  because I'm not saying that it's a pattern.  I'm just simply

7  pointing out for the record that the striking of one

8  African-American juror has been done by both sides.

9          THE COURT:  Right.

10          MS. STEELE:  You didn't make a Batson challenge,

11  though.

12          MS. DIAZ:  And I wouldn't on these facts.

13          THE COURT:  Listen, there are legitimate reasons for

14  both, so race-neutral reasons for both, so let's get back to

15  work.

16          MS. STEELE:  Very well.

17          (The following proceedings were held in open court.)

18          THE COURT:  All right.  Where were we?

19          COURTROOM DEPUTY:  So I have three empty seats.

20  Should I fill them?

21          THE COURT:  Yeah.  Go ahead.  Go ahead.

22          COURTROOM DEPUTY:  Seat Number 2, Jeffrey Eisen.

23          MS. STEELE:  Your Honor, we have a question about

24  the order that the jurors are being placed in the box.  I

25  believe that the jurors in the back should be moving up.

1          COURTROOM DEPUTY:  No.  You guys had picked from

2  there to there.

3          MS. STEELE:  But then the jurors from the back are

4  always going to be open.

5          COURTROOM DEPUTY:  I tried to explain that, and you

6  guys agreed on taking from there.

7          MS. STEELE:  No, I didn't.

8          COURTROOM DEPUTY:  I gave you two -- yes, you did.

9  I gave you two scenarios.

10          MR. LARA:  Your Honor, may I be heard on this?

11          THE COURT:  It doesn't matter.  It just doesn't

12  matter.  It doesn't matter.

13          MS. STEELE:  It does, your Honor.

14          THE COURT:  How does it matter?

15          MS. STEELE:  Because the jurors in the back are

16  stuck in alternate positions while people are being --

17          THE COURT:  No, no, no.  There's no such thing as an

18  alternate position.  We'll talk about it later, but there is no

19  such thing as an alternate position.

20          MS. STEELE:  What happens at the end for the

21  alternates, though?

22          THE COURT:  Okay.  Pretend that I'm going to run

23  this pretty much the way I want to.  I want everyone paying

24  attention.  You understand that part?  Do I have to spell it

25  out any further than that?  I want everyone focused.  I don't

1   want anyone mailing it in because, well, I don't really count.

2   You understand that?  Okay.  We'll have no further discussion

3   about that.

4                What else?  Anything else?  All right.  If not --

5                COURTROOM DEPUTY:  Let me finish.

6                THE COURT:  Okay.

7                COURTROOM DEPUTY:  So Seat Number 5 is Daniel Moyer.

8   And if you'd just kind of come around.  Come around.  Come the

9   long way.  Yeah.  And Seat 7, Adam Matthews.

10                THE COURT:  Okay.  All right.  The defense's second

11   peremptory.

12                MS. STEELE:  Your Honor, the defense requests that

13   you thank and excuse Juror Number 15, Mariana Vasquez.

14                THE COURT:  Seat 15?

15                MS. STEELE:  Yes, your Honor.

16                THE COURT:  All right, ma'am.

17                COURTROOM DEPUTY:  Is that Mariana Vasquez?

18                THE COURT:  Thank you, Ms. Vasquez.  You can return

19   to the first floor.

20                And the defense's third peremptory?

21                MS. CHRISTERNA:  May we have a quick moment, your

22   Honor?

23                THE COURT:  Come here.

24                (The following proceedings were held at the bench,

25   outside the hearing of the jury.)

1          MS. CHRISTERNA:  I just meant so we could talk.

2          THE COURT:  You mean we took that long break for you

3   all to determine what peremptories you were going to exercise

4   and you managed to put together three?  That's it?

5          MS. STEELE:  Your Honor, I apologize, but can I

6   address the jurors that are -- and I guess I didn't understand

7   it.  I thought the jurors were going to be moving in from,

8   like -- from the back.

9          THE COURT:  What is -- what is your objective here?

10          MS. STEELE:  No.  There's jurors in the back that

11   are good jurors, but if the Court says 8, 9, 10, 11, 12, these

12   jurors here that are good jurors are going to become

13   alternates --

14          THE COURT:  Who said?

15          MS. STEELE:  I don't know.  Do you scramble them at

16   the end?

17          THE COURT:  You're going to get a piece of paper in

18   a little bit and it's going to have a 3, 6, and a 9 on it, and

19   that's who the alternates are going to be.

20          MS. STEELE:  Oh, so you're going to just pick

21   randomly?

22          THE COURT:  It's done.  It's done.  And I don't

23   advertise -- I don't want these people --

24          MS. STEELE:  Okay.  Okay.  I just was worried that

25   the ones -- weren't moving in.  Like some Courts, they all move

1  up and you get some more from the gallery, so I just wanted to

2  make sure.

3          THE COURT:  Would you please concentrate on what you

4  have to do?

5          MS. STEELE:  I'm concentrating.  It's strategic.

6          THE COURT:  You've done three.  That's it.  All this

7  time, and you've done three and we've got two of you?  Would

8  one of you concentrate on this?  Thank you.  Come on.  I want

9  to get out of here.  They want to get out of here.

10          MS. STEELE:  Very well, your Honor.

11          THE COURT:  This is like we've never done it before.

12          (The following proceedings were held in open court.)

13          COURTROOM DEPUTY:  Can you let her know that it's

14  still their choice?

15          THE COURT:  Yes.  They're working on it.

16          MS. CHRISTERNA:  Your Honor, we would ask the Court

17  to thank and excuse the juror in Box Number 1.

18          THE COURT:  All right.  Ms. Dubbs, thank you, ma'am.

19  You can return to the first floor jury assembly room.  Thank

20  you for your willingness to serve.

21          The next peremptory is with the Government.

22          MS. DIAZ:  Your Honor, the Government would ask the

23  Court to thank and excuse the juror in Box 8.

24          THE COURT:  All right.

25          MS. DIAZ:  Mr. --

1           COURTROOM DEPUTY:  Cotugno.

2           THE COURT:  The law student.  Good luck to you,

3   young man.

4           All right.  Defense's fourth.

5           MS. CHRISTERNA:  Your Honor, we would thank and

6   excuse juror in Box Number 8.

7           MS. STEELE:  9.

8           MS. CHRISTERNA:  I'm sorry, 9.

9           COURTROOM DEPUTY:  He's gone.  Which one?

10          MS. CHRISTERNA:  In Number 9.

11          THE COURT:  Norma Denise Umekubo?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Thank you, ma'am.

14          PROSPECTIVE JUROR:  Thank you very much.

15          THE COURT:  Okay.  We have four open seats now.

16          COURTROOM DEPUTY:  Do you want me to fill the box

17   first?

18          MS. CHRISTERNA:  I'm sorry?  Oh, yeah.  Please.

19          COURTROOM DEPUTY:  Seat 1 is Scott Robert Brooks.

20   And Seat 8, Joshua Soto.  Seat 9 is Trisha Kozlowski.

21          PROSPECTIVE JUROR:  Excuse me.  Would this be --

22          COURTROOM DEPUTY:  Yes, right there.  And then the

23   last seat up top is, oh, boy, Vir Vergel.  Yeah.  Come around.

24   Yeah, that way.

25          THE COURT:  All right.  Defense's fifth?

1        MS. CHRISTERNA:  Your Honor, we would ask the Court

2  to thank and excuse juror in Box Number 15.

3        COURTROOM DEPUTY:  15.  She just came.  Ms. Vergel?

4        MS. CHRISTERNA:  Yes.

5        THE COURT:  Thank you, ma'am.

6        PROSPECTIVE JUROR:  Thank you.

7        THE COURT:  Government's fourth.

8        MS. DIAZ:  Your Honor, the Government would ask the

9  Court to thank and excuse the juror in Box 8.

10        COURTROOM DEPUTY:  Mr. Soto.

11        THE COURT:  Thank you, Mr. Soto.

12        PROSPECTIVE JUROR:  Thank you, your Honor.

13        THE COURT:  Defense's sixth.

14        MS. CHRISTERNA:  Would it be possible to fill the

15  boxes?

16        COURTROOM DEPUTY:  I need another seat.  I do it at

17  three.

18        MS. CHRISTERNA:  Oh, okay.  Your Honor, we would ask

19  the Court to thank and excuse juror in Box Number 13, Robyn

20  Miller.

21        MS. DIAZ:  Your Honor, can we approach a sidebar?

22        THE COURT:  Sure.

23        (The following proceedings were held at the bench,

24  outside the hearing of the jury.)

25        MS. DIAZ:  This is Damaris Diaz for the Government.

The Government would like to make a Batson challenge.  This is now the fifth woman in a row that defense has stricken from the jury.  Would the Court like me to list their names?  We had Number 19, Ms. Mariana Vasquez; Number 1, Ms. Elizabeth Dubbs; Number 12, Ms. Norma Umekubo; Number 39, Ms. Vir Vergel De Dios; and Number 30, Robyn Miller.

THE COURT:  I think that's going to happen.  I'm just going to make the observation that 60 percent of the folks here are women, 39 percent men, so it isn't surprising that this is going to happen.  Now, we may be reaching the tipping point because -- well, I can understand the strategy, if that is, in fact, a strategy.

MS. STEELE:  It is not, your Honor.  If the Court would like me to explain why we kicked -- why we --

THE COURT:  In a moment.  You know, not now.  Not now, but 60 versus 39 isn't so lopsided that I would expect to see it happen a couple more times.  But it does give me pause that the defendant is a lady and there is a school of thought that ladies aren't terribly sympathetic to other ladies and that you may be making a conscious effort to get rid of the ladies on the jury.  I'm not saying that that's what's happened, but I'm saying that I'm not surprised that the Government has made this observation.  But let's see how it plays out.  You may be starting all over.

(The following proceedings were held in open court.)

1          THE COURT:  All right.  Where are we?  You going to
2     flip those or not, yes or no?  I don't care.
3          COURTROOM DEPUTY:  Well, do you want Ms. Millen
4     gone?  Okay, Ms. Millen, you're excused.
5          PROSPECTIVE JUROR:  Thank you.
6          THE COURT:  Okay.  Be prepared to do your sixth.  Go
7     ahead.
8          MS. CHRISTERNA:  Your Honor, we would ask the Court
9     to thank and excuse the juror in Box Number 2, Jeffrey...
10          THE COURT:  Eisen?
11          MS. CHRISTERNA:  Eisen.
12          THE COURT:  Thank you, sir.
13          COURTROOM DEPUTY:  Should I fill?
14          THE COURT:  Go ahead, yeah.
15          COURTROOM DEPUTY:  Seat Number 2 is Kathy Tichenor.
16     Number 8, Emily Gardner, Seat 8.  Byron Marin, Seat 13.  And
17     Seat 15, Maxwell Tufeld.
18          THE COURT:  All right.  Government's fifth.
19          MS. DIAZ:  Your Honor, the Government would ask the
20     Court to thank and excuse the juror in Seat Number 15,
21     Mr. Maxwell.
22          THE COURT:  Thank you, sir.
23          All right.  The defendant's eighth?
24          MS. CHRISTERNA:  Your Honor, we would ask the Court
25     to thank and excuse Juror Number 2, Kathy Tichenor.

1          THE COURT:  All right.  We may be reaching the

2  point.

3          MS. DIAZ:  Your Honor, Government --

4          THE COURT:  We may be reaching that point.  The

5  Government may have a point.

6          COURTROOM DEPUTY:  Does she leave or --

7          THE COURT:  Stick around.

8          COURTROOM DEPUTY:  Just sit right there for a

9  minute.

10          (The following proceedings were held at the bench,

11  outside the hearing of the jury.)

12          THE COURT:  We have reached a point now where the

13  men outweigh or outnumber the women up here, and that -- we

14  continue to see you bouncing women.  I'm thinking it's not

15  just -- because there's nothing special about this lady, other

16  than the fact that, what, she's got some friends that are in

17  the PD's office, right?

18          MS. STEELE:  Your Honor, the last juror we struck

19  before her was male.

20          THE COURT:  Yes, I know.  Right.  And only because a

21  whole big deal had been made about it, and I fully expected

22  that the next one was going to be a male.  You people aren't

23  silly enough to just -- we have a discussion about you

24  systematically striking women and then we have a big discussion

25  about it and you strike another woman?  You're not going to do

1  that.  So you did insert one man in there and then you are back

2  to the same pattern.

3          MS. STEELE:  Would you like to have a gender --

4          THE COURT:  I would like for you to give me a reason

5  for why you seem to be striking so many women out.

6          MS. STEELE:  Ms. Tichenor lives in Montrose.  It's a

7  very, very conservative area.  She also has friends or family

8  in the LAPD and the L.A. County Sheriff's Office.

9          THE COURT:  And the PD's office.

10          MS. STEELE:  And the PD's office.  So we felt the

11  Los Angeles Public -- sorry -- Los Angeles Police Department

12  and the Los Angeles County Sheriff's Department, and the fact

13  that she lives in a very, very conservative community was

14  grounds for us not to want her to be a juror in this case.

15          THE COURT:  She's also got friends in the Public

16  Defender's office.

17          MS. STEELE:  Your Honor, she -- the first thing she

18  said was LA County Public -- I'm sorry -- LA County Police

19  Department, LA County Sheriff's Department, and then kind of as

20  an aside she said "and some public defenders."  It seemed like

21  more of an aside.  But the ones that she answered first were

22  the police officers.

23          THE COURT:  That's your rationale, that she couldn't

24  blurt them out all at once?

25          MS. STEELE:  No, no, no.  My rationale is there's a

1  lot of things that we took into consideration.  She also has

2  been on a civil and criminal jury before.  That's not someone

3  that we want on this case.

4         THE COURT:  Someone with prior jury experience?

5         MS. STEELE:  Well, your Honor, we have our own

6  strategies, and that's something that --

7         THE COURT:  I'm just trying to clarify what it is.

8  Those are the reasons that you struck her, because she's got

9  prior jury experience?

10        MS. STEELE:  That came to a verdict.  The jury came

11 to a verdict.  Generally when there's a verdict in a criminal

12 case, it's guilty.

13        MS. DIAZ:  She said no verdict.

14        MS. STEELE:  I thought she said verdict.

15        MS. DIAZ:  May I respond?

16        THE COURT:  Uh-huh-huh.

17        MS. DIAZ:  Your Honor, this is the sixth juror that

18 the defense has stricken that is a female.  The defense did not

19 question any of these jurors when given the opportunity to do

20 so.  The defense could have asked her about her conservative

21 neighborhood, could have asked her about her law enforcement

22 friends, could have asked her about her prior jury experience,

23 and did not choose to do so.  In fact, none of the jurors that

24 the defense has struck that are women, the six women the

25 defense has struck, they didn't inquire.

1          MS. STEELE:  I don't think you should speak so

2     loudly.

3          MS. DIAZ:  Okay, I'm sorry.  They didn't inquire of

4     any of them.  There are multiple other potential jurors who had

5     jury experience.  The defense didn't seem to care about those

6     at any other time.  There are multiple other people with law

7     enforcement friends and family that the defense did not care

8     about any of those other jurors, and it is clear that at this

9     point they are just striking women from the jury because they

10    are women.

11         MS. STEELE:  Your Honor, if I may respond?

12         THE COURT:  Sure, please.

13         MS. STEELE:  Juror in Seat Number 1, Joshua Soto,

14    has no jury experience.  The juror in Seat Number 8, Benjamin

15    Platte, has no jury experience.  The juror in Seat Number 8,

16    Emily Gardner, has no jury experience.  The juror in Seat

17    Number -- let's see -- 8, 9, 10, 11, I believe 12 has no jury

18    experience.

19         MS. DIAZ:  I think you like jurors with no jury

20    experience.

21         MS. STEELE:  I don't have to explain it.  What I'm

22    saying is that one of our strategies is that sometimes when

23    someone has jury experience in a criminal case and there's a

24    verdict, then it's usually a guilty verdict.

25         MS. DIAZ:  I thought she said there was no verdict,

1  but --

2        MR. LARA:  Your Honor, for the record, I also wrote

3  down that she had no verdict, so it's actually quite the

4  opposite argument, but she actually didn't reach a verdict in

5  this case.

6        MS. STEELE:  If I may have a moment.  I think she

7  said that she had jury experience in a civil and criminal case,

8  and I thought she said she had reached a verdict.  Maybe she

9  didn't in one of them, but I have civil and criminal.

10       MR. LARA:  This is Scott again.  I believe what I

11  remember was she did reach a verdict on the civil case but not

12  on the criminal case, and what Ms. Steele's argument is is

13  because she reached a verdict on a criminal case, they want to

14  kick her off, so that's actually factually wrong.

15       MS. STEELE:  Your Honor, there are several reasons

16  that we are moving to exclude this juror.  One is that she's

17  been on a jury before.  Two is that she indicated that she has,

18  I believe, friends or family members at the LAPD and the LA

19  County Sheriff's Department.  Also, your Honor --

20       THE COURT:  As well as the Public Defender's Office.

21       MS. STEELE:  That's correct.

22       THE COURT:  What you are -- I don't understand what

23  you're trying to draw.  What is the take-home from all of that?

24       MS. STEELE:  Well, your Honor, a person is either

25  going to be male or female, so we can't just only exclude males

because the Government has said that there's a pattern.  We

have to look at everything about the juror, and we are not

including gender.  We're looking at their -- the neighborhood

that they live in, whether or not they've been on a jury

before, whether or not they came up with -- come up with

verdicts in prior cases, who their friends are.  When you look

at all these things from this individual, whether she's male or

female, this is someone who has friends on the Los Angeles

County Police Department and the Sheriff's Department and, as

the Court noted, the Public Defender, but that's not the first

person -- that's not the first group that she mentioned, that

was the third, which was more like an afterthought.  If you

were asking me where my friends were, I would definitely start

with the Public Defender, but that's just me.  But what I'm

saying is, when you take all that into consideration and the

fact that we have either males or females, you can't say it's a

pattern when the last one we excluded, we asked the Court to

exclude, was male.

THE COURT:  Uh-huh.  And I explained that.  After

you -- after you've actually been chastised for it, I did not

expect you to come right back and excuse another woman.

MS. STEELE:  Well, your Honor, we can only excuse a

man or a woman.  There's only two choices.

THE COURT:  There used to be only two choices, I'll

grant you that.

1          MS. DIAZ:  Your Honor, the Government would argue

2     that the reasons given by the defense are pretext.  They did

3     not question any of these jurors regarding any of these women

4     regarding the things that they are now claiming to be reasons

5     for cause, and I will note that the Court specifically asked,

6     "Do you have any friends or family in law enforcement?"  It

7     does not ask whether you know anybody in the Federal Public

8     Defender's.  So of course they're going to list law enforcement

9     first because that's the question that they were specifically

10    asked.

11         MS. STEELE:  You keep saying Federal Public

12    Defender.  I don't think she said Federal Public Defender.  I

13    think she said Public Defender.

14         THE COURT:  She said Public Defender, but still.

15    What's the relief you guys are seeking?

16         MS. DIAZ:  We'd like her to stay on the jury.

17         THE COURT:  Okay.  All right.

18         MS. STEELE:  We would object, your Honor.

19         THE COURT:  Okay.  Where did she go?  Oh, there she

20    is.

21         COURTROOM DEPUTY:  Oh, I had her sitting out here.

22         THE COURT:  Bring her back.

23         MS. STEELE:  And, your Honor, there is no

24    requirement that we -- your Honor, there's no requirement that

25    we ask individual jurors questions when the Court does the --

1   primarily does the questioning.  And I see ask questions -- I

2   did ask questions of all of the jurors to find out what their

3   responses were, and the fact that these jurors did not address

4   it does not mean that somehow we didn't make any determination

5   from their answers or lack of answers.

6            THE COURT:  Listen.  All I'm saying is your

7   gender-neutral explanation for why you were bouncing these

8   people lacks substance, it really does.  It sounds like a

9   pretext.  But we'll see.  Okay?

10           MS. STEELE:  Have you been to Montrose?

11           THE COURT:  I worked in Montrose.

12           MS. STEELE:  Okay.  So you know what I mean.  It's a

13  very conservative city.  It's like Mayberry.

14           THE COURT:  People might say that I grew up in a

15  couple conservative cities, too, but it doesn't make me

16  conservative.

17           MS. STEELE:  No.  I live very close to there.

18  That's how I how.

19           THE COURT:  The only thing is, it's like you're

20  making generalizations that are just baseless.

21           MS. STEELE:  No, it's not baseless.  I interact with

22  those people on a regular basis.

23           THE COURT:  Okay.  I find it weak.  I find it

24  specious.  But, you know, let's see what you do now.

25           (The following proceedings were held in open court.)

1          THE COURT:  All right, defense, take another stab at

2     it.

3          MS. CHRISTERNA:  Your Honor, we would ask the Court

4     to thank and excuse juror in Box Number 5, Daniel Moyer, I

5     think it is.

6          THE COURT:  Sir, you are excused.  Thank you.

7          PROSPECTIVE JUROR:  Thank you, your Honor.

8          THE COURT:  You've got one more.

9          MS. CHRISTERNA:  Your Honor, we would accept the

10    jury impaneled -- or as seated.

11         THE COURT:  Presently constituted?  Okay.  Thanks.

12         MS. CHRISTERNA:  Subject to our last objection, your

13    Honor.

14         THE COURT:  Yeah.  The Government's sixth?

15         MS. DIAZ:  Your Honor, the Government would ask the

16    Court to excuse the juror in Box 7, Mr. Adam Matthews.

17         THE COURT:  Thank you, sir.  You're excused.  Take

18    me with you.

19         All right.  The defense still has a challenge.

20         MS. STEELE:  Well, your Honor, doesn't the clerk

21    usually fill them in when there's three so that we can see

22    exactly --

23         THE COURT:  I appreciate you doing my job, but I

24    want you to decide which juror you would like to excuse or

25    pass.  However, it would make it easier, wouldn't it?

1          COURTROOM DEPUTY:  Yes.  So Seat Number 5, Leyla
2    Nicole Huite.  Linus Lou, Seat 7.  Penelope Garcia, Seat 13.
3          MS. STEELE:  Your Honor, we'd ask the Court to thank
4    and excuse the juror in the 15th position, Penelope Garcia.
5          THE COURT:  Which position?
6          COURTROOM DEPUTY:  Penelope Garcia.
7          THE COURT:  Penelope Garcia?  Thank you, ma'am.
8          You also have one remaining.
9          MS. STEELE:  Your Honor, we'd ask that the Court
10   thank and excuse the juror in the Number 14 spot, Louise Loza.
11         THE COURT:  Thank you, ma'am.
12         PROSPECTIVE JUROR:  Thank you.
13         THE COURT:  Okay.  Everybody gets an additional.
14         MS. DIAZ:  The Government would accept the jurors in
15   the box.
16         THE COURT:  Okay.
17         MS. STEELE:  Your Honor, we'd accept the jury as
18   constituted.
19         THE COURT:  Okay.  I want to make sure you all
20   understand, that includes --
21         MS. STEELE:  Yes.
22         THE COURT:  -- all of them.  You understand?
23         MS. STEELE:  Yes, your Honor.
24         THE COURT:  Do you understand it's all of them?
25         MS. DIAZ:  Does that mean we're not filling in the

1  seats?

2           THE COURT:  I don't believe we have -- wait a

3  minute.

4           COURTROOM DEPUTY:  Yes.  We still need one more.

5           THE COURT:  We need one more.  Who wants to be on

6  our jury?  Come on down.  We need one more person.

7           COURTROOM DEPUTY:  Diane Radcliff.  Ms. Radcliff,

8  you're going to take Seat...

9           THE COURT:  14?

10          COURTROOM DEPUTY:  14, yeah.  Okay.  That's it.

11          THE COURT:  Well, things have changed.  Okay.

12  Defense?  There's been a change, so you still have a challenge.

13          MS. CHRISTERNA:  Your Honor, the defense accepts the

14  jury as constituted.

15          THE COURT:  Thank you.

16          MS. DIAZ:  Same, your Honor.

17          THE COURT:  Same?

18          MS. DIAZ:  Yes.

19          THE COURT:  All right.  We're fine.  Okay.  We're

20  perfect.

21          COURTROOM DEPUTY:  Okay.  The rest of you in the

22  gallery, you may go home.  Thank you for this long day.

23  Remember to put the plastic on the jury's desk, and you can

24  just go home.

25          (Jury sworn.)

1              (Jury out.)

2              THE COURT:  All right.  3, 6, and 9.  We're not

3    going to tell them.  They won't know until the jury goes out to

4    deliberate, then we'll give the bad news to 3, 6, and 9.

5              Are you going to ask them now -- 8:00.  Are you just

6    going to tell them?

7              COURTROOM DEPUTY:  Correct, uh-huh.  Because we lost

8    a whole day.

9              THE COURT:  I agree.  8:00.  The building will be

10   open at 7.

11             MS. DIAZ:  Your Honor?  I would note for the record

12   that 3, 6, and 9 are all women.

13             THE COURT:  I know.  It's just the way it is.  That

14   isn't their fault.  I made that designation as soon as we got

15   started this afternoon.  They had nothing to do with that.

16   That's the luck of the draw.

17             Anyway, come tomorrow prepared to go to war for the

18   entire day.  Okay?  Remember to bring something to nourish

19   yourself because we will break for the reporter, and midday we

20   will take a longish break, but it won't be an hour and a half.

21   And we're going to go as hard as we can go.  Okay?  We are

22   going to go till we drop.  We'll come back tomorrow and do the

23   opening statements and put the first witness on, and off we go.

24             Yes, ma'am?

25             MS. STEELE:  Your Honor, I just wanted to renew our

1  objection.  The jurors, just for the record, were all the way

2  to the right and they could see Ms. Xing's shackles.

3          THE COURT:  I'm sure you arranged that.

4          MS. STEELE:  I didn't arrange it, your Honor.  I

5  asked that they be taken off.

6          THE COURT:  The answer is no.  No, no, no, no, no.

7  It's still no, and it will be no tomorrow.

8          MS. STEELE:  I know, your Honor, but what I'm

9  concerned with -- and I'm just making this for the record.  I

10  understand --

11          THE COURT:  I don't think you're concerned at all.

12  Otherwise, you'd tell her, you know, and don't rattle the

13  chains or whatever else you think it is that she's doing.

14          MS. STEELE:  I didn't say that she's rattled the

15  chains.  I said that the way the court is configured and when

16  jurors were placed all the way to the right from the bench,

17  from your Honor's perspective, when they were placed all the

18  way to the right, they -- they were able -- there was a direct

19  line of sight to her shackles, which is why I asked that they

20  be taken off from the beginning.  So I'm renewing my objection.

21  I don't know what the remedy would be because we have jurors

22  that have seen her shackles.  I mean, maybe it's a mistrial.

23  Maybe I have to move for a mistrial.

24          THE COURT:  That's fine with me.

25          MS. STEELE:  I'm moving for a mistrial, and I'd ask

1  the Court at least tomorrow to take the shackles off so we

2  don't have the same problem.

3          THE COURT:  No, we're not taking the shackles off.

4          MS. STEELE:  Very well, your Honor.

5          THE COURT:  But I'd be more than happy to grant your

6  mistrial, more than happy.  All right.  If there's nothing

7  else, good night.

8          MS. CHRISTERNA:  8:00 a.m. to...

9          THE COURT:  To when we drop.

10         MS. CHRISTERNA:  5:00?  Is 5:30 --

11         THE COURT:  At least.

12         MS. CHRISTERNA:  Sorry.  For child care purposes.

13         MR. LARA:  I'm sorry, your Honor.  What was that?

14         MS. CHRISTERNA:  8 a.m., and I asked when we'd stop

15 for child care purposes, and he said until we --

16         MS. STEELE:  Could we also ask if the Government

17 give us their order of witnesses, just because we have a lot of

18 notebooks for each witness, so we want to make sure we have

19 everything.

20         THE COURT:  Yes.  Yes.  Yes.

21         MR. LARA:  The order?  So we're definitely calling

22 Detective Nick Stewart first and then -- and expert Detective

23 Fries, then likely Hong Yang, though it could shift between

24 her and Agent Stanley Patrzalek, depending on what time of day

25 we're starting.  We're not sure which is going Number 3 and

1  which is going Number 4.  And after that, do you have the --

2          THE COURT:  We don't need to be on the record for

3  this.  This is a courtesy thing, letting the other side know

4  what the witnesses are.  Go home.

5          (Proceedings concluded at 6:02 p.m.)

6              CERTIFICATE OF OFFICIAL REPORTER

7

8  COUNTY OF LOS ANGELES   )
                           )
9  STATE OF CALIFORNIA     )

10

11          I, JUDY K. MOORE, FEDERAL OFFICIAL REALTIME COURT

12  REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

13  CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

14  TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

15  IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

16  REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

17  THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

18  REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

19

20

21          DATED THIS 3RD DAY OF MAY, 2022.

22

23

24                  /s/Judy K. Moore
    _____
25          JUDY K. MOORE, CRR, RMR
        FEDERAL OFFICIAL COURT REPORTER